Case: 23-10384   Doc# 41   Filed: 08/22/23   Entered: 08/22/23 18:14:37   Page 1 of 34

**REBEKAH PARKER SBN 143674**
4225-H Oceanside Boulevard #369
Oceanside CA, 92056-3472
Telephone No. (213) 268-2918
Email: AttorneyRParker@Gmail.Com

Attorney for Committee of Essential Creditors & Post-
Petition Providers

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SANTA ROSA DIVISION

|  |  |
|---|---|
| In re<br>KELHAM VINEYARD & WINERY, LLC.<br>　　　　　　　　　　　Debtor. | **Case No. 23-10384**<br><br>Chapter 11 |

**DECLARATION OF HAMILTON NICHOLSEN RESPONDING TO FALSE ACCUSATIONS OF ALLEGED PREPETITION BAD ACTS FILED IN SUPPORT OF OPPOSITION TO MOTION TO APPOINT CHAPTER 11 TRUSTEE**

DATE:  September 5, 2023
TIME:  9:30 A.M.
ROOM: Courtroom 220

　　　United States Bankruptcy Court
　　　1300 Clay Street
　　　Oakland, CA 94612

1

**Declaration of Hamilton Nicholsen**
**Responding to False Accusations of Alleged Prepetition Bad Acts Filed in Support of**
**Opposition to Motion to Appoint Chapter 11 Trustee**

I, Hamilton Nicholsen, declare,

1.  I am the Authorized Agent for the newly formed Committee of Essential Creditors and Post-Petition Providers (herein, the "Committee").

2.  I am a Member of the Debtor, Kelham Vineyard & Winery ("KVW"), along with my mother Susanna Kelham and my older brother Ronald Nicholsen ("Ron").

3.  I also serve as both the winemaker and curator of the KVW Wine Library.

4.  In these capacities, I have personal knowledge of the following facts and herein attest to their veracity under penalty of perjury.

5.  With that said, at the outset I would like to apologize to the Court for feeling compelled to address the various factual allegations made in the Motion to Appoint Trustee (herein "Motion"); I have been told these allegations are probably legally irrelevant; however, in an abundance of caution, I have instructed the attorney to draft this declaration in an effort to explain why each of these has no merit.

6.  The Motion alleges that "As a result of that state court action, Kelham Vineyards was forced to provide Ronald Nicholsen its company's books and records in December 2022. Those records tell a tale of gross mismanagement of Kelham Vineyards and egregious breaches of fiduciary duty against the estate and in favor of related entities under Susanna Kelham's common ownership." For the record, this assertion is categorically false, as will be shown below, the Motion presents no evidence of "gross mismanagement" or "breaches of fiduciary duty" .

2

7. In a misguided effort to allege supporting facts for this false accusation, the Motion asserts that, "For example, despite representing in applications for insurance in 2021 that its inventory of wine is worth $100 million, Kelham Vineyards obtained a "valuation" for the purpose of buying Ronald Nicholsen's interest in the company, which claimed his 33.3% interest in the company was only worth $499,000." For the record, KVW's wine inventory was quoted for insurance (over insured as is the custom and practice) based on the wine inventory's listed price book value, which does not reflect the wine's fair market value. With that said, implying that KVW's wine inventory is worth over $100 million dollars is a non-starter. Again, for the record, it is true that KVW retained a business appraiser, Barber & Associates, to value Ron's interest, said interest was valued at $499,000. Having said that, in what universe does a company's retention of a reputable appraiser constitute a breach of fiduciary duty or an act gross mismanagement. If Ron Nicholsen and his attorney found the business appraisal of Barber & Associates so objectionable or ill-reasoned, perhaps Ron Nicholsen and his Attorney should have commissioned their own appraiser. I would posture that the Barber & Associates appraisal is probably accurate due to the fact that there is a limited to nonexistent market for Ron's Minority Interest in KVW because KVW does not own the land on which the winery operates, because KVW does not own the land that grows the grapes from which most of the KVW wines are made, and because KVW's goodwill is personal to Susanna Kelham, who has a special bond with KVW's customer base. I would further point out that the Barber & Associates appraisal was an appraisal of Ron's "minority interest"; it was not an appraisal of the value of KVW's assets in a liquidation. With that said, it is not unusual for businesses to have more value in the liquidation of their assets than in a sale of equity shares (i.e., the premise of a common corporate raider strategy

3

1  known as "asset stripping").  To this end, I believe that the liquidation of KVW's assets in this

2  bankruptcy proceeding will maximize the value of Ron's interest in KVW.

3      8.   As noted in my previous Declaration filed in response to the still pending Motion for

4  Relief from the Automatic Stay, my brother Ron has for some time now circulated a false

5  narrative that he is the founder of Kelham Vineyard & Winery ("KVW"),   Ron's narrative takes

6  various forms at different points in time, and he has been circulating these lies for so long that he

7  has a hard time keeping his story straight.  By way of illustration, in his Motion for Relief from

8  Stay, he represented to the Court that, *"Ronald Nicholsen founded Kelham Vineyards in 1999 at*

9  *360 Zinfandel Lane, St Helena"*; but days later, in this Motion to Appoint a Chapter 11 Trustee the

10  story changes, he now represents to the Court that in *"1997, Ronald Nicholsen established*

11  *Kelham Maclean Winery at 360 Zinfandel Lane."*  Declarations of Ronald Nicholsen ("Decl. R.

12  Nicholsen").  For the record, this bankruptcy case is neither captioned "Kelham Vineyards" nor

13  "Kelham McClean Winery"; moreover, the entity in this bankruptcy, as reflected in its

14  incorporation documents on file with the Secretary of State was founded in the year 2000, not

15  1997 or 1999, as suggested by the various versions of my brother's false narratives.

16      9.   The Motion alleges that "From its inception until 2021, Ronald Nicholsen was its

17  winemaker, vineyard manager, tasting and tour guide, operations manager, and host of winemaker

18  dinners all over the United States. R. Nicholsen Declaration, ¶ 6.  For the record, my brother Ron

19  has no training and little experience working as a winemaker, vineyard manger, or operations

20  manager, while my mother and I (in retrospect against our better judgment) allowed him to use

21  these titles to impress winery visitors and patrons at winemaker dinners, the truth is that Ron's

22  only real function at the winery were limited to the duties of a "tasting and tour guide"; and yes,

23  KVW spent an obscene amount of money, with little by way of entomic return, allowing Ron to

24

4

travel all over the United States hosting winemaker dinners. I would note that, since his departure from KVW, there is no indication that anyone has been willing to hire Ron as a winemaker, vineyard manger, or operations manager; and, I would further note that his declaration testimony that he has been working in a "tasting room" is consistent with his limited experience and contribution at KVW.

10.   The Motion alleges that "On May 24, 2021, Susanna Kelham abruptly pushed Ronald Nicholsen out of the company he started and banned him from the property at 360 Zinfandel Lane even though he is a partial owner of that real property. Nicholsen, ¶ 13, Ex. 1." To be clear Susanna Kelham did not "abruptly push Ronald Nicholsen out the company". The letter which Ron unwittingly attaches to his declaration as Exhibit 1 details in part, although certainly not completely, some of the reasons that lead to Ron's termination as a quasi-employee at KVW. To be clear, Exhibit 1 does not "ban" Ron from the property; it merely revokes his winemaking privileges because he was using KVW staff and equipment to produce wine, on his own account, for competitors.  For the record, against my mother's express instructions (and my mother had the legal and contractual right to issues those instructions), Ron persisted in his efforts to gain assess and control of KVW assets for his own personal benefit.  Attached hereto as Exhibit A is a Letter dated September 9, 2021, from Susanna Kelham to Ron, a follow-up to Ron's Exhibit 1, that details how matters eventually came to a head.

11. The Motion alleges that "Since May 24, 2021, Hamilton Nicholsen and Susanna Kelham have had exclusive control of Kelham Vineyards and its operations – over Ronald Nicholsen's objections." To be clear, while Susanna Kelham may have exclusive control of KVW as its Member Manager, I work at KVW at her sole pleasure and discretion; and, while Ron may have objected to Susanna Kelham's termination of his quasi-employee status, Susanna Kelham had the

absolute right to terminate him with or without cause. It just so happens that, as evidenced by the correspondence discussed in paragraph 10 above, Susanna Kelham had cause for terminating Ron; moreover, it would have been a breach of her fiduciary duty to KVW and its creditors not to terminate him given his self-dealing.

12. The Motion alleges that "Since its inception, Kelham Vineyards has made its wine with grapes sourced from its 40-acre vineyard in Oakville, California. Decl. Nicholsen, ¶ 7. Those vineyards were always, until his death in 2011, owned by Rawson Kelham with the intention of providing grapes for Kelham Vineyards' wines. 7 Id. at ¶ 7." For the record, as will be attested to by Susanna Kelham's Estate Planning Attorney Alexis White, the 40-acre parcel of land (herein the "Oakville Property" ) that produces most of the grapes from which KVW wines are made is owed by Kelham Growers, LLC. It is not owed by KVW and never has been. It was left to Susanna Kelham personally by her deceased husband Rawson Kelham, free of any conditions or restrictions. It is for her to do with as she pleases.

13. The Motion alleges that, "In 2016, after contentious litigation over Rawson Kelham's estate, Susanna Kelham formed Kelham Vineyards Growers LLC ("Kelham Growers") and began "selling" grapes from the vineyard to Kelham Vineyards. Decl. Nicholsen, ¶¶ 8-11; Decl. Davis, ¶ 4, Ex. 4. Susanna Kelham is the only owner of Kelham Growers. Decl. Davis, ¶ 5, Ex. 5." For the record, as will be attested to by Susanna's Kelham's Estate Planning Attorney Alexis White, contrary to the misleading suggestion that "contentious litigation over Rawson Kelham's estate" somehow involved KVW or Ronald Nicholsen, neither KVW nor Ronald Nicholsen were a party to this action. The litigation involved a dispute between Susanna Kelham and Rawson Kelham's son from an earlier marriage. There was never any claim or issue that either KVW or Ronald Nicholsen had an interest in the Oakville Property as speciously implied by Ron and his Attorney.

The Oakville Property was willed to Susanna Kelham who deeded it to Kelham Growers, LLC. As such Kelham Growers is within its legal right to sell the grapes grown on that property to anybody it wants; there is nothing clandestine, sinister, or improper here.

14. The Motion alleges that "On January 4, 2017, Susanna Kelham transferred certain real property located at 1760 Main Street, St. Helena, California ("1760 Main Street" or "cottage") to Main Street LLC. Decl. Davis, ¶ 10, Ex. 10. In or about 2017, Kelham Vineyards began renting 1760 Main Street for $5,250 a month as an incentive for winery club members to stay at the "cottage" in exchange for purchasing wine. Decl. Davis, ¶ 6, Ex. 6, S. Kelham Depo. Tr. 204:12-205:1. There is no written lease agreement between Kelham Vineyards and Main Street LLC." For the record, this is all true; with that said, there is nothing clandestine, sinister, or improper here; as readily acknowledged by the Motion, KVW's monthly rental of the Main Street Cottage serves a bona fide purpose, proven effective (i.e., to promote wine sales).

15. The Motion alleges that "At her deposition on May 18, 2023, Melanie Drescher confirmed she was the bookkeeper for all three entities controlled by Susanna Kelham: Kelham Vineyards, Kelham Growers, and Main Street LLC. Decl. Davis, ¶ 9, Ex. 9, M. Drescher Depo. Tr. 22:5-17. She further testified that Kelham Growers pays for her bookkeeping services on behalf of itself and Main Street LLC. Id. at Ex. 9, M. Drescher Depo. Tr. 23:20-23." This is all true; but again, there is nothing clandestine, sinister, or improper here.

16. The Motion alleges that "Over the past two years, Kelham Vineyards overpaid Kelham Growers, and has sold a significant amount of its bulk wine and unlabeled wine then transferred all its proceeds to Kelham Growers or Susanna Kelham. For example, on November 25, 2018, Kelham Growers sold grapes to Kelham Vineyards for $209,733.00. Decl. Davis, ¶ 24, Ex. 21. As reflected on that invoice, there is a credit of $92,937 toward the balance. Id. On July 22, 2021,

Kelham Vineyards paid Kelham Growers $90,000 with the memo line "2018." Decl. Davis, ¶ 25, Ex. 22. On November 19, 2021, Kelham Vineyards also paid Kelham Growers $206,796.00 for its 2018 purchase of grapes. Decl. Davis, ¶ 26 and Ex. 23 and ¶ 27 and Ex. 24. Thus, in 2021 Kelham Vineyards inexplicably paid Kelham Growers $180,000 more than it agreed to pay for grapes in 2018. This is not an isolated incident." For the record, KVW has not "overpaid" Kelham Growers for grapes over the past two years as carelessly alleged by the Motion; Attorney Davis's declaration incorrectly (carelessly) assumes that all the payments from KVW to Growers were or have been for the payment of grapes when in point of fact, because KVW has been unable to sustain itself, Growers has extended loans to KVW, partial payments of which are included in the transfers noted by Attorney Davis's declaration. I further note that, while Attorney Davis's declaration concludes with an ominous statement that, "This is not an isolated incident.", the Motion fails to cite any other instances of alleged instances of "overpayment."

17. The Motion alleges that "Kelham Vineyards has repeatedly sustained financial losses for the benefit of Kelham Growers under the current management. For example, on October 16, 2020, Kelham Vineyards purportedly purchased $142,245 worth of smoke tainted grapes from Kelham Growers, which had been rejected from another buyer. Decl. Davis, ¶ 28, Ex. 25. Kelham Vineyards processed the grapes into bulked out wine - bulking out wine is a known term within the industry, which means Kelham Vineyards bought the grapes and spent the time and money process it into wine, but Kelham Vineyards did not ingest the grapes into its own production. Decl. Nicholsen, ¶ 14. Kelham Vineyards then sold the bulked wine for $151,445.00. Decl. Davis, ¶ 29, Ex. 26." For the record, KVW has never repeatedly sustained financial losses for the benefit of Kelham Growers. The single transaction cited in the motion involves a $142,245 purchase of grapes from Kelham Growers which KVW processed and sold as bulked wine for $151,445.

While there is no dispute that the wine was sold for substantially more than the cost of the grapes, the evidence of the alleged wrongdoing is that "Days after selling the bulked wine, on June 17, 2021, [KVW] wrote a check for the entire amount it was paid to [Growers]". Okay, here's the thing, from its inception, KVW has been indebted to Growers for hundreds of thousands of dollars in unpaid for grape shipments and loans. On the eve of this filing, by way of example, KVW owes Growers approximately $533,925.45. With that said, the transfer that Attorney Davis recklessly imputes as some type of fraudulent transfer was merely a partial payment on KVW's outstanding balance to Growers.

18. For the record, as part of KVW's production to Ron Nicholsen and his attorneys in the Writ Action; KVW turned over a flash drive with KVW's entire QuickBooks Accounting Records; but as evidenced by his own descriptions of testimony solicited by him in the Writ Action, rather than taking the time to review KVW QuickBooks Accounting Records, Attorney Davis prefers to play the *Gotcha! Game*, asking and expecting KVW members and staff to know, off the top of their head, the exact outstanding balance on various claims held against KVW, an unreasonable expectation under any circumstances ,but particularly unreasonable where those balances are in a constant state of flux. Then, if a deponent has not committed the figure to memory, Ron Nicholsen and his attorney cry out, *Gotcha!*, "KVW is withholding information; thus we need to conduct further depositions" (e.g., Motion, Page 27, Lines 14-18 – an example of how Attorney Davis expects KVW staff to provide the exact balance outstanding on specific accounts during deposition testimony, from memory.

19. Another instance of this approach (the *Gotcha Game!*) is seen where the Motion alleges that "On July 12, 2022, Kelham Vineyards paid $600,000 to Kelham Growers … When asked during her deposition why Kelham Vineyards paid her $600,000, she did not know the purpose

for the payment and claimed the bookkeeper would know the answer. Id. at Ex. 6, S. Kelham Depo. Tr. 305:7-306:19. Simply stated, because Susanna Kelham is constantly funneling money into KVW in various personal, corporate, and trust capacities, at any point in time, Susanna Kelham (and/or the entities she represents) is owed hundreds of thousands of dollars, maybe even millions. Given this volatile situation, it is not unreasonable or inconceivable my mother is unable to identify the purpose of any particular payment. Here for example, I am informed that the $600,000 payment was a paydown on balances owed to Growers for grape shipments to KVW spanning from 2019 through 2021; given the circumstances, it is understandable that my mother could not identify or testify with any specificity (off the top of her head) how this $600,000 payment was being applied. As noted in her testimony, this was the job of her bookkeeper. With that said, as previously noted, KVW turned over a flash drive with KVW's entire QuickBooks Accounting Records in connection with the Writ Action, which is to say that both Ron Nicholsen and his attorney, at all times herein noted, had access to and/or knew the answer to the question of what this $600,000.00 transfer was for.

20. The Motion then goes on to allege that "Then on December 1, 2022, Kelham Vineyards paid $128,000 to Kelham Growers for "repayment of loans." Decl. Davis, ¶ 34, Ex. 31." For the record, as previously noted, Growers has loaned money to KVW, and Growers is entitled to repayment of those loans. The Motion does not seem to question that the loans were actually made by Growers, the Motion simply seeks to sling mud by suggesting there is somehow something clandestine, sinister, or improper in KVW's repayment of the loans. It's almost as if my brother Ron is operating under the delusion that KVW should be issuing some type of dividend or distribution to shareholders before paying its obligations to creditors.

10

21. The Motion makes much ado about a meeting held "…on November 18, 2021, [between] members of Kelham Vineyards (without Ronald Nicholsen) met regarding its finances and those of Kelham Growers. …. Kelham Vineyards' office manager took notes of that meeting. … Her notes reflect that they 'need to empty bank accounts due to lawsuit,' which she testified regarded his writ action….." The Motion goes on to allege that "The day after that meeting, Susanna Kelham made numerous transfers from Kelham Vineyards' bank accounts to its Mechanic's Bank account – these transfers totaled $298,000 … On the same day, November 19, 2021, she cashed the $206,796 check on behalf of Kelham Growers." For the record, I was present at this meeting and I was also present at the Deposition of Melanie Drescher. For the record, in her deposition, Melanie Drescher (KVW's bookkeeper) provided Ron Nicholsen and his attorneys with a full-blown explanation regarding the purpose of that meeting and propriety of any actions taken after the meeting. See generally, Exhibit B, Excerpts to Deposition of Melanie Drescher, Page 226-237. While the deposition testimony is a bit disjointed given Mr. Davis' *Gotcha!* approach, the situation can be described summarily as follows. This was an end of the year tax planning meeting, where, as with all end of the year tax planning meetings, the subject turns to what a company should do with cash on hand, which involves a draining of the bank accounts to minimize end of the year tax liability. Various options were discussed, including paying off debt (including debt owed to Growers), investing in equipment, or providing additional benefits to KVW employees. At some point in the conversation, someone made the comment that Ron Nicholsen would be entitled to 1/3 of anything left after the payment of all debt, which the office manager "comically" relayed in her notes as a need to empty the bank accounts to due to the litigation; in point of fact, the emptying of the accounts was something being undertaken for tax purposes. The record is clear that (a) nobody at that meeting ever said that the bank accounts

Case: 23-10384    Doc# 41    Filed: 08/22/23    Entered: 08/22/23 18:14:37    Page 11 of 34

should be emptied because of the lawsuit; (b) the bank accounts were not emptied because of the lawsuit; and (c) any transfers made due to conversations at this meeting involved the lawful repayment of outstanding KVW debt for legitimate tax reasons, on the advice of KVW's CPA. See, Exhibit 2, Excerpts to Deposition of Melanie Drescher, Page 225, Lines 2-11 and Page 237, Lines 2-7.

22. The Motion alleges that "Kelham Vineyards may be pursuing unpermitted and unlawful business expansions. The Napa County Winery Definition Ordinance 947 of 1990 prohibits wineries in Napa County from offering food service for charge to its patrons." For the record, KVW does not produce food. While KVW at one point explored the idea of starting a food service and took steps toward making that food service program a reality, steps which would have included getting all the proper permits and licenses from Napa County. That idea was abandoned, and we found that catering was a better solution which our current permits allow. Tasting venues were expanded due to Covid with the ABC's approval. Ron Nicholsen has been unable to locate any permits because the food service program, as anything other than 'a would be' project, only exists as a figment of Ron Nicholsen's vivid imagination.

23. The Motion alleges that "Kelham Vineyards employs Antonio Olivera as one of its two full-time employees. Decl. Nicholsen, ¶ 17. As reflected on Mr. Olivera's timecards, he performs work both at the vineyards and winery – and at Susanna's and Hamilton's homes. Decl. Davis, ¶ 41, Ex. 38. Kelham Vineyards pays all his wages for working for Kelham Growers and for the owners of the company.". Ron was aware of this practice and in fact also used Mr. Olivera at his own home. For the record, I have no knowledge of who paid Mr. Olivera for any time he may have spent working at my home or Ron's home and/or whether if it was KVW, whether KVW was properly reimbursed. If KVW was not reimbursed, I have no problem with KVW offsetting

12

1  anything that KVW may be owed for Mr. Olivera's time against my entitlement to Guaranteed

2  Payments and the same treatment could be afforded with respect to work performed for Ron

3  Nicholsen's benefit.

4      24. The Motion alleges that "The bookkeeper for all three entities testified that "there was a

5  period of time prior to [her] where some of the employees were paid by Kelham Vineyards and

6  Winery LLC and reimbursed by Growers." Decl. Davis, ¶ 9, Ex. 9, M. Drescher Depo. Tr.

7  149:14-24. Apparently, this was done because Kelham Growers did not have payroll set up. *Id.* at

8  Ex. 9, M. Drescher Depo. Tr. 150:4-15." The Motion further alleges that "There are no records or

9  evidence of Kelham Growers reimbursing those amounts – or any money – to Kelham"

10  Vineyards.  For the record, it is undisputed that there was a period of time prior to Melanie

11  Drescher's tenure where some of the employees "were paid by Kelham Vineyards and Winery

12  LLC and reimbursed by Growers"; with that said, the Motion further alleges that "There are no

13  records or evidence of Kelham Growers reimbursing those amounts…" This allegation directly

14  contradicts Melanie Drescher's deposition testimony that, cited by Ron Nicholsen attorney's

15  themselves, that these amounts were "reimbursed by Growers".  Decl. Davis, ¶ 9, Ex. 9, M.

16  Drescher Depo. Tr. 149:14-24.

17      25. The Motion alleges that "On October 8, 2021, Kelham Vineyards furnished Ronald

18  Nicholsen its 2020 tax returns. Therein, it reported to the IRS that it paid Ronald Nicholsen almost

19  twice the amount he was paid."  This is not an issue that is before this court; this is an issue that

20  Ron Nicholsen needs to take up with the IRS and State Franchise Tax Board.  To the best of my

21  knowledge, KVW has not received any inquiries from either the IRS or the State Franchise Tax

22  Board questioning the propriety or accuracy of KVW's income assessment against Ronald

23  Nicholsen.

24

13

26. The Motion alleges wrongdoing in connection with KVW's payment of expenses on two properties, the property located at 360 Zinfandel Lane ("Zinfandel Lane") out of which the winery operates and the vacation home in Tahoe ("Tahoe"). In connection with Zinfandel Lane, the property was leased to KVW, with provisions for a rent based on a very complex grape production formula; rather than requiring KVW to pay the full rent due per that complex rent formula, it was agreed (based on bad advice from Ronald Nicholson's CPA Sean McNamee) that KVW would simply start making partial payments toward the satisfaction of its lease obligation by making minimum payments in the form of the amount due on Zinfandel Lane's existing mortgage. Mr. McNamee advised KVW that if KVW paid the mortgage directly, KVW would be able to right off the interest expense, which based upon the advice of KVW's current CPA is categorically wrong. Ron's suggestion that somehow the Writ Action uncovers some type of breach of fiduciary duty or self-dealing by Susanna Kelham in connection with KVW's payment of the mortgage on 360 Zinfandel Lane is egregious and outrageous. The payment of the mortgage was intended as a partial lease payment, the payment of the mortgage in this manner was recommended by Sean McNamee, Ron Nicholsen's CPA, and Ron Nicholsen was fully aware of what was going on. With respect to the Tahoe Property, the property was at one point jointly owned by all Members of KVW and thus it was agreed that KVW would pay the mortgage and expenses on the property. At some point in time, Ron pressured my mother to "buy" back his interest in the property, an interest she had "gifted" him. At that juncture, perhaps payment of the Tahoe Property's mortgage, taxes, insurance, and utilities should have been removed perhaps as items on KVW's expense rooster to the extent that not all members of KVW shared an equal interest or benefit in the property. The items are in QuickBooks but were not paid from the

14

winery. To this end, when a final accounting is done, an appropriate adjustment may have to be made. These numbers will be nominal.

27. Finally, the Motion makes the allegation that "Ronald Nicholsen reasonably believes that Kelham Vineyards likely owns properties that are either hidden or constructively owned as a result of paying mortgages or shared title, and that secured creditors may arise laying claims to assets. For this reason, Ronald Nicholsen suspects that the company may be at risk beyond just related creditors." For the record, the only parcel of real property that KVW's owns is a now vacant lot located at 540 Mund Road in Deer Park California, where at one point back when there was still a house on the property, KVW allowed Ronald Nicholsen and his wife to live rent free. Ron's speculation that KVW holds hidden titles or constructively owns properties is wishful thinking and part of the grand fishing expedition that he and his attorneys have embarked on for the past two years in an effort to pressure KVW to buyout his minority interest at an inflated price the reflects the list price book value of KVW' s wine inventory.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on August 21, 2023, in the County of Napa, State of California.

_Hamilton Nicholson, Declarant_

15

# CERTIFICATE OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 4225-H Oceanside Boulevard #369, Oceanside CA, 92056-3472

A true and correct copy of the foregoing document described as **DECLARATION OF HAMILTON NICHOLSEN RESPONDING TO FALSE ACCUSATIONS OF ALLEGED PREPETITION BAD ACTS FILED IN SUPORT OF OPPOSITION TO MOTION FOR APOINTMENT OF TRUSTEE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR; and **(b)** in the manner indicated below:

William Lafferty
U.S. Bankruptcy Court,
1300 Clay St. Room 220
Oakland, CA 94612
Served by Priority Mail

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 22, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

| | |
|---|---|
| U.S. Trustee | USTPRegion17.SF.ECF@usdoj.gov |
| Rebekah Parker | attorneyrparker@gmail.com |
| Harold H. Davis, Jr. | hal.davis@gtlaw.com |
| Michael F. Thomson | thomsonm@gtlaw.com |

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL:** On August 22, 2023, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Susanna R. Kelham
Manager Member
Kelham Vineyard & Winery, LLC.
360 Zinfandel Lane
St. Helena, CA 94574
Served by U.S. Mail

Ron Nicholsen
223 Alchemy Way
Napa, CA 94558
Served by U.S. Mail

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on August 22, 2023, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Susanna R. Kelham
Manager Member
Kelham Vineyard & Winery, LLC.
360 Zinfandel Lane
St. Helena, CA 94574
Served by Email:
info@kelhamvineyards.com.

Alexis White, Attorney for
Susanna R. Kelham
Day, Pace, York & York
587 Jefferson Street
Napa, CA 94559
Served by Email
awhite@yorkyorklaw.com

Service information continued on attached page: None

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

August 22, 2023

Rebekah Parker

# EXHBIT A

**Letter Dated September 9, 2021
from S. Kelham to R. Nicholsen**



Ron Nicholsen
P.O. Box 47
Oakville, CA 94562

Kelham Vineyards
360 Zinfandel Lane
St. Helena CA 94574

September 9th, 2021

On September 8th 2021, you sent an email to Kelham Vineyards in regards to the Crane Terrace wine. In this communication, you stated that you intend to come on property and fill one of Kelham Vineyards 1,500-gallon fermenting tanks this harvest season. Your request is denied.

You were specifically informed on May 24th, 2021 that you are no longer authorized to make wine here at Kelham Vineyards. Your resignation was then accepted on June 23rd, 2021. You have purposely chosen to start legal action against your partners, effectively ensuring that you can no longer have contact with Kelham Vineyards, its properties or its assets. The letter received from your attorney contained allegations that make any request to come on property a liability issue that we will not take.

The tank in question was paid for by Kelham Vineyards, as is time accrued by current Kelham Vineyards employees. Due to current circumstances, you are in no position to make requests of either.

You were informed on April 30th, 2021 that Kelham Vineyards had no interest in leasing barrels. It was made clear that barrels brought on property for winemaking use were to be *purchased only*, with an acceptable initial down payment upon approval. You were required as the contract initiator to provide an invoice reflecting these terms. It was never produced therefore we are under no obligation to fulfil any agreement you made stating otherwise.

Any attempt to deliver unauthorized barrels will be turned away. All commitments, promises, signed or verbal agreement etc. made without company knowledge and/or express approval will not be honored by Kelham Vineyards.

You remain in possession of company assets that have yet to be returned, specifically the 2004 Black Super Duty Ford Truck. On June 24th 2021, we requested that this company property be returned or that a reasonable request for purchase be submitted. You were also asked to

EXHIBIT
Kelham 4/29/2
13

provide a preferred company of choice to assess a fair market value for the LLC partnership. No response has been given for either of these requests. We will proceed with our initial plans to go with Aspect Consumer Partners unless we hear from you within the next 10 business days. They will evaluate the partnership as it stands and we will forward their conclusions directly to your legal representation upon completion.

All communications regarding any further issues or concerns are to be presented by your attorney's office only. We do not have an attorney nor can we afford one. This is now a legal matter at your insistence, therefore you are no longer to have direct contact with Kelham Vineyards, its partners or any of its current employees. Kelham Vineyards customers contacting you directly are strongly encouraged to reach out to us instead. Please inform them to either call our office or use the info@kelhamvineyards.com email address only to have their needs met.


Thank you,

Kelham Vineyards
360 Zinfandel Lane
St. Helena, CA 94574
707-963-2000

# EXHIBIT B

**Excerpts from Deposition of Melanie Drescher**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF NAPA

--oOo--

RONALD NICHOLSEN II,      )
                          )
        Petitioner,       )
                          )
VS.                       )        No. 21CV001403
                          )
KELHAM VINEYARDS & WINERY )
LLC and SUSANNA ROGERS    )
KELHAM,                   )
                          )
        Respondents.      )
                          )
                          )

**CERTIFIED COPY**

--oOo--

DEPOSITION OF MELANIE DRESCHER

--oOo--

Napa, California
Thursday, May 18, 2023
10:05 a.m.

--oOo--

REPORTED BY: KATHLEEN M. SOLOAGA, CSR, RPR
        CSR License No. 6957

Sims & Sims Reporting, Inc. * (707) 226-3022

1  sheet when we met with our CPA.  That's generally the

2  only thing that she wants to see in a meeting.

3  Q.      And so would that have been like the physical

4  copy, or was it like an electronic, you emailed it or

5  something to her?

6  A.      I don't recall.  Sometimes I send -- she would

7  ask for it in advance so she can review it before the

8  meeting.

9  Q.      Do you know what is meant by "full amounts"

10  here?

11  A.      Uh, full amounts of what's owed to the Growers.

12  Q.      And do you know -- do you recall what

13  information you used to compile this spreadsheet?

14  A.      From the QuickBooks file for the Growers.

15  Q.      I would like to turn to the page that ends in

16  28420, and this is Roman numeral two, it says, "Need to

17  empty bank accounts due to lawsuit."  Do you see that

18  sentence?

19  A.      I do.

20  Q.      Do you know what lawsuit you guys were referring

21  to?

22  A.      Uh, the potential for possibly one forthcoming

23  from you guys.

24  Q.      When you say "you guys," from Mr. Nichol --

25  Ronald Nicholsen?

Case: 23-10384 * Doc# 41 * Filed: 08/22/23  Entered: 08/22/23 16:14:37 * Page 23 of 34

1    A.        Yes.

2    Q.        Okay.  And did someone discuss emptying bank

3    accounts?

4    A.        No.  The -- you will have to excuse Gen for her

5    comical way that she writes her notes.  What we discussed

6    was how to pay back Susanna for what -- a lot of what she

7    is owed, because it was determined and told to us that if

8    she didn't get reimbursed soon, she probably never would.

9    And we had the cash to do so, and our CPA advised us that

10   that would be tax beneficial for us to get -- take that

11   cost, take that expense.

12   Q.        Have you discussed these notes with anyone prior

13   to your deposition today?

14   A.        No.

15             MR. PETTY:  Well, hold on.

16             I will object to the extent the question calls

17   for the disclosure of any information protected by the

18   attorney-client privilege.

19             Please do answer, with the exception of any

20   conversations you may have had with Counsel.

21             THE WITNESS:  Okay.

22   BY MR. DAVIS:

23   Q.        Well, you say it's comical, but then the next

24   sentence says,

25                 "RN will be 'owed' one-third of amounts

Case: 23-10384 * Doc# 41 * Filed: 08/22/23 * Entered: 08/22/23 16:14:37 * Page 24 of 34

1          left pending in KV accounts unless paying

2          off debtors" --

3     A.      Uh-huh.

4     Q.      -- "i.e. Growers."

5          Do you see that?

6     A.      I do.

7     Q.      So at least during that discussion, it was

8     discussed whatever money was in Kelham Vineyards'

9     accounts, one-third of that would belong to Mr. Ronald

10    Nicholsen, correct?

11    A.      Okay.  Yes.

12    Q.      Do you -- did you have any authority to move

13    money from the bank accounts?

14    A.      I have authority to.  I -- I don't usually do

15    it.

16    Q.      Do you know if Kelham Vineyards has any savings

17    accounts?

18    A.      It has the accounts that are reported on

19    Exhibit 3.

20    Q.      Do you know where Kelham Vineyards maintains its

21    banking records?

22    A.      Its banking records?

23    Q.      (Nodding head.)

24    A.      Yeah.  In the filing cabinet at the winery.

25    Q.      Is the same true with respect to its deposit

Case: 23-10384 * Doc# 41 * Filed: 08/22/23 * Entered: 08/22/23 16:14:37 * Page 25 of 34

1  slips?

2  A.      As far as I know.  I don't make the deposits.

3  Q.      Underneath the sentence I just read it says:

4  Informed Grace of the situation.

5          Do you recall who or if that happened, that

6  someone informed Grace of the situation?

7  A.      I don't know what situation we're referring to.

8  Q.      Okay.  Right above that line on the right-hand

9  side it says "Will lease back."  Do you recall what was

10  talked about as referred to "Will lease back"?

11  A.      I'm sorry, where?

12  Q.      It's at the top here, it's on the right-hand

13  side, it's above the sentence that says "Informed Grace

14  of situation," and then there's some handwriting that

15  says, "Will lease back."

16  A.      I don't know what that's for.

17  Q.      Okay.  Roman numeral three says, "Suggestions

18  for assets."  Do you recall a discussion about assets?

19  A.      I do.

20  Q.      Okay.  And there's a thing in here that says,

21  "Excavator."  Do you know what that was about?

22  A.      Yeah.  Um, the three things that are listed on

23  there were potential purchases to lower our tax liability

24  before the end of the year.

25  Q.      And were the -- any of these assets actually

Case: 23-10384 * Doc# 41 * Filed: 08/22/23 Entered: 08/22/23 16:14:37 * Page 26 of 34

1    purchased?

2    A.        No, I don't believe so.

3    Q.        Roman numeral four says, "Mark's vineyard

4    spreadsheet, went over with Grace."  Do you see that?

5    A.        I do.

6    Q.        Do you know what it referred -- what's being

7    referred to as "Mark's vineyard spreadsheet"?

8    A.        Yes.  It has to do with the Growers and their

9    parcels and the farming costs.

10             You had asked about this same thing in a prior

11   exhibit.  Do you want me to find it?

12   Q.        So it -- let me -- let me ask a couple questions

13   first.

14   A.        Okay.

15   Q.        So is Mark's vineyard spreadsheet a vineyard

16   management company?

17   A.        No.  Mark was the intern that I told you about,

18   the volunteer.

19   Q.        I see.

20   A.        And he was -- he's a number cruncher, he used to

21   work for the IRS, I think.  But anyway, he was very

22   interested in cost calculating for parcels and vineyard.

23   We felt we were -- we were thinking we might be

24   overpaying our vineyard manager for what we were getting,

25   so that was kind of what -- you know, he -- he said, "Oh,

Case: 23-10384* Doc# 41 * Filed: 08/22/23 * Entered: 08/22/23 16:14:37 * Page 27 of
34
Sims & Sims Reporting, Inc. * (707) 226-3022

1   I can look that stuff up," or, "I can figure that out,"

2   so he did that on his own.

3   Q.      Is that spreadsheet kept at Kelham Vineyards?

4   A.      No.

5   Q.      Where is it kept, if at all?

6   A.      It's kept by Mark himself, who is -- lives in, I

7   think, Washington, D.C., and then I have a copy of it, as

8   well, on my computer at my office.

9   Q.      Okay.  And you say it concerns the costs for

10  Kelham Growers?

11  A.      That's correct.

12  Q.      Okay.  And why were you going over this

13  spreadsheet with Grace?

14  A.      Because Grace does the taxes, as well, for

15  Kelham Growers.

16  Q.      So this would have been for the purposes of

17  Kelham Growers' tax returns?

18  A.      Correct.

19  Q.      Okay.  And it says, "Mel will input info as it

20  comes in," and then in parenthesis "from Tina."

21          Who is Tina?

22  A.      Tina is the office manager at Jack Neal & Son,

23  the vineyard management company.  She was sending me the

24  timecards so that I could input them into our spreadsheet

25  because we were tracking hours and costs.

231

Case: 23-10384 * Doc# 41 * Filed: 08/22/23 Entered: 08/22/23 16:14:37 * Page 28 of 34

1  Q.      And it says, "Will work on spreadsheet for

2  winery."

3  A.      Mm-hmm.

4  Q.      Do you know what spreadsheet that's referring

5  to?

6  A.      Yeah.  We were discussing doing the same thing

7  for the parcels at the winery, but we did -- I don't

8  believe we ever did.  It never really amounted to

9  anything, um, the information, it was just a lot of Excel

10 spreadsheets.  It didn't make a whole lot of sense to

11 anyone but Mark.

12 Q.      Okay.  And on the right-hand side there's a box

13 that says "Ham," and then there appears to be some

14 questions.

15        Looking at these, is this, in your mind,

16 memorializing some questions that maybe Hamilton had when

17 he came in for a portion of the meeting?

18 A.      Uh, let me -- give me a moment.

19        Yes.

20 Q.      Do you know what the discussion was about "How

21 much do we" need -- "do we have to spend"?

22 A.      Uh, yeah, to lower our tax liability.  That's

23 always the purpose of our meeting with the CPA at the end

24 of the year.

25 Q.      Do you ever discuss the working capital of the

Case: 23-10384 * Doc# 41 * Filed: 08/22/23 * Entered: 08/22/23 16:14:37 * Page 29 of 34

1    winery with the CPA?

2    A.      The working capital?

3    Q.      Yes.

4    A.      Meaning?

5    Q.      The amount of money necessary in cash or

6    inventory to run the winery?

7    A.      No.  No, I don't.

8    Q.      Do you have any idea what the working capital

9    amount is for --

10           (Reporter interrupts for clarity of the record.)

11   BY MR. DAVIS:

12   Q.      Do you know what the working capital amount is

13   for the winery?

14   A.      Not off the top of my head, no.

15   Q.      And how would you look that up?

16   A.      In QuickBooks.

17   Q.      And how would you go about looking it up in

18   QuickBooks?

19   A.      I could run profit and loss reports and see how

20   much, or even cash flow reports, to see.

21   Q.      In this regard I'm ignorant about it, and so I

22   would literally like to know mechanically how you would

23   go about doing this.

24   A.      Running a report?

25   Q.      No, finding out the working capital of the

Case: 23-10384 * Doc# 41 * Filed: 08/22/23 * Entered: 08/22/23 16:14:37 * Page 30 of 34

1  winery.

2  A.      Okay.  Well, you would run a P&L report, first

3  and foremost, for -- I mean, if we're talking about one

4  year at a time?

5  Q.      (Nodding head.)

6  A.      Okay.  So you run the P&L for that year,

7  whatever year you're looking at.  You would also run a

8  balance sheet.  You could run a statement of cash flows,

9  as well, which would tell you kind of your cash in, cash

10 out, which is kind of more of a working capital number I

11 think that you are referring to, which is, how much does

12 it actually cost to run this business, not just income

13 and expenses, because obviously you have to purchase

14 equipment and the different things, too, sometimes; so

15 inventory, or things that go into inventory assets that

16 also go on the balance sheet.

17         So I would -- for that, I would run a statement

18 of cash flow, I would look at that, which can be run

19 right out of QuickBooks, as well.  I would run a general

20 ledger and just look at the debits and credits that went

21 in and out of the bank accounts, and look at the totals

22 to see how much was -- came in and how much went out.

23         That would be probably the -- your best bet if

24 you're looking at just money in, money out.

25 Q.      Okay.  That was a lot -- it was very helpful.

Case: 23-10384 * Doc # 41 * Filed: 08/22/23 Entered: 08/22/23 16:14:37 * Page 31 of 34

1     I'm going to think about it.  I may have follow-up

2     questions on that.

3     A.     Okay.  Yeah.

4     Q.     The second question, going back to the document,

5     Exhibit 51, under -- in the box it says "Ham," it says,

6     "Employee payments of what we're spending?  After debt."

7     Do you know what debt he's -- he was referring

8     to here?

9     A.     No.  I imagine it's debt that's the winery debt,

10     which would be anything that's owed to anybody.

11     Q.     Okay.  And then it says right underneath there,

12     "Possible tax reduction in 'investing' in people" --

13     A.     Mm-hmm.

14     Q.     -- "past debt of course.  Bonus us, potential

15     other option."

16     Do you see that?

17     A.     Yes.

18     Q.     Was there a discussion of reducing tax liability

19     by paying Hamilton Nicholsen and Susanna Kelham?

20     A.     No.  It was about Gen.

21     Q.     In what way was it about Gen?

22     A.     That's why she said "us."  She's talking about

23     herself, and probably Ian, the houseman, and possibly

24     giving them more employee benefits to reduce our tax --

25     anything that will reduce the tax liability that you can

Case: 23-10384 * Doc# 41 * Filed: 08/22/23 Entered: 08/22/23 16:14:37 * Page 32 of 34

1    expense at the end of the year is a good thing for a

2    business.

3    Q.      Okay.  If we turn the page, the one that ends in

4    421 --

5    A.      Okay.

6    Q.      -- Exhibit 52, Roman numeral five says:  Finish

7    up with Grace.  The first thing says, "Paying off SK."

8    A.      Yes.

9    Q.      Do you see that?

10   A.      Mm-hmm.

11   Q.      Who is paying off SK?  The winery?

12   A.      The winery.

13   Q.      And the QuickBooks would be the records for that

14   paying off of Susanna, correct?

15   A.      That's correct.

16   Q.      And then the next sort of line item there, it

17   says, "Take surplus cash and reseed into company if

18   necessary."

19   A.      Yes.

20   Q.      In parenthesis, "Shows pattern of bailing out

21   company."  Do you see that?

22   A.      I do.

23   Q.      Do you know what that discussion was?

24   A.      Yes.  Um, we were talking about how we had a

25   surplus of cash that we were trying to decide what to do

Case: 23-10384 * Doc# 41 * Filed: 08/22/23 Entered: 08/22/23 16:14:37 * Page 33 of 34

1   with it; do we buy equipment, do we pay off debt, what do

2   we do with it?  And we asked our CPA what would be the

3   most tax beneficial, because we wanted to lower our tax

4   liability.

5           And part of the -- it was decided, per

6   recommendation also from Grace, that we pay down the

7   debt and that we -- the discussion was:  Well, what will

8   we do if we end up needing that cash for operating

9   expenses?  And that's where the discussion was:  She can

10  loan it back to the company.  That's what that means,

11  reseed it into company if necessary, loaning the money

12  back.

13  Q.      Was Ms. Kelham here during this discussion?

14  A.      I don't recall.

15  Q.      Okay.  Do you recall any part in which you

16  recall that she was actually part of?

17  A.      She was definitely there for part of it, but I

18  don't recall which parts.

19  Q.      Okay.

20  A.      She had tastings going on, so she was in and

21  out.

22  Q.      Do you know what "Shows pattern of bailing out

23  company" refers to?

24  A.      I imagine just -- my guess is that it's talking

25  about the fact that she has had to do that before.

Case: 23-10384 * Doc# 41 * Filed: 08/22/23 Entered: 08/22/23 16:14:37 * Page 34 of 34