# Complaint for Injunctive Relief with Attached Exhibits

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

**PLAINTIFFS**

Susanna R. Kelham

**DEFENDANTS**

Ronald Nicholsen II

**ATTORNEYS** (Firm Name, Address, and Telephone No.)

Rebekah Parker, 4225-H Oceanside Blvd. #369, Oceanside CA, 92056-3472. (213) 268-2918

**ATTORNEYS** (If Known)

Carson Heninger, 101 Second Street, #2200, San Francisco, CA 94105 (415).655.1300

**PARTY** (Check One Box Only)

☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor ■ Other
☐ Trustee

**PARTY** (Check One Box Only)

☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin
■ Creditor ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Complaint for Declaratory Relief (11 U.S.C. §362 and for Compensatory and Punitive Damages); or in the Alternative, Injunctive Relief (11 U.S.C. §105)

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| | |
|---|---|
| **FRBP 7001(1) – Recovery of Money/Property** | **FRBP 7001(6) – Dischargeability (continued)** |
| ☐ 11-Recovery of money/property – §542 turnover of property | ☐ 61-Dischargeability - §523(a)(5), domestic support |
| ☐ 12-Recovery of money/property - §547 preference | ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury |
| ☐ 13-Recovery of money/property - §548 fraudulent transfer | ☐ 63-Dischargeability - §523(a)(8), student loan |
| ☐ 14-Recovery of money/property - other | ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support) |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien** | ☐ 65-Dischargeability - other |
| ☐ 21-Validity, priority or extent of lien or other interest in property | **FRBP 7001(7) – Injunctive Relief** |
| **FRBP 7001(3) – Approval of Sale of Property** | ■ 71-Injunctive relief – imposition of stay |
| ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h) | ☐ 72-Injunctive relief – other |
| **FRBP 7001(4) – Objection/Revocation of Discharge** | **FRBP 7001(8) Subordination of Claim or Interest** |
| ☐ 41-Objection / revocation of discharge - §727(c),(d),(e) | ☐ 81-Subordination of claim or interest |
| **FRBP 7001(5) – Revocation of Confirmation** | **FRBP 7001(9) Declaratory Judgment** |
| ☐ 51-Revocation of confirmation | ■ 91-Declaratory judgment |
| **FRBP 7001(6) – Dischargeability** | **FRBP 7001(10) Determination of Removed Action** |
| ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims | ☐ 01-Determination of removed claim or cause |
| ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud | **Other** |
| | ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.* |
| ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny | ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case) |
| **(continued next column)** | |

| | |
|---|---|
| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| ☐ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

Case: 23-10384   Doc# 72-2   Filed: 09/10/23   Entered: 09/10/23 16:21:38   Page 1 of 16

Case: 23-10384   Doc# 73-2   Filed: 09/12/23   Entered: 09/12/23 20:01:21   Page 2 of 120

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>In re Kelahm Vineyard & Winery | BANKRUPTCY CASE NO.<br>23-10384-WL | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of California | DIVISION OFFICE<br>Santa Rosa | NAME OF JUDGE<br>W. Lafferty |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br><br>September 10, 2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Rebekah Parker | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**REBEKAH PARKER SBN 143674**
4225-H Oceanside Boulevard #369
Oceanside CA, 92056-3472
Telephone No. (213) 268-2918
E-Mail: AttorneyRParker@gmail.com

Appearing for Susanna Kelham, in her Individual capacity,
and for the Unofficial Committee of Essential Creditors
and Post-Petitions Providers

**United States Bankruptcy Court**
**Northern District of California – Santa Rosa Division**

| | |
|---|---|
| In re Kelham Vineyard & Winery, LLC<br><br>Debtors. | Case No. 23-10384-WL<br><br>Chapter 11<br><br>Adv. No |
| Susanna R. Kelham, in her Individual Capacity as Managing Member of Kelham Vineyard & Winery, LLC<br><br>Plaintiff,<br><br>v.<br><br>Ronald Nicholsen II, in his Individual Capacity as Petitioner in State Court Action No. 21CV001403<br><br>Defendant. | **Complaint for**<br><br>1. **Declaratory Relief that Ronald Nicholsen is Stayed by 11 U.S.C. §362(a) from Prosecuting State Court Acton 21CV001403 against Susanna R. Kelham; and for Compensatory and Punitive Damages Under 11 U.S.C. §362(d) for Intentional Violation of the Automatic Stay; or in the Alternative,**<br><br>2. **Injunctive Relief Staying Ronald Nicholsen from Prosecuting State Court Case No. 21CV001403 Against Susanna R. Kelham Pending the Liquidation of this Estate.**<br><br>[HEARING TO BE SET ] |

**TO THE HONORABLE WILLIAM LAFFERTY, UNITED STATES BANKRUPTCY JUDGE, CREDITOR RONALD NICHOLSEN, II, AND HIS ATTORNEYS OF RECORD:**

Plaintiff Susanna R. Kelham (herein "Ms. Kelham" or "Plaintiff"), in her individual capacity and capacity as Managing Member of the Kelham Vineyard & Winery, (herein, "KVW" or "Debtor") alleges as follows,

## INTRODUCTION

1.   This adversary proceeding seeks relief in the alternative either (a) a declaration that that Ronald Nicholsen is stayed by 11 U.S.C. §362(a) from Prosecuting State Court Action 21CV001403 against Ms. Kelham, along with an award of compensatory and punitive damages under 11 U.S.C. §362(d) for Ronald Nicholsen's intentional violation of the automatic stay; or in the alternative, (b) an injunction staying Ronald Nicholsen from prosecuting State Court Case No. 21CV001403 against KVW and Ms. Kelham pending the liquidation of the above captioned Estate.

2.   State Court Case No. 21CV001403 is a lawsuit pending in the Napa Superior Court filed by Ronald Nicholsen against KVW and Ms. Kelham seeking production of various corporate records pursuant to California Corporations Code §§17704.10 and 17704.13 (herein, the "Writ Action").  A copy of the Petition in the Writ Action is hereto as Exhibit 1.

## JURISDICTION

3.   This Court has jurisdiction pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

4.   This adversary proceeding constitutes a core proceeding within the meaning of one or more subsections of 28 U.S.C. § 157(b).

5.   Venue is proper in this district pursuant to 28 U.S.C. § 1409, because KVW's principal place of business is in Napa County and because both Plaintiff Susanna R. Kelham and Defendant Ronald Nicholsen, reside in Napa County.

### THE PARTIES

6.   Plaintiff, Susanna R. Kelham (herein "Plaintiff" or "Ms. Kelham"), is the Managing Member of KVW and a named defendant in the Writ Action.

7.   Defendant, Ronald Nicholsen II (herein, "Defendant Nicholsen") is Ms. Kelham's oldest adult son, who holds a minority interest in KVW, an interest gifted to him by his mother Ms. Kelham.  Defendant Nicholsen is the Petitioner in the Writ Action.

### GENERAL ALLEGATIONS

8.   The above captioned bankruptcy was commenced as an involuntary proceeding filed on July 20, 2023, with an Order for Relief entered on August 16, 2023.

9.   At the time of the filing of this involuntary, the Writ Action was pending in the Napa County Superior Court.

10.   The Writ Action's stated purpose is found at paragraph 23 of the Petition, which provides that Ronald Nicholsen "desires to obtain statutory documents and to review, inspect, and copy  the books of records of [KVW] for reasons related to his interest as a member of Kelham Vineyards, including without limitation, to evaluate the current value of [KVW] and its assets, [KVW]'s assets and liability, and the corresponding value of his membership interest; to evaluate the propriety…".

11.  Unfortunately, the Writ Action has degenerated into an unchecked fishing expedition being used by Ronald Nicholsen as a vehicle to extort or leverage an inflated settlement from KVW in connection with the once proposed buyout of his minority interest.

12. The stated purpose of the Writ Action has been rendered moot by the appointment of a Chapter 11 Trustee and pending liquidation of KVW; specifically, both KVW's assets and liabilities are in the process of being liquidated, with the corresponding value of Ronald Nicholsen's interest in KVW to be determined by the distribution priority scheme of 11 U.S.C. §726.

13. Defendant Nicholsen and his Attorneys at Greenberg, Traurig, LLC (herein, the "Greenberg Law Firm"), along with the Napa County Superior Court were put on notice of the commencement of the involuntary and the resulting stay of 11 U.S.C. §362.

14. In recognition that the stay was in place, on July 31, 2023, before the Order for Relief had been entered, Defendant Nicholsen through the Greenberg Law Firm filed a Motion for Relief from Stay, setting a hearing for August 16, 2023. A copy of the Motion for Relief from Stay is attached hereto as Exhibit 2.

15. Plaintiff is informed and believes that, notwithstanding their recognition that a stay was in place, sometime shortly after the filing of their Motion for Relief from Stay, in a knowing, willful, and intentional violation of the automatic stay, Defendant Nicholsen through the Greenberg Law Firm contacted the Napa Superior Court and requested and obtained a continued hearing in their further prosecution of the Writ Action noticed for August 17, 2023.

16. Plaintiff is informed and believes that Defendant Nicholsen through the Greenberg Law Firm convinced the Napa Superior Court to set a continued hearing on the Writ Action based on a false representation to the Superior Court, that the stay would be lifted by August 17, 2023.

17.  Plaintiff is informed and believes that the misrepresentation that the stay would be lifted by August 17, 2023, was made by Defendant Nicholsen through the Greenberg Law Firm knowingly, willfully, and maliciously, for the purposes of unlawfully continuing the prosecution of the Writ Action in violation of the automatic stay.

18.  Plaintiff is informed and believes that the misrepresentation that the stay would be lifted by August 17, 2023, was made by Defendant Nicholsen through the Greenberg Law Firm knowingly, willfully, and maliciously, for the purposes of harassing KVW and Ms. Kelham.

19.  Defendant Nicholson's Motion for Relief from Stay, among other things, sought a determination that the stay did not extend to Ms. Kelham in the Writ Action, putting the matter "at-issue" in a 'contested proceeding' pending before the Bankruptcy Court.

20.  Defendant Nicholson's Motion for Relief from Stay raises the issue of whether the stay extended to or protected Ms. Kelham at page 9, Paragraph E of its motion, captioned "The California state action is not stayed as to Susanna Kelham". A copy of the Motion for Relief from Stay attached hereto as Exhibit 2.

21.  Opposition to the Motion for Relief from Stay was filed by interested party and unsecured creditor Main Street Cottage, LLC, who provided responsive briefing at page 13, paragraph III. F. on the issue of whether the stay extended to or protected Ms. Kelham.   A copy of the Opposition to Motion for Relief from Stay is attached hereto as Exhibit 3.

22.  Finally, Defendant Nicholsen filed a Reply, which again addressed and briefed the issue of whether the stay extended to Ms. Kelham; specifically, the issues is raised at page 13, Section IV, captioned "The Automatic Stay Does Not – And Should Not – Apply to Susanna Kelham."   A copy of the Reply to Opposition to Motion for Relief from Stay is attached hereto as Exhibit 4.

23.  After hearing oral argument on August 16, 2023, the Bankruptcy Court continued its hearing on Defendant Nicholson's Motion for Relief from Stay to September 5, 2023, without making any final findings or issuing any orders.

24.  Plaintiff is informed and believes that the following day, at a hearing that itself was unlawfully scheduled in violation of the automatic stay, rather than simply advising the Napa County Superior Court that the Bankruptcy Court had continued their Motion for Relief Stay, Nicholsen through the Greenberg Law Firm sought to continue or further prosecute the Writ Action by falsely representing to the Napa County Superior Court that the Bankruptcy Court had issued a ruling deferring the issue of whether the stay applied to Ms. Kelham to the Napa County Superior Court, for the Napa Superior Court's adjudication.

25.  Plaintiff is informed and believes that, while the Bankruptcy Court may have postured that the stay probably did not extend to Ms. Kelham, the Bankruptcy Court never made any actual finding or ruling on this issue, therein noting that its comments on this issue were "… *just an aside*".

///

///

///

26.  Plaintiff is informed and believes that Defendant Nicholsen through the Greenberg Law Firm misrepresented to the Napa County Superior Court that the Bankruptcy Court had made an actual finding or ruling that the issue of whether the stay extended to Ms. Kelham was an issue to be decided by the Napa County Superior Court, prompting the Napa County Superior Court to issue an OSC and request briefing on the application of the automatic stay.

27.  Plaintiff is informed and believes that to the extent Defendant Nicholsen had placed the issue of the application of the automatic stay before the Bankruptcy Court though its Motion for Relief from Stay and to the extent the Bankruptcy Court had not yet issued a final ruling on this issue, Defendant Nicholson's attempts to proceed with the prosecution of the Writ Action before Bankruptcy Court actually issued a ruling constitutes a knowing, willfull, and malicious violation of the automatic stay intended to harasses both KVW and Ms. Kelham.

**FIRST CLAIM FOR RELIEF**
**(Section 362 Declaratory Relief & Request for Damages)**

28.  Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-27 of this Complaint as if fully set forth herein.

29.  Through his continued prosecution of the Writ Action, Defendant Nicholsen seeks continued discovery from Debtor pursuant California Corporations Code §§17704.10 and 17704.13, as well as, an award of attorney fees against Debtor pursuant to Corporations Code §§17704.10(g).

30.  While Ms. Kelham is a named defendant in the Writ Action, Ms. Kelham is not the real party in interest in the Writ Action; KVW or Debtor herein is the real party-in-interest.

31.  While California Corporations Code §§17704.10 and 17704.13 bestows rights on corporate members or shareholders and provide a remedy where a corporate entity does not honor those rights, these statutory rights and remedies exist strictly as to the corporate entity (i.e., KVW or Debtor).

32.  As such, while not clear on the face of the pleading itself, Ms. Kelham is named in the Writ Action in her representative capacity as KVW's Managing Member.

33.  The Writ Action is void of any claim or cause of action against Ms. Kelham personally beyond her duties to respond on behalf KVW or Debtor in her capacity as KVW's Managing Member pursuant California Corporations Code §§17704.10 and 17704.13,

34.  While that Napa County Superior Court has issued orders directing Ms. Kelham to produce documents and pay attorney fees, said orders make it clear that, while Ms. Kelham was being ordered to personally execute an action, the action was being executed on behalf of KVW.  This is illustrated by a Napa County Superior Court order entered on May 10, 2023, captioned "Order Following Continued Second Order to Show Cause Held on April 17, 2023" where Ms. Kelham was ordered to "personally" pay an attorney fee award on behalf  KVW or Debtors.  A copy of the May 10, 2023, Order is attached hereto as Exhibit 5.

35.  Based on the foregoing, Plaintiff seeks a declaration that (without the need for further extension under either §§362 or 105) the automatic stay of §362 bars or enjoins Defendant Nicholsen and the Firm of Greenberg from further prosecuting or taking any action in the Writ Action against either Debtor (KVW) or Ms. Kelham.

///

36.  Moreover, Plaintiff seeks compensatory damages against Defendant Nicholsen in sum reflecting the cost to the Estate and all Interested Parties of dealing with the effect and consequences of Defendant Nicholsen's violation of the automatic stay and punitive damages in an amount to make an impression on Defendant Nicholsen and the Greenberg Firm that the stay must be taken seriously and that this Court's comments or rulings should not be misrepresented to other tribunals in an effort to procure a litigation advantage.

### SECOND CLAIM FOR RELIEF
### (Section 105 Injunctive Relief)

37.  Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-36 of this Complaint as if fully set forth herein.

38.  Plaintiff seeks an injunction enjoining the continued prosecution of the Writ Action against the KVW and Ms. Kelham under section 105 of the Bankruptcy Code until such time as the duly appointed Chapter 11 Trustee in this case has fully liquidated this Estate's assets

39.  Section 105 of the Bankruptcy Code authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105.

40.  Relief under section 105 of the Bankruptcy Code is particularly appropriate in a Chapter 11 case when necessary to protect an Estate's ability to effectively reorganize or confirm a plan, particularly when said efforts (here in the form of an orderly liquidation) are designed to protect and preserve the assets of this Estate from diminishing in value.

41.  For the reasons stated herein, injunctive relief should be granted herein under section 105 of the Bankruptcy Code to enjoin the continuation or prosecution of the Writ Action.

A.     The likelihood of the Estate's success on the merits is a foregone conclusion, especially given the recent appointment of Chapter 11 Trustee to liquidate this Estate's assets and liabilities (i.e., KVW's stated Chapter 11 Objective); with that said, the Unofficial Committee of Essential Creditors and Post-Petition Providers has also prepared and is ready to file is Disclosure Statement Describing Plan of Liquidation, and Liquidating Plan thereon, as soon as permitted to do so by the provisions of 11 U.S.C. §1126 governing "exclusivity", which provides prima facia evidence that it is highly probable (almost certain) that the bankruptcy estate will achieve its goal of liquidating KVW's assets.

B.     The bankruptcy estate will suffer irreparable harm in the absence of an injunction staying the prosecution of the Writ Action against KVW and Ms. Kelham in several ways (a)  the continued prosecution the Writ Action will divert KVW and Ms. Kelham's limited resources and time from the orderly liquidation of this Estate; (b) the continued prosecution of the Writ Action against Ms. Kelham will require that KVW (Debtor – now in the person of a Chapter 11 Trustee) as an entity to provide responses to Defendant Nicholsen's endless discovery requests; (c) the continued prosecution of the Writ Action will implicate KVW because Ms. Kelham is entitled to indemnification from KVW (the Estate) of any costs she may incur in connection with executing her responsibilities as the Managing Member of KVW pursuant KVW's Operating Agreement.  A copy of the Operating Agreement is attached hereto as Exhibit 6; and,

(d), due the fact that KVW is the real party in interest in the Writ Action, any finding or judgment against Ms. Kelham may have preclusive effect.

C.     In contrast, the imposition of total stay on the Writ Action will have absolutely no prejudicial effect on Defendant Nicholsen.  To the contrary, the imposition of the modest stay requested herein, to last for the duration of the liquidation of this estate, actually benefits Defendant Nicholsen; specifically, the Writ Acton was filed for the purpose of  obtaining documents to evaluate the current value of KVW assets and liabilities; the modest stay requested herein will aid the duly appointed Chapter 11 Trustee, with Ms. Kelham's assistance, to liquidate KVW's assets and thereon furnish Defendant Nicholsen with actual rather than speculative information regarding the value of KVW's assets; and,

D.     The imposition of a limited injunction serves the public policy interest of maximizing the liquidation value of this Estate's assets by ensuring that the duly appointed Chapter 11 Trustee has access to Ms. Kelham's time (and resources), all necessary to keep KVW operational during this Estate's liquidation, thereon maximizing the Estate's value for the benefit of all creditors and  equity holders, including Defendant Nicholsen himself.

42.  Based on the foregoing, injunctive relief should be granted herein under section 105 of the Bankruptcy Code to enjoin the continuation or prosecution of the Writ Action pending the duly appointed Chapter 11 Trustee's liquidation of this Estate's assets.

///

///

///

WHEREFORE, Plaintiff prays for judgment against the Ronald NIcholsen and request the following relief,

A.  A declaration that that Ronald Nicholsen is stayed by 11 U.S.C. §362(a) from Prosecuting State Court Acton 21CV001403 against Susanna R. Kelham, along with an award of compensatory and punitive damages under 11 U.S.C. §362(d) for Ronald Nicholsen's intentional violation of the automatic stay; or, in the alternative,

B.  An injunction staying Ronald Nicholsen from prosecuting State Court Case No. 21CV001403 pending the liquidation of the above captioned Estate against either KVW or Ms. Kelham.

C.  Such other relief as this Court deems just and proper under the circumstances.

Date: September 10, 2023

_____
Rebekah Parker
Attorney for Plaintiff
Susanna R. Kelham

# CERTIFICATE OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 4225-H Oceanside Boulevard #369, Oceanside CA, 92056-3472

A true and correct copy of the foregoing document described as **COMPLAINT FOR 1. DECLARATORY RELIEF THAT RONALD NICHOLSEN IS STAYED BY 11 U.S.C. §362(A) FROM PROSECUTING STATE COURT ACTON 21CV001403 AGAINST SUSANNA R. KELHAM; AND FOR COMPENSATORY AND PUNITIVE DAMAGES UNDER 11 U.S.C. §362(D) FOR INTENTIONAL VIOLATION OF THE AUTOMATIC STAY; OR IN THE ALTERNATIVE, 2. INJUNCTIVE RELIEF STAYING RONALD NICHOLSEN FROM PROSECUTING STATE COURT CASE NO. 21CV001403 AGAINST SUSANNA R. KELHAM PENDING THE LIQUIDATION OF THIS ESTATE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR; and **(b)** in the manner indicated below:

William Lafferty
U.S. Bankruptcy Court,
1300 Clay St. Room 220
Oakland, CA 94612
Served by Priority Mail

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On September 10, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

| | |
|---|---|
| U.S. Trustee | USTPRegion17.SF.ECF@usdoj.gov |
| Paul Leahy | paul.leahy@usdoj.gov |
| Ryan Wood | ryan@westcoastbk.com |
| Rebekah Parker | attorneyrparker@gmail.com |
| Harold H. Davis, Jr. | hal.davis@gtlaw.com |
| Michael F. Thomson | thomsonm@gtlaw.com |
| Carson Heninger | carson.heninger@gtlaw.com |
| Michael J. Gomez | mgomez@frandzel.com |
| Wesley H. Avery | wavery@rpmlaw.com |

**II.  SERVED BY U.S. MAIL OR  OVERNIGHT MAIL:**  On September 10, 2023, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Ron Nicholsen
223 Alchemy Way
Napa, CA 94558
Served by U.S. Mail

**III.** **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on September 10, 2023, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Susanna R. Kelham                  Alexis White, Attorney for
Manager Member                     Susanna R. Kelham
Kelham Vineyard & Winery, LLC.     Day, Pace, York & York
360 Zinfandel Lane                 587 Jefferson Street
St. Helena, CA 94574               Napa, CA 94559
Served by Email:                   Served by Email
info@kelhamvineyards.com.          awhite@yorkyorklaw.com

Service information continued on attached page: None

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

September 10, 2023

Rebekah Parker

# Exhibit 1 - Writ Action

Case: 23-01009   Doc# 3   Filed: 09/11/23   Entered: 09/11/23 07:50:23   Page 1 of 17

1 Harold H. Davis (SBN 235552)
Marc R. Baluda (SBN 192516)
2 **GREENBERG TRAURIG, LLP**
4 Embarcadero Center, Suite 3000
3 San Francisco, CA 94111
Telephone: (415) 655-1300
4 Facsimile: (415) 707-2010
E-mail: davish@gtlaw.com
5

6 *Attorneys for Petitioner RONALD NICHOLSEN II*

7

8 SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 FOR THE COUNTY OF NAPA

10

11 RONALD NICHOLSEN II,

12                 Petitioner,

13 v.

14 KELHAM VINEYARDS & WINERY LLC,
AND SUSANNA ROGERS KELHAM,

15                 Respondents.

16

Case No. **21CV001403**

**VERIFIED PETITION FOR WRIT OF
MANDATE TO ENFORCE MEMBER'S
RIGHT TO OBTAIN, INSPECT, AND
COPY CERTAIN RECORDS OF A
LIMITED LIABILITY COMPANY PER
CORPORATIONS CODE § 17704.10**

**ENDORSED**

OCT. 0 4 2021

Clerk of the Napa Superior Court
By:    L. WALKER
         Deputy

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED PETITION FOR WRIT OF MANDATE

Case: 23-01009   Doc# 3   Filed: 09/11/23   Entered: 09/11/23 07:50:23   Page 2 of 17

Case: 23-10384   Doc# 73-2   Filed: 09/12/23   Entered: 09/12/23 20:01:21   Page 19 of 120

**PETITION**

Per California Code of Civil Procedure § 1085, California Corporations Code §§ 17704.10, and 17701.13 *et seq.* and California Rules of Court Rule 8.932, Petitioner, in his capacity as a member of Kelham Vineyards & Winery LLC ("Kelham Vineyards") respectfully moves this Court for a Writ of Mandate directed to Respondents. By this Verified Petition, Petitioner alleges:

**INTRODUCTION**

1.      This Petition is brought to obtain corporate records that Petitioner is clearly entitled to, but for which Respondents unlawfully refuse to provide.

2.      Specifically, Petitioner has lawfully requested that Respondents provide to him copies of and/or allow inspection of:

      a.  Kelham Vineyards' state tax returns for the past six years per Cal. Corp. Code § 17701.13(4);

      b.  Kelham Vineyards' federal tax return for year 2020 per Cal. Corp. Code § 17701.13(4);

      c.  The complete Operating Agreement executed by all three members of Kelham Vineyards per Cal. Corp. Code § 17701.13(5); and

      d.  Kelham Vineyards' "books and records … as they relate to the internal affairs of the limited liability for at least the current and past four fiscal years" per Cal. Corp. Code § 17701.13(7)

Collectively, Petitioner refers to these materials as "KELHAM CORPORATE RECORDS".

3.      Despite requesting the KELHAM CORPORATE RECORDS, and having a clear right to these documents per California Corporations Code § 17704.10(1), Respondents have failed, without justification, to turn over these records.  Petitioner does not otherwise have access to these documents.  Consequently, an order compelling Respondents to produce these records is necessary.

**BACKGROUND**

4.      This dispute arises from a family's internecine conflict over Kelham Vineyards and its assets.  Respondent Susanna Rogers Kelham ("S. Kelham") seeks to conceal company records from

1

Petitioner for S. Kelham's pecuniary gain and at Petitioner's expense and in an effort to unwind Kelham Vineyards in a way that would result in an illegitimate windfall to the Respondents.

5.      Petitioner is the founder and co-owner of Kelham Vineyards.

6.      Respondents are Petitioner's mother, S. Kelham, and the limited liability company in which they are all members, Kelham Vineyards.

7.      Petitioner and Respondent S. Kelham are equal owners and members of Kelham Vineyards.

8.      At the end of May 2021, S. Kelham, unexpectedly informed Petitioner that it was "time to sever our business relationship, and to start the process of negotiating a settlement for your exit from Kelham Vineyards and Winery LLC."

9.      Immediately thereafter, Petitioner demanded Respondents allow him to inspect or transmit to him records pursuant to California Corporations Code §§ 17704.10 and 17701.13. Petitioner's demand for the records was related to his interest as a member of the company because those records will permit Petitioner to evaluate whether Respondent S. Kelham could unilaterally sever his ownership in the company, to discover the Company's assets and liabilities in light of the other members' decision to have Kelham Vineyards appraised to "buy him out", the corresponding value of his membership interest, and to evaluate the propriety of manager compensation and distributions, among other interests.

10.     There is no dispute that Petitioner is entitled to inspect or received these records pursuant to California Corporations Code §§ 17704.10 and 17701.13. Respondents have never claimed otherwise. Regardless, Respondents have denied and deprived Petitioner of his right to access, inspect or receive copies of the records, without any justification, for months.

11.     Respondents have also engaged in systematic retaliation against Petitioner presumptively in the hopes that he will abandon his request for the corporate records and his company.

2

Petitioner will not be doing either. Respondents' apparent efforts to purloin Petitioner's winery from him only serve to heighten the urgency and importance of his demand for the records.

12.    Petitioner has been diligent and made repeated efforts to obtain these records from Respondents in hopes of avoiding litigation.   These efforts have spanned months, and include, without limitation, engaging a lawyer, transmitting numerous written letters requesting the KELHAM CORPORATE RECORDS, and requesting the records from Kelham Vineyards' current and former CPAs and Hamilton Nicholson's attorney.  Hamilton Nicholsen is Petitioner's brother and a co-equal member of Kelham Vineyards.

13.    Petitioner has no adequate or speedy remedy at law to obtain the records to which he is statutorily entitled to receive from Respondents. This Court should issue a writ mandating Respondents to forthwith deliver to Petitioner the documents requested in ¶2.  Because Respondents failure to provide these documents is without justification, Petitioner also respectfully requests this Court for an award of costs and attorneys' fees per Cal. Corp. Code § 17704.10(g) that Petitioner incurred in bringing this writ of mandate and any other relief the Court may deem proper.

## The Parties

14.    Petitioner Ronald Nicholsen II is an individual residing in Napa County, California (hereinafter "Petitioner").   At all relevant times, Petitioner was and is a member of Kelham Vineyard, owning a 33% interest in the Company.   Petitioner is also an owner of the real property at 360 Zinfandel Lane, where respondent Kelham Vineyard has its principal place of business.

15.    Respondent Kelham Vineyards & Winery, LLC is a California limited liability corporation organized under the California Revised Uniform Limited Liability Company Act, Corporations Code, §17701.01, *et seq*. with its principal place of business located at 360 Zinfandel Lane, St. Helena, California ("Kelham Vineyards" or "Company"). The Company does business as Kelham Vineyards, which owns and operates a winery, tasting room, and showroom in St. Helena.

3

Kelham Vineyards manages 10.9 acres included planted vineyards and winery with capacity of 75-thousand gallon annual wine production.

16. Respondent Susanna Rogers Kelham is an individual residing in Napa County, California. At all relevant times, Respondent S. Kelham is a member of and the member-manager of Kelham Vineyards.

17. Hamilton Nicholsen is an individual residing in Napa County, California is also a member of Kelham Vineyards.

18. Petitioner, Respondent S. Kelham, and Hamilton Nicholsen are the equal owners of Kelham Vineyards with each owning a 33% in the Company. Petitioner and Respondents are also family members. Respondent S. Kelham is Petitioner and Hamilton Nicholsen's mother and Petitioner is Respondent Hamilton Nicholsen's older brother.

19. Upon information and belief, Kelham Vineyards may also have an ownership interest in an approximately eighty acre parcel in the Oakville Appellation in the premier Cabernet Sauvignon growing region ("Oakville Vineyards"). Kelham Vineyards sells grapes from Oakville Vineyards to Napa's most esteemed so-called "cult" wineries. Information regarding Oakville Vineyards, Kelham Vineyards, and the Kelham Family are published on a single website which represents that Oakville Vineyards and Kelham Vineyards are affiliated and one company. Petitioner is unaware of the members or owners of Oakville Vineyards or the identity of the owners of the land, but Petitioner understands and believes Kelham Vineyards may have comingled assets, funds, and liabilities or that capital improvements on Oakville Vineyards were paid for by Kelham Vineyards. Petitioner, accordingly, may have an interest in Oakville Vineyards.

### Jurisdiction and Venue

20. This Court has jurisdiction over this matter pursuant to the common law and California Corporations Code section 17704.10 (f), which provides:

4

> In addition to the remedies provided in Sections 17713.06 and 17713.07 and any other remedies, a court of competent jurisdiction may enforce the duty of making and mailing or delivering the information and financial statements required by this section and, for good cause shown, extend the time therefor.

21. Jurisdiction is proper in this venue because Respondent Kelham Vineyards maintains its principal place of business in Napa County, and the corporate books and records that are the subject of this Petition are presumptively in this County. Jurisdiction is proper because Respondent is a resident of Napa County. Jurisdiction is further proper in this county pursuant to California Code of Civil Procedure §§ 1085 and 1086 because Petitioner has no alternative plain, speedy and adequate remedy in the ordinary course of the law.

22. Venue is proper in this County pursuant to California Code of Civil Procedure §§ 395(a) and 395.5 because Respondent Kelham Vineyards has its principal place of business in Napa County. Venue is further proper because Respondent S. Kelham is a resident of Napa County.

### General Allegations

23. Petitioner is a member of Kelham Vineyards. He desires to obtain statutorily delineated documents and to review, inspect and copy the books and records of the Company for reasons reasonably related to his interests as a member of Kelham Vineyards, including, without limitation, to evaluate the current value of the Company and its assets, the Company's assets and liabilities, and the corresponding value of his membership interest; to evaluate the propriety of Respondents efforts to "buy him out"; to evaluate the priority of manager compensation and distributions; and to evaluate whether the Company is being managed in a manner consistent with its purposes and in the interests of the members. Petitioner is entitled to such an inspection per California Corporations Code §§ 17704.10 and 17701.13.

24. Under Cal. Corp. Code § 17704.10(a), upon request by a member, "for purposes reasonably related to the interest of that person as a member," a manager of a limited liability company

"shall promptly deliver, in writing, to the member… a copy of the information required to be maintained under paragraphs (1), (2), and (4) of subdivision (d) of Section 17701.13, and any written operating agreement of the limited liability company." Additionally, under Cal. Corp. Code § 17704.10(b)(1), a member of a limited liability company may, "for purposes reasonably related to the interest of that person as a member . . . (1) inspect and copy during normal business hours any of the records to be maintained pursuant to Section 17701.13."

**The Creation and Management of Kelham Vineyards**

25.    With the financial and moral support of his late step-father, Rawson Kelham, Petitioner founded Kelham Vineyards in 1997. Petitioner and Mr. Kelham envisioned that the winery would exist for generations as a family business with the responsibility first to the generation running the winery as partners and second to maintain the business so that each successive generation would share in the opportunity to grow, produce, and sell Kelham Vineyards' Wine.

26.    For six days a week for the past twenty-four years, Petitioner has been the winemaker, vineyard manager, winery tour guide, and operations manager for Kelham Vineyards. He also managed the Oakville Vineyards that Petitioner believes may be owned, operated, or part of Kelham Vineyards. If Petitioner was not at the winery or in the vineyards, he was hosting winemaker dinners all over the United States on behalf of Kelham Vineyards. Petitioner consistently outperformed the other members and employees of Kelham Vineyards in terms of his sheer volume of sales and sweat equity poured into the winery he founded.

27.    Petitioner also maintained his and Mr. Kelham's vision that Kelham Vineyards be owned and operated as a family business.

28.    While Petitioner has focused his energy almost exclusively on the winemaking, sales, and growth of the Winery, Petitioner understands and believes that Respondent S. Kelham exclusively controls the books, records, and finances of the Company. At all times relevant, Petitioner has not had

6

access to the Company's books and records, bank accounts, contracts, or other records regarding the operations of Kelham Vineyards.

**Respondent S. Kelham Informs Petitioner of her Shocking Decision to "Buy Him Out" of the Winery he founded**

29.     On May 24, 2021, Respondent S. Kelham unexpectedly informed Petitioner that it was "time to sever our business relationship, and to start the process of negotiating a settlement for your exit from Kelham Vineyards and Winery LLC. As a reminder, you own a 33% interest in Kelham Vineyards and Winery LLC. I am in the process of having Kelham Vineyard and Winery LLC appraised. Once that value is determined, we can negotiate the terms of your exit…. I believe it is time to move in our separate directions and I hope you will agree to a reasonable settlement for your exit."

30.     Petitioner's interest as a member of Kelham Vineyards is squarely at issue by Respondent's claim of appraising the Company with the intent to buy him out and to sever his membership interest in Kelham Vineyard.

31.     But this was not the first of Respondent S. Kelham's questionable decisions involving his membership interests in the prior months. In October 2020, Respondent S. Kelham informed Petitioner that his monthly "membership distributions" were being reduced by the amount of his and his family's health insurance because Kelham Vineyards was unable to secure "any help from the Federal or State Government." Petitioner recently discovered that was false because the Company received $103,452 from the Federal Government's Paycheck Protection Program. Nevertheless, Respondent S. Kelham did not reset his membership distributions to their previous levels; thus causing tremendous financial hardship to Petitioner and his family.

32.     Upon information and belief, Petitioner understands that Kelham Vineyards only very recently filed its 2020 federal or state returns. The members of Kelham Vineyards are taxed as a partnership, so Petitioner cannot file his taxes until Kelham Vineyards files its taxes. Respondent only provided the schedule K-1 to Petitioner, which is insufficient and does not comply with the

1  Corporations Code.

2    33.    Moreover, the Company's continued dilatory filing of its taxes causes and will continue

3  to cause Petitioner harm. For tax year 2019, Petitioner only recently received Kelham Vineyard's tax

4  returns and Petitioner was penalized by the IRS because of the delay. Petitioner expects that he will

5  be further penalized by the IRS for the 2020 tax year due to Respondent S. Kelham's inexplicable and

6
7  inexcusable delay.

8    34.    Upon information and belief, Petitioner understands Respondent S. Kelham is making

9  decisions regarding capital improvements to Kelham Vineyards' property without his consent and with

10  funds from Kelham Vineyards. In 2013, the County of Napa sued Petitioner, Respondent S. Kelham,

11  and Hamilton Nicholsen because of similar conduct. Thus, Petitioner's membership interest in the

12  Company and his interests as an owner of the real property are directly at issue by Respondents'

13
14  conduct.

15    **Petitioner Repeatedly Requests KELHAM CORPORATE RECORDS, But**
   **Respondents Unjustly Fail to Comply**

16
17    35.    Given the events transpiring over the months preceding the abrupt announcement that

18  Respondent S. Kelham intends to buy Petitioner out of his business and sever their business

19  relationship, on June 1, 2021, Petitioner's attorney transmitted a written demand to receive or inspect

20  and copy seeking fourteen categories of records from Kelham Vineyards, including six categories of

21  records pursuant to Cal. Corp. Code §§ 17704.10 and 17701.13 ("Record Demand Letter") to be

22  delivered to Respondents.

23    36.    On June 4, 2021, Hamilton Nicholsen informed Petitioner's counsel that Petitioner "has

24  access to all the information you demand." Having found the response inadequate and inaccurate, on

25  June 8, 2021, Petitioner's counsel once again demanded the prompt delivery of the records or provide

26  him a date and time to inspect the documents at the Company.

27
28    37.    On June 10, 2021, Hamilton Nicholsen informed Petitioner's counsel that he could

8

review any information he would like at the Winery and directed him to schedule a visit with Kelham Vineyard's office manager. The next day, Respondent S. Kelham provided her first response to the Record Demand Letter. Therein she feigned confusion regarding the purpose of Petitioner's demand for the records. No documents were transmitted or forthcoming.

38.     On June 30, 2021, Petitioner notified Respondent that he and his attorney intended to appear in person on Thursday, July 1, 2021 at 10:00 a.m. to inspect and copy the records.  Later that same day, Respondent S. Kelham informed Petitioner that the records would ***not*** be available for his inspection at Kelham Vineyards. Instead, she claimed she would send the documents via email. Respondent also provided the contact information for Kelham Vineyards' former and current Certified Public Accountants and directed Petitioner's attorney to obtain the requested information from them.

39.     Also attached to the June 30th email were two letters from Respondent S. Kelham detailing her and Hamilton Nicholsen's retaliation against Petitioner for invoking his statutory right to obtain records from the Company. In those letters, Respondents made the spurious claim that Petitioner "resigned" and then informed him that his grossly diluted membership distributions were being further cut.

40.     At no time did Petitioner abdicate his ownership in the property, his membership interest in Kelham Vineyard, nor did he "resign" in his role as winemaker, vineyard operator, or his other roles at the Company.

41.     Hamilton Nicholsen also informed Petition that "the decision has been made by Kelham Vineyards to sell off a large majority of its current bulk wine inventory" and if Petitioner wished to purchase the wine then he should submit a written offer for the "remaining partners" to consider. The decision to sell of a significant asset of the Company before engaging an appraiser to evaluate and determine the fair market value of the Company certainly regarded Petitioner's

9

membership interest in Kelham Vineyards. And Petitioner believes it required his approval. He did not consent to the sale, which he believes was nonetheless effectuated over his objection.

42. Because of Respondents' ongoing refusal to provide the records and block Petitioner's access to the records at the Company, Petitioner contacted Kelham's two CPAs to ask for the records. Only one of the CPAs responded that she has not performed any work for Kelham Vineyards in more than six years and she returned all of its records to Respondent S. Kelham years ago. The other CPA did not respond to the numerous emails from Petitioner.

43. On July 11, 2021, Respondent S. Kelham transmitted what appears to be an incomplete and unsigned version of the Kelham Vineyard Operating Agreement. Petitioner contends that there is a version that is executed by all three members and should be produced.

44. On July 16, 2021, Petitioner once again demanded a fully executed version of the Operating Agreement and the remaining set of records. No response was forth coming until August 9, 2021 when Respondent S. Kelham transmitted some of the requested records. She did not transmit each amendment or version of the Operating Agreements or one executed by all three members, its state tax returns for the past six years, its federal tax return for year 2020, and the books and records of the limited liability company as they relate to the internal affairs of the limited liability for at least the current and past four fiscal years. The latter category being the most critical for his interests.

45. Thereafter, on or about August 17, 2021, Petitioner's counsel had a call with an attorney purporting to represent Hamilton Nicholsen regarding the parties deteriorating relationship. During that call, Petitioner's counsel explained that he had been waiting for months to receive the requested documents Respondents, including an executed copy of the Operating Agreement. Shockingly, the attorney stated he was in possession of a fully executed Operating agreement and possibly in possession of amendments to the Operating Agreement, and if permitted to do so, he would send them to Petitioner's counsel. Despite numerous follow-ups, no such documents were received from the

10

attorney and the attorney has never been heard from again.

46. On Sunday, September 12, 2021, Respondent S. Kelham transmitted another set of letters to Petitioner informing him that he was no longer permitted on the premises of Kelham Vineyards (a property he owns) and that he is not to contact Respondent S. Kelham or Hamilton Nicholsen. Having no access to Kelham Vineyards, its books or records, Petitioner is compelled to seek a writ from this Court.

## FIRST CAUSE OF ACTION

### Writ of Mandate Code of Civil Procedure 1085

47. Petitioner incorporates by reference all of the foregoing paragraphs, as though fully set forth herein.

48. California Code of Civil Procedure section 1085 (a) provides:

> A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded by that inferior tribunal, corporation, board, or person.

49. A writ of mandate lies to compel a limited liability company, such as Kelham Vineyards, and S. Kelham, a manager of a California Limited Liability Company in possession of the requested information, to perform an official act required by law. In this case, Respondents are in possession of KELHAM CORPORATE RECORDS and thus are required to provide Petition with those records and documents in response to a demand from Petitioner pursuant to Corporations Code sections 17704.10 and 17701.13.

50. California Code of Civil Procedure Section 1086 compels this Court to issue a writ "in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law. It must be issued upon the verified petition of the party beneficially interested." A writ of mandate will

11

lie when, as here, there is no plain, speedy, and adequate remedy, when Respondents have a duty to perform, and Petitioner has a clear beneficial right to performance. *Payne v. Superior Court of Los Angeles County* (1976) 17 Cal.3d 908

51.     Petitioner has standing to seek this writ because he is a member of the limited liability company and he has beneficial interest with a direct and substantial interest in the documents withheld. Without access to the books and records of Kelham Vineyards to which he is legally entitled, Petitioner is unable to evaluate or know of the assets, liabilities, and internal affairs of the Company. He is, accordingly, unable to determine whether his rights or obligations due to him by his other members have been violated. Likewise, without access to the books and records, Petitioner cannot obtain an independent value of "the partnership as it stands" for determining how and whether Kelham Vineyards should be wound down or whether the appraiser selected by Respondent S. Kelham is in possession of information that would inform it of the full picture of the assets and liabilities of Kelham Vineyards in Respondent S. Kelham's efforts to push him out of the company he founded.

52.     Petitioner seeks to enforce his rights as a member of the Company and he respectfully requests the Court issue a writ compelling Respondents to provide to him:

   a.  Kelham Vineyards' state tax returns for the past six years;

   b.  Kelham Vineyards' federal tax return for year 2020;

   c.  The complete Operating Agreement executed by all three members of Kelham Vineyards; and

   d.  Kelham Vineyards' "books and records … as they relate to the internal affairs of the limited liability for at least the current and past four fiscal years".

53.     Petitioner is informed and believes and thereon alleges that, at all times relevant, Respondents have been able to provide Petitioner with the KELHAM CORPORATE RECORDS, and to permit Petitioner to inspect and copy those and other company documents. Notwithstanding this ability, and despite Petitioner's repeated requests, Respondents have failed and refused to perform their legal duty to comply.

12

Case: 23-01009    Doc# 3    VERIFIED PETITION FOR WRIT OF 06/11/23 07:50:23    Page 14 of 17
Filed: 09/11/23    Entered: 06/11/23 07:50:23

Case: 23-10384    Doc# 73-2    Filed: 09/12/23    Entered: 09/12/23 20:01:21    Page 31 of 120

54.     Rather than comply with the California Corporations Code, Respondents obstructed Petitioner's right to access the records and retaliated against him for making the demand. Hamilton Nicholsen instructed Petitioner's attorney that he could access the records at Kelham Vineyard but when Petitioner endeavored to do so, Respondent S. Kelham refused to permit him to do so by denying him access to the records. Then Respondent S. Kelham directed Petitioner to contact Kelham Vineyards' former CPAs to obtain the records, and although he was not required to, Petitioner did so in good faith but to no avail. Petitioner also tried to obtain some of the KELHAM CORPORATE RECORDS from Hamilton Nicholsen's attorney but no records were forthcoming.

55.     Further, Respondents have continued an illegitimate retribution campaign in retaliation for Petitioner's demand of the KELHAM CORPORATE RECORDS he is legally entitled to receive. These retaliatory actions include, without limitation, prohibiting Petitioner from entering the premises he owns and claiming he is not allowed to contact his mother or brother, and current co-members of Kelham Vineyards. Respondent S. Kelham and Hamilton Nicholsen's conduct reflects that absent a writ from this Court, Respondents will not produce to Petitioner the records to which he is legally entitled.

56.     Petitioner has no plain, speedy, and adequate remedy in the ordinary course of law, other than the relief sought in this Petition. Petitioners seek timely, current, and sufficiently informative information about the Company and Petitioner's interests.

57.     Respondents' failure to comply with their statutory obligations has damaged Petitioner by denying him access to current information about the Company and Petitioner's interests, to which Petitioner is clearly entitled, and which Respondents are legally required to provide. Further, Petitioner has been forced to incur legal expenses in bringing this Petition for which he otherwise would not have incurred.

58.     Per Cal. Corp. Code § 17704.10(g), "if the court finds the failure of the limited liability

Case: 23-01009    Doc# 3    VERIFIED PETITION FOR WRIT OF MANDATE 07:50:23    Page 15 of 17
Filed: 09/11/23    Entered: 09/11/23 07:50:23

Case: 23-10384    Doc# 73-2    Filed: 09/12/23    Entered: 09/12/23 20:01:21    Page 32 of 120

company to comply with the requirements of this section is without justification, the court may award

an amount sufficient" to reasonably reimburse a member for expenses, including attorneys' fees.

Respondents have not provided any, let alone "sufficient," justification for their failure to comply, and

Petitioner is entitled to an award of costs and attorneys' fees.

**WHEREFORE, Petitioner prays**:

a.      That the Court issue a writ of mandate compelling Respondents to forthwith deliver

to Petitioner copies of the KELHAM CORPORATE RECORDS;

b.      That the Court issue a writ of mandate commanding Respondents to forthwith permit

Petitioners to conduct an inspection and copying of the Company's books and records as requested;

c.      For an award of costs and attorneys' fees to compensate Petitioner for reasonable

expenses incurred in bringing this Petition; and

d.      For such other and further relief as the Court may deem proper

Respectfully submitted,

GREENBERG TRAURIG

Dated:  October 4, 2021                    By:    */s/ Harold Davis*
                                                                Harold Davis
                                                                Marc Baluda

                                                                Attorneys for Petitioner
                                                                RONALD NICHOLSEN II

14

## VERIFICATION

I, Ronald Nicholsen II, am the petitioner in this proceeding. I have read the foregoing petition and know its contents. The facts stated therein are true and are within my personal knowledge, except those alleged on information and belief, and as to those I believe true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is correct.

Executed October 4, 2021, at Napa, California.

By: _____  10·04·2021

RONALD NICHOLSEN II

# Exhibit  2 - MFRS

Harold H. Davis (SBN CA 235552)
Marc R. Baluda (SBN CA 192516)
GREENBERG TRAURIG, LLP
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone: 415.655.1300
Facsimile: 415.707.2010
Hal.Davis@gtlaw.com
Marc.Baluda@gtlaw.com

Attorneys for Party in Interest
RONALD NICHOLSEN II

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA – SANTA ROSA

In re Kelham Vineyards & Winery, LLC

Bankruptcy Case No.
23-10384 SR__ - Chapter 11
[Assigned to: Judge William Lafferty]

**PARTY IN INTEREST RONALD NICHOLSEN II'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

Hearing:
DATE:    August 16, 2023
TIME:    9:30 a.m.
DEPT:    220

# Table of Contents

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................... 3

I.     INTRODUCTION ......................................................................................................... 3

II.    THE PARTIES ............................................................................................................. 3

III.   JURISDICTION ........................................................................................................... 4

IV.   FACTUAL BACKGROUND ........................................................................................ 4

     A.    Ronald Nicholsen's Petition for Writ of Mandate ............................................. 5

     B.    The California state court granted a Writ of Mandate compelling Kelham
Vineyards' and Susanna Kelham's Compliance with the California Corporation
Code ............................................................................................................................ 5

     C.    The California state court orders Kelham Vineyards and Susanna Kelham to pay
sanctions and fees for their failure to comply with the Writ and on-going violations
of California law ....................................................................................................... 6

     D.    The California state court set a trial to commence in 70 days ........................... 7

          1.    Discovery in the state action regarding the Purported Debt to Main Street LLC ..... 7

          2.    Hamilton Nicholsen's Deposition ...................................................................... 8

     E.    The California state action is not stayed as to Susanna Kelham ........................ 9

V.    LEGAL AUTHORITY ............................................................................................... 10

     A.    Relief from the Stay will allow the California state court to proceed to final judgment
and conserve judicial economy. .............................................................................. 11

     B.    The Other *Curtis* Factors Support Lifting the Stay .......................................... 13

VI.   CONCLUSION ........................................................................................................... 14

# TABLE OF AUTHORITIES

## Cases

In American Spectrum Realty, Inc.

    540 B.R. 730 (Bankr.C.D.Cal.2015) ...................................................................12

In re Curtis
    40 B.R. 795 (Bankr. D. Utah 1984) .............................................................10, 11

In re Elmira Litho, Inc.
    174 B.R. 892 (Bankr. S.D.N.Y. 1994)................................................................10

In re Korean Western Presbyterian Church of Los Angeles

    618 B.R. 282 (Bankr.C.D.Cal. 2020) ..................................................................12

In re Kronemyer
    405 B.R. 915 (9th Cir. 2009) .......................................................................10, 11

In re Plumberex Specialty Products, Inc.
    311 B.R. 551 (Bankr. C.D. Cal. 2004) .........................................................10, 11

In re Woodberry
    383 B.R. 373 (Bankr.D.S.C.2008) .......................................................................4

MacDonald v. MacDonald (In re MacDonald)
    755 F.2d 715 (9th Cir. 1985) .............................................................................10

Ozai v. Tabuena (In re Ozai)
    34 B.R. 764 (9th Cir. BAP 1983) ......................................................................10

## Statutes

11 U.S.C. § 101 ...............................................................................................1, 4

11 U.S.C. § 362 .......................................................................................4, 10, 11

11 U.S.C. Section 522 .................................................................................11, 13

28 U.S.C. § 157 .................................................................................................4

Cal. Code Civ. Proc. 1085 ...................................................................................5

Cal. Corp. Code 17701.13 ...................................................................................5

Cal. Corp. Code, §17704.10..................................................................4, 5, 7, 12

2

[Assigned to: Judge William Lafferty]

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PARTY IN INTEREST'S MOTION TO LIFT THE AUTOMATIC STAY

ACTIVE 689142159v1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

This is an internecine family business dispute involving a request for books and records under the California Corporations Code. On the one hand we have a brother (Hamilton Nicholsen, who filed a Petition for Involuntary Bankruptcy on behalf of a purported creditor) and a mother (Susanna Kelham); on the other hand, is a second brother (Ronald Nicholsen). All three own the claimed debtor, Kelham Vineyards & Winery, LLC (the "Debtor"). Hamilton Nicholsen, on behalf of the creditor, filed this Petition for Involuntary Bankruptcy against his own company to stay a California state Petition for Writ of Mandate action filed by his brother and co-owner exercising his right to the Debtor's books and records. Specifically, after months of evading being deposed following the California state court--issued Writ of Mandate, the California state court compelled Hamilton Nicholsen's attendance at his deposition on July 24, 2023. On the eve of his deposition Hamilton Nicholsen caused this Petition for Involuntary Bankruptcy to be filed by his company, Main Street Cottage, LLC.

The involuntary bankruptcy petition is consistent with and in furtherance of Kelham Vineyards' and Susanna Kelham's ongoing effort to obstruct Ronald Nicholsen's statutory right to inspect the company's books and records, and the California state court's Writ of Mandate, as evidenced by fee and sanctions awards against Susanna Kelham (personally) totaling over more than $140,000 to date. A bench trial is set to begin in 63 days (October 2, 2023) against Kelham Vineyards and Susanna Kelham. The only questions to be resolved in that trial are whether the parties complied with the Court's writ of mandate issued on November 4, 2022 and whether Ronald Nicholsen can recover his attorneys fees and costs in attempting to enforce his statutory rights.

## II.     THE PARTIES

Purported creditor Main Street Cottage, LLC ("Main Street LLC") is a California limited liability company. Debtor Kelham Vineyards & Winery LLC ("Kelham Vineyards" or "Debtor") is a California limited liability company. The members of the parties are as follows:

| Main Street Cottage LLC | Debtor Kelham Vineyards & Winery LLC |
|---|---|
| Hamilton Nicholsen | Hamilton Nicholsen (Respondent) |
| Susanna Kelham (Respondent) | Susanna Kelham (Respondent) |
| | Ronald Nicholsen (Petitioner) |

1    Hamilton Nicholsen and Ronald Nicholsen are brothers and sons of Susanna Kelham. Hamilton

2    Nicholsen and Susanna Kelham, as well as their affiliate company (and petitioning creditor) Main Street

3    LLC, are "insiders" of the Debtor as expressly described in 11 U.S.C. § 101 (31)(B) (i-vi) & E. Ronald

4    Nicholsen files this motion to lift the stay as to Kelham Vineyards to protect his rights to books and

5    records, as reflected in an issued Writ of Mandate, and enforce the California court's orders regarding

6    access to information, including a California court mandated deposition.

7                                    **III.    JURISDICTION**

8            This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 157(b)(2)(G) & (O).  The

9    Bankruptcy Court has authority to grant relief from the automatic stay "[o]n request of a party in interest"

10   pursuant to 11 U.S.C. § 362(d)(1). The term "party in interest" is not defined in the Bankruptcy Code.

11   Status as "a party in interest" under § 362(d) "must be determined on a case-by-case basis, with reference

12   to the interest asserted and how [that] interest is affected by the automatic stay." In re Woodberry, 383

13   B.R. 373, 378 (Bankr.D.S.C.2008) (internal quotation marks and citation omitted). Ronald Nicholsen is

14   an interested party under Section 362(d) based on, *inter alia*, his status as a member of Kelham

15   Vineyards.

16                               **IV.    FACTUAL BACKGROUND**

17           Ronald Nicholsen founded Kelham Vineyards in 1999 at 360 Zinfandel Lane, St. Helena,

18   California, as a winery and tasting room on 6.7 acres in prime California wine country. Susanna Kelham

19   and Hamilton Nicholsen subsequently joined the company and collectively the three owned, operated,

20   and managed Kelham Vineyards until Susanna Kelham abruptly pushed Ronald Nicholsen from the

21   business and banned him from the property in May 2021. Since that time, Hamilton Nicholsen and

22   Susanna Kelham have had exclusive control of Kelham Vineyards and its operations – over Ronald

23   Nicholsen's objections.

24           As a member of Kelham Vineyards, Ronald Nicholsen has a statutory right under California law

25   to inspect the company's books and records. See Cal. Corp. Code, §17704.10 (a).[1] Immediately after

---

[1] "Upon the request of a member or transferee, for purposes reasonably related to the interest of that person as a member or a
transferee, a manager or, if the limited liability company is member-managed, a member in possession of the requested
information, shall promptly deliver, in Writing, to the member or transferee, at the expense of the limited liability company, a
copy of the information required to be maintained by paragraphs (1), (2), and (4) of subdivision (d) of Section 17701.13, and
any Written operating agreement of the limited liability company."

being forced out of the company he founded, Ronald Nicholsen invoked his statutory right to inspect the company's records on June 1, 2021.

### A.    Ronald Nicholsen's Petition for Writ of Mandate

Ronald Nicholsen made the initial request to inspect Kelham Vineyards books and records on June 1, 2021. After months of obfuscation and delay by Debtor Kelham Vineyards and Susanna Kelham, on October 4, 2022, Ronald Nicholsen filed a verified petition (the "Petition") pursuant to California Code of Civil Procedure §1085 for a Writ of mandate compelling Kelham Vineyards and Susanna Kelham (the "respondents") to comply with their obligations under California Corporations Code §§ 17704.10 and 17701.13, *et seq*., to permit him to inspect the company's books and records in California Superior Court, County of Napa. Declaration of Harold Davis ("Decl. Davis"), ¶ 2, Exhibit 1.

Despite quickly serving Kelham Vineyards, Susanna Kelham, a member of both debtor Kelham Vineyards and petitioning creditor Main Street LLC, evaded five separate attempts to personally serve her the Petition. Eventually, on November 15, 2021, counsel for Kelham Vineyards accepted service of the Petition on Susanna Kelham's behalf. Decl. Davis, ¶ 3, Exhibit 2 and Exhibit 3. On January 26, 2022, Kelham Vineyards filed a response to the Petition. Susanna Kelham did not personally respond to the Petition.

### B.    The California state court granted a Writ of Mandate compelling Kelham Vineyards' and Susanna Kelham's Compliance with the California Corporation Code

Unfortunately, the filing of the Petition did not secure respondents Kelham Vineyards and Susanna Kelham's compliance. On September 27, 2022, Ronald Nicholsen filed an opening brief on the merits for a Writ of mandate. Neither respondent bothered filing an opposition. On November 4, 2022, the California state court heard arguments from Ronald Nicholsen and Kelham Vineyards regarding the merits of Ronald Nicholsen's Petition. Thereafter, the California state court granted Ronald Nicholsen's Petition for Writ and compelled Kelham Vineyards and Susanna Kelham to provide him its books and records, which included, but was not limited to, 19 categories of records enumerated therein ("Writ"). Decl. Davis, ¶ 4, Exhibit 4.

Pursuant to the Writ, on December 4, 2022, the parties appeared at the winery for Ronald Nicholsen to inspect the Debtor's books and records. The only records presented were hard copy

1  documents provided in such a haphazard manner that Ronald Nicholsen was forced hire a vendor to scan

2  the records to determine if respondents complied with the Writ. Respondents Kelham Vineyards and

3  Susanna Kelham denied Ronald Nicholsen's repeated requests to permit the vendor to scan the records

4  off-site for a considerably discounted price. Decl. Davis, ¶ 5.

5      Over the following two weeks, Kelham Vineyards provided inconsistent representations regarding

6  whether 29 banker boxes contained any records responsive to the Writ. By December 20, 2022, the

7  vendor had scanned 1/3 of the records, costing Ronald Nicholsen more than $24,000; but without any

8  confirmation from Kelham Vineyards the relevancy of the thousands of other pages, Ronald Nicholsen

9  was forced to call off the scanning efforts. Ronald Nicholsen still does not know the content of those 29

10  banker boxes. And he has received scant electronic documents.

11      **C.    The California state court orders Susanna Kelham to pay sanctions and fees for
        respondents' failure to comply with the Writ and on-going violations of California law**

12

13      Respondents Kelham Vineyards and Susanna Kelham were required to make an initial return of

14  the Writ by December 15, 2021. Neither bothered, and both continued withholding records from Ronald

15  Nicholsen.

16      On January 25, 2023, during a regularly scheduled case management conference, Ronald

17  Nicholsen informed the California state court of the respondents' on-going non-compliance. In response,

18  the state court told respondents that it was not "rocket science" and *sua sponte* set a hearing to show

19  cause why they should not be sanctioned for failing to comply with the Writ. Decl. Davis, ¶ 6.

20      By the date of the hearing on the order to show cause, on February 15, 2023, Kelham Vineyards

21  and Susanna Kelham had neither returned the Writ, produced any additional records, nor made another

22  other effort to comply with the Writ. Ronald Nicholsen requested that the state court hold Susanna

23  Kelham personally liable on behalf of both respondents because she is the managing member of Kelham

24  Vineyards, and any order against Kelham Vineyards would hurt Ronald Nicholsen's pecuniary interest in

25  the Company. The California state court sanctioned Susanna Kelham $1,500, personally, for her and

26  Kelham Vineyards' failure to comply with its Writ.[2] Decl. Davis, ¶ 7, Ex. 5. As part of its order, the state

27  court also determined that Kelham Vineyards' and Susanna Kelham's refusal to comply with its Writ and

28  _____
    [2] The law firm representing Kelham Vineyards in the state action paid this sanction on her behalf.

Case: 23-10384    Doc# 72-3    Filed: 09/30/23    Entered: 09/30/23 16:23:38    Page 7 of
                                      16
Case: 23-10384    Doc# 73-2    Filed: 09/12/23    Entered: 09/12/23 20:01:21    Page 42
                                      of 120

the Corporations Code, as of March 2, 2023, was without justification pursuant to Cal. Corp. Code §17704.10 (g). Id. The court set a further order to show cause as to why they still had not returned the Writ and sanctions should not issue. Id.

The second hearing for an order to show cause for why sanctions should not issue was held on March 13, 2023. Days before that hearing, Kelham Vineyards finally made an initial return of the Writ, which was woefully deficient. Decl. Davis, ¶ 8. Susanna Kelham did not return the Writ by the hearing. Decl. Davis, ¶ 9, Ex. 6. At the conclusion of that hearing, the California state court set another hearing on April 17, 2023, for third order to show cause to Susanna Kelham for her failure to appear, and to rule Ronald Nicholsen's petition for attorney's fees.

Thereafter, Susanna Kelham appeared through new counsel in the action and made an initial return of the Writ whereby she made the baseless claim that she complied with the Writ. As of today's date, Kelham Vineyards has refused to provide any of the company's emails, Susann Kelham has refused to produce emails sent on her personal email account regarding the company and responsive to the Writ, records regarding purported debts with related entity Kelham Vineyards Growers, LLC, and numerous other categories of records required by the Writ. Decl. Davis, ¶ 10.

On May 10, 2023, the state court awarded Ronald Nicholsen $134,679.40 as a partial reimbursement for his expenses, including attorney's fees, up to March 9, 2023, against Susanna Kelham, personally, due to her and Kelham Vineyards' failure to comply with the Writ and Corporations Code. Decl. Davis, ¶ 11, Ex, 7.

**D. The California state court set a trial to commence in 63 days**

By the May 10, 2023 order, the state court ruled that there were questions of fact regarding Kelham Vineyards' and Susanna Kelham's compliance with the Writ (and the Corporations Code) necessitating an evidentiary hearing. On May 18, 2023, the state court set 1-2 day trial to commence in 63 days, on October 2, 2023. Decl. Davis, ¶ 29, Ex. 18 (docket of the state action).

1. _Discovery in the state action regarding the Purported Debt to Main Street LLC_

Although the Involuntary Petition does not mention the property for which rent is allegedly due, Ronald Nicholsen is informed and understands that the only property Kelham Vineyards purports to rent from Main Street LLC is a home located at 1760 Main Street in St. Helena, California ("1760 Main

7                                    [Assigned to: Judge William Lafferty]
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PARTY IN INTEREST'S MOTION TO LIFT THE
STAY
ACTIVE 689142159v1

Case: 23-10384   Doc# 72-3   Filed: 09/30/23   Entered: 09/30/23 16:23:36   Page 9 of
16

Case: 23-10384   Doc# 73-2   Filed: 09/12/23   Entered: 09/12/23 20:01:21   Page 43
of 120

Street").

In anticipation of the trial in the Writ action, Ronald Nicholsen deposed Susanna Kelham on April 27, 2023. Susanna Kelham testified that she purchased 1760 Main Street and Kelham Vineyards pays $5,250 in rent for use of the property as an incentive for winery club members to stay at the house in exchange for purchasing wine. Decl. Davis, ¶ 12, Ex. 8, [Tr. 204:12-205:1]. She further testified that she did not know whether Kelham Vineyards had made all payments due to Main Street LLC, the now purported owner of 1760 Main Street. *Id.* [Tr. 310:7-22]. She also testified that Melanie Drescher, the bookkeeper for *both* Kelham Vineyards and Main Street LLC, would know whether Kelham Vineyards owed any amounts for unpaid rent to Main Street LLC. *Id.*

At her deposition on May 18, 2023, Melanie Drescher confirmed she was the bookkeeper for *both* Kelham Vineyards and Main Street LLC. She testified in her personal capacity and on behalf of Kelham Vineyards regarding topics: "7. The assets and liabilities of Kelham Vineyards…" and "11. All real properties for which Kelham Vineyards pays mortgage, rental or use payments and/or property taxes and any associated mortgage or lease agreements whether Written or oral." Decl. Davis, ¶13. Ms. Drescher testified that she believed Kelham Vineyards had paid all rent due to Main Street LLC, but she needed to check. Dec. Davis, ¶ 13, Ex. 9 [Tr. 81:22-23].

2.    Hamilton Nicholsen's Deposition

In anticipation of the trial in the California state court, Ronald Nicholsen served notices of deposition of Kelham Vineyards and Hamilton Nicholsen. On January 20, 2023, Ronald Nicholsen served a deposition subpoena on Hamilton Nicholsen. Decl. Davis, ¶ 14, Ex. 10. Ronald Nicholsen served amended deposition subpoenas on Hamilton Nicholsen on January 30, 2023, February 13, 2023, and March 15, 2023. Decl. Davis, ¶ 15, Ex. 11. Thereafter, on March 28, 2023, Hamilton Nicholsen's personal counsel informed Ronald Nicholsen that he would not appear for his deposition on March 31, 2023. Decl. Davis, ¶ 16, Ex. 12.

Hamilton Nicholsen's counsel also objected to the subpoenas because Hamilton Nicholsen allegedly experienced a medical emergency and he was unable to be deposed until the foreseeable future. *Id.* Despite any health concerns, Hamilton Nicholsen attended all the other depositions in the California state action - each lasting more than 6 hours - without issue starting on April 27, 2023. Decl. Davis, ¶ 17.

8    [Assigned to: Judge William Lafferty]
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PARTY IN INTEREST'S MOTION TO LIFT THE
*ACTIVE 689142159v1*

Case: 23-10384    Doc# 73-2    Filed: 09/12/23    Entered: 09/12/23 20:01:21    Page 44 of 120

1    Hamilton Nicholsen is the last fact-witness Ronald Nicholsen anticipates deposing in anticipation

2    of the trial in the state action. Decl. Davis, ¶ 18. After months of refusing to produce Hamilton Nicholsen

3    to testify, on May 31, 2023, Ronald Nicholsen was forced to file a motion to compel, among other things,

4    Hamilton Nicholsen's deposition both as a person designated most knowledgeable by Kelham Vineyards

5    and in his personal capacity pursuant to four duly served deposition subpoenas. Decl. Davis, ¶ 19.

6    In its opposition to that motion, Kelham Vineyards designated Hamilton Nicholsen to testify as its

7    person most knowledgeable regarding nine topics of inquiry. Decl. Davis, ¶ 20, Ex. 13, p. 2. On June 29,

8    2023, the California state court granted Ronald Nicholsen's motion to compel and ordered the parties to

9    "meet and confer in good faith to schedule a mutually convenient date and time within the next four

10   weeks for [Hamilton Nicholsen's] deposition." Decl. Davis, ¶ 21, Ex. 14.

11   Thereafter, the parties agreed that Hamilton Nicholsen's deposition—as the person most

12   knowledgeable and in his personal capacity pursuant to the deposition subpoenas—would proceed on

13   Monday, July 24, 2023. Decl. Davis, ¶ 22.

14   **E.    The California state action is not stayed as to Susanna Kelham**

15   On July 20, 2023, the parties appeared in California state court for a further case management

16   conference. Decl. Davis, ¶ 23. Moments after the conference concluded, and without informing the court

17   of the prepared filing, at 9:02:53 a.m. Hamilton Nicholsen – on behalf of Main Street LLC – filed

18   Official Form 205 – Involuntary Petition against a Non-Individual, debtor Kelham Vineyards. Decl.

19   Davis, ¶ 24, Ex. 15.

20   At 5:42 p.m. on July 20, 2020, Main Street LLC's counsel in this involuntary case transmitted a

21   letter regarding the "automatic stay" arising from the filing of the Chapter 11 Petition. Decl. Davis, ¶ 25.

22   On July 21, 2023, at 12:49 p.m., Kelham Vineyards filed a Notice to Stay Proceedings in the Superior

23   Court. Decl. Davis, ¶ 23.

24   On July 21, 2023, at 3:01 p.m., Hamilton Nicholsen's personal counsel informed Ronald

25   Nicholsen that he would not appear for his deposition in his personal capacity due to the automatic stay

26   of the Writ Action, even though he was subpoenaed to appear in his personal capacity in the state court

27   action against Susanna Kelham. Decl. Davis, ¶ 26, Ex. 16.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PARTY IN INTEREST'S MOTION TO LIFT THE STAY

*ACTIVE 689142159v1*

1    On July 26, 2023, counsel for Kelham Vineyards contacted the clerk of the California state court
2    and requested that all the dates and proceedings in the writ action be taken off calendar because he
3    believed the entire case was stayed. Decl. Davis, ¶ 28. On July 27, 2023, the clerk responded and denied
4    the request because, as the clerk correctly noted, Ronald Nicholsen's writ action is against Susanna
5    Kelham and that case is active. Decl. Davis, ¶ 28, Exhibit 17.

6                                    **V.    LEGAL AUTHORITY**

7        Section 362(d)(1) provides that "[o]n request of a party in interest and after notice and a hearing,
8    the court shall grant relief from the stay ... (1) for cause...." 11 U.S.C. § 362(d)(1). What constitutes
9    "cause" for granting relief from automatic stay is decided on a case-by-case basis. 11 U.S.C. §362(d)(1).

10       "To obtain relief from the automatic stay, the party seeking relief must first establish a prima facie
11   case that 'cause' exists for relief under § 362(d)(1)." In re Plumberex Specialty Products, Inc., 311 B.R.
12   551, 557 (Bankr. C.D. Cal. 2004) (footnote omitted). "Once a prima facie case has been established, the
13   burden shifts to the debtor to show that relief from the stay is unwarranted." Id. "A prima facie case
14   requires the movant to establish 'a factual and legal right to the relief that it seeks.'" Id. at 557, n. 11
15   (citing In re Elmira Litho, Inc., 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994)). "The decision whether to
16   grant or deny stay relief is within the broad discretion of the bankruptcy court." Id. at 558; In re
17   Kronemyer, 405 B.R. 915, 919 (9th Cir. 2009) ("The decision of a bankruptcy court to grant relief from
18   the automatic stay under § 362(d) is reviewed for abuse of discretion.").

19       "Among factors appropriate to consider in determining whether relief from the automatic stay
20   should be granted to allow state court proceedings to continue are considerations of judicial economy and
21   the expertise of the state court, as well as prejudice to the parties and whether exclusively bankruptcy
22   issues are involved." In re Kronemyer, 405 B.R. at 921 (citations omitted) (citing MacDonald v.
23   MacDonald (In re MacDonald), 755 F.2d 715, 717 (9th Cir. 1985) and Ozai v. Tabuena (In re Ozai), 34
24   B.R. 764, 766 (9th Cir. BAP 1983)).

25       There are also 12 non-exclusive factors articulated In re Curtis, 40 B.R. 795, 799–800 (Bankr. D.
26   Utah 1984), known as the *Curtis* factors, that courts weigh to determine whether "cause" exists to grant
27   relief to allow an entity to continue pending litigation against a debtor in a non-bankruptcy forum. In re
28   Kronemyer, 405 B.R. at 921.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PARTY IN INTEREST'S MOTION TO LIFT THE
STAY
*ACTIVE 689142159v1*

1. Whether the relief will result in a partial or complete resolution of the issues;

2. The lack of any connection with or interference with the bankruptcy case;

3. Whether the foreign proceeding involves the debtor as a fiduciary;

4. Whether a specialized tribunal has been established to hear the particular cause of action and whether that tribunal has the expertise to hear such cases;

5. Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation;

6. Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question;

7. Whether the litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties;

8. Whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c);

9. Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f);

10. The interests of judicial economy and the expeditious and economical determination of litigation for the parties;

11. Whether the foreign proceedings have progressed to the point where the parties are prepared for trial, and

12. The impact of the stay on the parties and the "balance of hurt."

In re Plumberex, 311 B.R. at 559 (citing In re Curtis, 40 B.R. 795 (Bankr. D. Utah 1984)). Not all the factors will be relevant, and some will carry more weight than others. Id. at 560. As shown below, many of the factors demonstrate that cause exists to grant relief and lift the stay to allow Ronald Nicholsen's Writ action to proceed in the California state court against Kelham Vineyards.

**A.      Relief from the Stay will allow the California state court to proceed to final judgment and conserve judicial economy.**

Many of the factors are present here and strongly support severing the Writ action from the bankruptcy case. See In re Plumberex, 311 B.R. at 556–57 ("Courts in the Ninth Circuit have granted relief from the stay under § 362(d)(1) when necessary to permit pending litigation to be concluded in another forum if the non-bankruptcy suit involves multiple parties or is ready for trial."). In re Kronemyer, 405 B.R. at 921 ("[S]tay should be granted to allow state court proceedings to continue are considerations of judicial economy and the expertise of the state court, as well as prejudice to the parties and whether exclusively bankruptcy issues are involved."); see also In American Spectrum Realty, Inc.,

11                    [Assigned to: Judge William Lafferty]
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PARTY IN INTEREST'S MOTION TO LIFT THE STAY
ACTIVE 689142159v1

Case: 23-10384    Doc# 72-3    Filed: 09/30/23    Entered: 09/30/23 16:23:38    Page 12 of 16

Case: 23-10384    Doc# 73-2    Filed: 09/12/23    Entered: 09/12/23 20:01:21    Page 47 of 120

540 B.R. 730, 739 (Bankr.C.D.Cal.2015) ("All of the causes of action in the Texas Action arise under state law. The Texas court is best suited to adjudicate these causes of action. This Court has independently reviewed the docket in the Texas Action which reflects extensive pleadings, decisions, and dispositions by the Texas state court which could include interpretations of the Agreed Temporary Injunction Order and whether disbursements made under that order were appropriate. As a result, there is a risk of inconsistent determinations between the two court systems.").

Ronald Nicholsen's Writ action has been pending in state court since October 4, 2021. The California state court has already ruled on the merits of his claim and issued a Writ of mandate. The Writ action is not stayed as to respondent Susanna Kelham and it will proceed to trial in 63 days – with or without Kelham Vineyards. Accordingly, the **tenth *Curtis* factor** (the interests of judicial economy and the expeditious and economical determination of litigation for the parties) is met here. "While it is true that one purpose of bankruptcy is to avoid piecemeal litigation and enable the bankruptcy court to decide in one forum various related proceedings, forcing the parties to start anew in this Bankruptcy Court would result in a duplication of efforts and would be a waste of judicial resources." In re Korean Western Presbyterian Church of Los Angeles, 618 B.R. 282, 290 (Bankr.C.D.Cal. 2020). It would be highly inefficient and a significant waste of judicial resources to start the Writ petition against Kelham Vineyards anew. The only issues that remain in the California state action is whether respondents Kelham Vineyards and Susanna Kelham complied with the Writ, and if not, whether their failure to comply was with justification pursuant to Cal. Corp. Code § 17704.10 (g).

The resolution of these questions has no connection with and will not interfere with the bankruptcy case so the **second *Curtis* factor** (the lack of any connection with or interference with the bankruptcy case) is also satisfied. Respondents in the state action have never served discovery and the deposition of Hamilton Nicholsen is the last deposition Ronald Nicholsen intends to take.[3] Conversely, the initial status conference in this bankruptcy case is scheduled for September 20, 2023, which is less than two weeks before the 1–2-day trial is set to begin. [Dkt. 3]. Moreover, the pending trial will

---

[3] Subject to resolution of the parties' current dispute regarding Susanna Kelham's refusal to answer deposition questions and errata containing 29 substantive changes to her testimony, which resolution may require Susanna Kelham and Melanie Drescher to provide supplemental deposition testimony.

12                              [Assigned to: Judge William Lafferty]

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PARTY IN INTEREST'S MOTION TO LIFT THE STAY

*ACTIVE 689142159v1*

Case: 23-10384     Doc# 72-3     Filed: 09/30/23     Entered: 09/30/23 16:21:38     Page 13 of 16

completely resolve the issues arising from the Writ action so the **first** *Curtis* **factor** (whether the relief will result in a partial or complete resolution of the issues) is also met.

These questions pending in the state action involve the state court's interpretation of California law and its own Writ of Mandate. Thus, the **fourth** *Curtis* **factor** (whether a specialized tribunal has been established to hear the particular cause of action and whether that tribunal has the expertise to hear such cases) is also present. While a special tribunal has not been empaneled, the state court is experienced at adjudicating Writ of Mandate actions regarding state laws. In this case, the state court made numerous decisions regarding its interpretation of the California Corporations code, the Writ it issued, and whether respondents complied with its terms.

Whether Kelham Vineyards and Susanna Kelham complied with the Writ is the subject of the forthcoming trial set to begin in 63 days, on October 2, 2023, so the **eleventh** *Curtis* **factor** (whether the foreign proceedings have progressed to the point where the parties are prepared for trial) is met.

Conversely, a stay of the state action would be highly prejudicial to Ronald Nicholsen, and therefore the **twelfth Curtis factor** (the impact of the stay on the parties and the "balance of hurt") tips in favor of granting relief from stay. Ronald Nicholsen has expended significant legal fees over the past two years to enforce his statutory right to inspect Kelham Vineyards' books and records in the state action and to depose Hamilton Nicholsen. Ronald Nicholson should not be forced to start over and allowing him proceed in the Writ action where it is almost completed will provide negligible, if any, prejudice to the Debtor.

### B. The Other *Curtis* Factors Support Lifting the Stay

Because the Debtor is not an individual and not entitled to claim exemptions, the Writ action would not result in a judicial lien avoidable by the Debtor under 11 U.S.C. Section 522(f) and the **ninth** *Curtis* **factor** (whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f)) weighs in favor of granting this Motion.

Finally, the interests of Main Street LLC – or other creditors – will not be prejudiced if the stay is lifted. Ronald Nicholson seeks to complete his attempt to enforce of the Writ which is close to trial. While allowing the litigation concerning the Writ may result in a monetary judgment being entered

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PARTY IN INTEREST'S MOTION TO LIFT THE STAY

Case: 23-10384   Doc# 72-3   Filed: 09/30/23   Entered: 09/30/23 16:23:38   Page 15 of 16
ACTIVE 689142159v1

Case: 23-10384   Doc# 73-2   Filed: 09/12/23   Entered: 09/12/23 20:01:21   Page 49 of 120

against the Debtor, by this Motion Ronald Nicholson is not seeking relief from the automatic stay to enforce or collect any such judgment against the Debtor. Rather, the enforcement of any such judgment (absent further relief granted by this Court) would be in this bankruptcy case. Therefore, the **seventh *Curtis* factor** (whether the litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties) favors lifting the stay.

## VI. <u>CONCLUSION</u>

For the foregoing reasons, Ronald Nicholsen respectfully requests an order lifting the automatic stay as it pertains to the California writ action so that it may proceed to trial as scheduled. In the alternative, Ronald Nicholsen respectfully requests an order lifting the stay to permit him to conclude his Writ action against Kelham Vineyards.

Dated: July 31, 2023            GREENBERG TRAURIG, LLP

                By:    */s/ Harold H. Davis*
                      Harold H. Davis
                      Marc R. Baluda

                      Attorneys for Petitioner
                      RONALD NICHOLSEN II

# Exhibit 3 - OPPOSITIION re MFRS

Case: 23-10384    Doc# 72-4    Filed: 09/10/23    Entered: 09/10/23 16:21:38    Page 1 of 19

Case: 23-10384    Doc# 73-2    Filed: 09/12/23    Entered: 09/12/23 20:01:21    Page 51 of 120

1  **REBEKAH PARKER SBN 143674**
   4225-H Oceanside Boulevard #369
2  Oceanside CA, 92056-3472
   Telephone No. (213) 628-2918
3  Email: AttorneyRParker@Gmail.Com

4  Attorney for Main Street Cottage, LLC.
   Petitioning Creditor

5

6                    **UNITED STATES BANKRUPTCY COURT**

                     **NORTHERN DISTRICT OF CALIFORNIA**
7
                        **SANTA ROSA DIVISION**
8
   In re                                    **Case No. 23-10384**
9  KELHAM VINEYARD & WINERY, LLC.
                        Alleged Debtor.
10                                          Chapter 11

11

12                                          **OPPOSITION TO RONALD NICHOLSEN
                                            II' S MOTION FOR RELIEF FROM THE
13                                          AUTOMATIC STAY: MEMORANDUM OF
                                            POINTS AND AUTHORITIES; AND
14                                          DECLARATION OF REBEKAH PARKER
                                            IN SUPPORT THEREOF**

15
                                            DATE:  August 16, 2023
16                                          TIME:   9:30 A.M.
                                            ROOM: Courtroom 220
17
                                            United States Bankruptcy Court
18                                          1300 Clay Street
                                            Oakland, CA 94612
19

20

21

22

23

24

# Table of Contents

I.   INTRODUCTION                                                          3

II.  THE PARTIES                                                           4

III. FACTUAL BACKGROUND                                                    7

IV.  ARGUMENT                                                              8

     A.   Keeping the Stay in Place Serves the Statutory Mandate of Title 11.   8

     B    Keeping the Stay in Place Serves the Interest of Judicial Economy.    9

     C.   Keeping the Stay in Place Serves the Economic Interests of Both the   10
          Estate and Creditor Ron to the Extent that Title 11 Provides a Forum
          Where Creditors Can Examine a Debtor's Books and Records Without
          a Debtor Having to Bear the Expense of Having to Respond to
          Individual Creditor Demands and Without the Creditor Having to Bear
          the Expense of Having to Make Demands.

     D.   Keeping the Stay in Place Serves the Interest of Protecting the Estate  12
          and Its Creditors Without Substantially Affecting or Causing 'Legal
          Prejudice' to Creditor Ron.

     E.   Keeping the Stay in Place Preserves the Estate's Defenses Against the   12
          Claims of Creditor Ron; Granting Relief Would Be Highly Prejudicial
          to KVW, Other Creditors, and All Equity Holders.

     F.   Keeping the Stay in Place Prohibits the Solicitation and/or Entry of    13
          Any State Court Order that Requires Susanna Kelham to Speak on
          Behalf of KVW or Take Any Action on Behalf of KVW

V.   CONCLUSION AND RELIEF REQUESTED                                       15

Declaration of Rebekah Parker                                             16

Certificate of Service                                                    17

**TO WILLIAM LAFFERTY, U.S. BANKRUTPCY JUDGE,  KELHAM VINEYARD & WINERY, LLC., AND THE OFFICE OF THE U.S. TRUSTEE:**

# I
## INTRODUCTION

The Motion for Relief from Stay ("Motion") of Ronald Nicholsen II ("Creditor Ron[1]") should be denied on the ground that Creditor Ron has failed to show "cause" why relief should be granted.

This Motion is fashioned as a request by a "party-in-interest" in connection with a Writ of Mandate (the "Writ Action"), which suggests that more is at stake than the enforcement of a disputed monetary claim.  However, by Creditor Ron's own admission, what we have here is simply a creditor with a 'disputed' claim for attorney fees that wants to continue litigating rather than simply file a Proof of Claim as dictated by the policies underlying Title 11.

On this point, the evidentiary record before this court is clear,

> The only questions to be resolved in that trial are whether the parties
> complied with the Court's writ of mandate issued on November 4, 2022
> and whether Ronald Nicholsen can recover his attorneys fees and costs in
> attempting to enforce his statutory rights.  Motion, Page 3, Lines 17-21.

Based on the record, Creditor Ron's remedy is to file a Proof of Claim, which will be deemed allowed in the absence of a duly filed Objection to Claim.  Succinctly stated, if and when it can be shown that Creditor Ron's claim has any value, cause may exist for liquidation of this claim in State Court rather than in the above captioned bankruptcy case; but, as the record stands today, it would be an unmitigated waste of this Estate's limited time and dollars, as well as State and Federal Judicial resources to further litigate and liquidate Creditor Ron's claim.  Stated in the simplest terms, when all

---

[1]  No disrespect is intended or should be taken by the reference to Ronald Nicholsen III as "Ron" or "Creditor Ron". Because both Movant and Respondent's representative are surnamed "Nicholsen", referring to them by a shortened version of their first names (names used their entire lives) is an appropriate convention (i.e., Ronald being called "Ron" and Hamilton being called "Ham").

1    is said and done, Creditor Ron's claim may receive a zero dividend, making the prudent approach in

2    Case Administration to simply keep the stay in place for the time being, pending the liquidation of this

3    Estate's assets.

## II
## THE PARTIES

6            While clearly not the threshold issue in this motion, a clear understanding of who Creditor Ron

7    is and what Creditor Ron is after may help put this matter into perspective.  Creditor Ron, the elder of

8    two adult children of Susanna Kelham, is the proverbial "prodigal son"  who has squandered his

9    inheritance; but, unlike the prodigal son of biblical fame who returned to his father and asked for

10   forgiveness, Creditor Ron sued his mother hoping to exact more money from her. See generally,

11   Declaration of Hamilton Nicholsen.

12           For the past several years, Creditor Ron has been circulating a false narrative regarding his role

13   at and his relationship to Kelham Vineyard & Winery ("KVW"), a false narrative that is repeated in

14   this motion.  Specifically, contrary to the false representations made in his moving papers, KVW was

15   NOT "founded" by Creditor Ron.  Motion, Page 4, Lines 17-23.  Moreover, it should be made clear

16   that Creditor Ron never invested a cent of his own money in KVW.  And while there is no denying that

17   Creditor Ron has a statutory right to inspect KVW's books and records, one should never lose sight of

18   the fact that Creditor Ron is basically suing his mother to determine the value of a gift she gave him,

19   his interest in KVW[2].  Declaration of Hamilton Nicholsen, ¶¶ 19-26, 31.

20   _____

21   [2] There is no denying that the Writ Action needlessly got out of control; and for this there is plenty of
     blame to go around.  Plaintiff, Creditor Ron, has been overreaching in his demands and sloppy in his
     discovery practices, unrealistically expecting and demanding that KVW management and staff have
22   knowledge of account balances off the top of their heads, without access to KVW accounting records.
     See generally, Deposition of Susanna Kelham, attached as Exhibit 6 to the Declaration of H. Davis.   As
23   for Defendant, through no fault of its own, KVW is the victim of bad accounting and bookkeeping
     practices by former CPAs and bookkeepers. KVW has at all times employed what it believed were
24   competent CPAs and bookkeepers; however, time has shown that in several instances some of these

1        Kelham Vineyard and Winery  ("KVW") was founded by Rawson "Rory" Kelham in 2001, the

2  deceased spouse of Susanna Kelham[3].  Prior to Rawson's death, 75% of the membership shares were

3  held by Rawson and his wife Susanna, who gifted their adult children Ronald ("Ron") Nicholsen and

4  Hamilton ("Ham") Nicholsen each a 12 ½ percent interest[4].  After Rawson's death, Susanna Kelham

5  found herself having to secure loans to keep KVW afloat; but somehow the original operating

6  agreement "mysteriously"[5] disappeared.  In order to secure the loan on an expedited basis as was

7  needed, a new operating agreement was prepared by a bank loan officer, that reallocated the

8  membership shares in KVW, therein increasing Ron's share to a 1/3 interest.  Feeling pressure to close

9  the loan due to the pending cash crunch, Susanna Kelham signed the new operating agreement without

10  reviewing it carefully and without an opportunity to consult an attorney.  Declaration of Hamilton

11  Nicholsen, ¶¶ 20-31.

12

---

13  CPAs and bookkeepers employed bad judgment in their accounting and bookkeeping practices. But,

14  as will be shown in the bankruptcy disclosure process, much if not all of what is perceived as nefarious by Creditor Ron's attorneys are simply sloppy accounting practices, which is to say that

15  while some of KVW's disbursements in the past may have been mislabeled and mischaracterized, when all is said and done, the record is clear that, contrary to what Creditor Ron would have this

16  Court believe, there is no evidence that KVW has made any improper disbursements at his expense and/or without his consent.  Declaration of Hamilton Nicholsen, ¶¶ 43-46.

17  [3] "After a long battle with diabetes, Rory Kelham lost the fight on Oct. 8 at his home in the Napa

18  Valley. He was 73. Beginning in 1971, Rory farmed in the prestigious Western Oakville Appellation, supplying fruit to wineries such as Robert Mondavi, Cakebread Cellars and BV for Georges De La Tour.

19  His farming practices employed the respected Old World tradition — that fine wines are a product of the vineyard. Rory was a man of his words and compromised for nothing." Wine Business, October

20  24, 2011.

21  [4] Susanna Kelham is the natural or birth mother of both Ronald and Hamilton Nicholsen from a prior marriage; Rawson was their common law stepfather.

22

23  [5] On June 20, 2023, while cleaning out barn storage space, the original 2001 KVW Operating Agreement was found squirreled away among Creditor Ron's personal possessions left behind when Creditor Ron abandoned his post at KVW. Declaration of Hamilton Nicholsen, ¶¶ 30.

24

1         In the years that followed, Ron contributed less and less to help keep KVW afloat; in contrast,

2    Ham and his mother found themselves working day and night. While Ron enjoyed the prestige of wine

3    country life, he simply lacked the work ethic of Rawson, Susanna, and Ham, required to run a winery.

4    Ron fancied himself  a playboy, a slick operator, a wheeler-dealer, whose self-described role was to

5    promote the winery at Napa parties, official functions, and in his travels, all paid for by his mother

6    Susanna and KVW, meanwhile his brother Ham toiled in the vineyard and served as KVW's

7    winemaker.  To be clear, all this time, Creditor Ron collected a salary and received company benefits,

8    including health coverage, a car, and was allowed to live in various properties owned or leased by

9    KVW.  Over the course of time,  Susanna and Ham lost interest in funding Ron's lifestyle or putting up

10   with his disruptive shenanigans at the winery. So, when Ron threatened to leave his post at KVW,

11   Susanna and Ham said, "Good Riddance", with Susanna instructing him to stay away from the

12   property[6].  Declaration of Hamilton Nicholsen, ¶¶ 32-37.

**III**
**FACTUAL BACKGROUND**

14

15        Creditor Ron would have this Court believe that the above captioned involuntary was filed by

     Ham simply to stay a single deposition, making the misguided argument that the *" involuntary*

16

17   *bankruptcy petition is consistent with and in furtherance of Kelham Vineyards' and Susanna Kelham's*

     *ongoing effort to obstruct Ronald Nicholsen's statutory right to inspect the company's books and*

18

19   *records"* . Motion, Page 4, Lines 17-23.  Clearly, Creditor Ron and his attorney lack an understanding

     of the amount of disclosure and examination KVW, and Ham, personally as KVW's winemaker and

20

21   _____

22   [6] Creditor Ron would like people to think that Susanna's request that he stay away from KVW was a
     punitive measure.  In point of fact Susanna was protecting the company. Creditor Ron had been
     caught attempting to sell KVW inventory and attempting to contract for use of KVW facilities and
23   winemaking equipment with third parties, for his own account, without KVW approval. Declaration of
     Hamilton Nicholsen, ¶ 39.

24

1 curator of this bankruptcy estate's most valuable asset (the "Kelham Wine Library"), will be subjected

2 to in this bankruptcy proceeding.  Motion, Page 3, Lines 10-13.  Subjecting oneself to a deposition is

3 child's play when compared to preparing bankruptcy lists, statements, and schedules, attending a U.S.

4 Trustee conducted 341(a) meeting of creditors, and complying with U.S. Trustee Guidelines for

5 Debtors-in-Possession.  Declaration of Hamilton Nicholsen, ¶ 40

6          While it may have brought his mother to tears, Ham, as a Member of Main Street Cottage LLC,

7 filed this involuntary as an act of mercy to create a forum for the liquidation of KVW's assets and

8 liabilities, thereon allowing everyone connected with KVW to start a new life, to get a fresh start. With

9 Susanna Kelham no longer willing to and/or in a position to finance KVW's income shortfalls or defer

10 payment of KVW debts for rents and grapes, KVW is no longer a viable entity.  As such, a case under

11 Chapter 11 of the United States Bankruptcy Code, provides an ideal forum for the liquidation of  both

12 KVW's assets and liabilities.  Declaration of Hamilton Nicholsen, ¶¶ 3-5.

13                                    **IV**
                                  **ARGUMENT**

14

15          Creditor Ron's attempt to state "cause" for relief from stay misses the proverbial boat.

16 Succinctly stated, as a general proposition, whether or not relief should be granted is determined by a

17 balancing of interests, a comparison of the impact of granting relief on the Bankruptcy Estate

18 compared to the impact on Creditor Ron of allowing the stay to remain in place. With that said, what

19 constitutes "cause" for granting relief from the automatic stay is decided on a case-by-case

20 basis. Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.), 912 F.2d 1162, 1166 (9th

21 Cir.1990); Piombo Corp. v. Castlerock Props. (In re Castlerock Props.), 781 F.2d 159, 163 (9th

22 Cir.1986).

23

24

1    With this case-by-case analytic framework in mind, Respondent respectfully submits that the

2    interests of both the Estate and Creditor Ron tip heavily in favor of keeping the stay in place as

3    evidenced by the following points and authorities:

4        **A.  Keeping the Stay in Place Serves the Statutory Mandate of Title 11.**

5        "The automatic stay protects the interests of both debtors and creditors. The primary purpose

6    is to assist the debtor. From the debtor's perspective, it provides a breathing spell from the pressure

7    and demands of creditors. The automatic stay provides the debtor with an opportunity to address

8    business problems and negotiate a plan of reorganization without interference from creditors.

9    Secondarily, the automatic stay generally benefits the creditor group. The stay prevents depletion of

10   the bankruptcy estate by creditors who, to the detriment of other creditors, race to the courthouse or

11   use "self-help" remedies to enforce their rights. In this way, the automatic stay enables the orderly

12   administration of the bankruptcy estate, which in turn promotes the policy of equality of distribution."

13   Thompson Reuters, *The Automatic Stay in Bankruptcy*:  An Overview, ABA, September 22, 2022.

14       Summarily stated, granting Creditor Ron relief from stay at this juncture would unduly

15   interfere with and hinder the orderly administration of this Bankruptcy Estate, which as noted above

16   entails the liquidation of KVW assets.  Among KVW assets that must be liquidated are grapes from the

17   2023 Harvest, which takes place any time now, as soon as the grapes attain the requisite sugar, pH, and

18   TA levels, an operation overseen by Ham as KVW's winemaker.   Simply stated, KVW needs a

19   breathing spell from the pressure and demands of Creditor Ron's Writ Action to address its business

20   problems and to negotiate a plan of reorganization-liquidation.  Granting Creditor Ron relief from stay

21   at this juncture results in further depletion of this Bankruptcy Estate's limited resources at a time when

22   KVW should be using these resources to market its assets.  Stated in the simplest terms, securing the

23

24

1   best and highest price for KVW's assets will serve everyone's interest, including Ron's both in his

2   capacity as a Creditor and an Equity Holder.   Declaration of Hamilton Nicholsen, ¶¶ 7-9.

3       **B.   Keeping the Stay in Place Serves the Interest of Judicial Economy.**

4       As previously noted, Creditor Ron's remedy is to file a Proof of Claim, which will be deemed

5   allowed in the absence of a duly filed Objection to Claim.  If and when it can be shown that Creditor

6   Ron's claim has any value, cause may exist for liquidation of this claim in State Court rather than in

7   the above captioned bankruptcy case; but, as the record stands today, it would be an unmitigated waste

8   of both this Estate's limited time and resources, as well as State and Federal Judicial resources to

9   further litigate and liquidate Creditor Ron's claim.  When all is said and done, Creditor Ron's claim

10  may receive a zero dividend, making the prudent approach in administering this Bankruptcy Estate to

11  simply keep the stay in place pending liquidation of this Estate's assets. Declaration of Hamilton

12  Nicholsen, ¶¶ 8-43.

13      **C.   Keeping the Stay in Place Serves the Economic Interest of Both the Estate and
          Creditor Ron to the Extent that Title 11 Provides a Forum Where Creditors Can**
14        **Examine a Debtors Books and Records Without a Debtor Having to Bear the Expense
          of Having to Respond to Individual Creditor Demands and Without the Creditor**
15        **Having to Bear the Expense of Having to Make Demands.**

16      Counsel for Respondent would submit that the level of financial disclosure required of a

17  debtor in bankruptcy, particularly a Chapter 11 Debtor, well exceeds the review of basic books and

18  records a limited liability company is subjected to by virtue of Title 2.6 of the California Corporations

19  Code, commonly known as the California Revised Limited Liability Company Act.  To this end, given

20  that there is no prejudice to Creditor Ron in keeping the stay in place for the time being *(as will be*

21  *shown below)*, the interests of both the Estate and Creditor Ron are served in that this "time out" may

22  provide KVW with an opportunity to demonstrate to Creditor Ron that continued and protracted

23  litigation is NOT in his best interest and that said continued and protracted litigation will irreparably

24

1  harm his equity interest. KVW has already incurred unpaid attorney fees and costs in excess of

2  $400,000.00 in connection with Creditor Ron's statutory right to inspect KVW's books that will appear

3  as a claim against this Bankruptcy Estate, a claim that is paid before his equity interest.

4          To this end, it would behoove Creditor Ron (and his Attorney if they are truly prosecuting the

5  Writ Action in his best interest rather than merely as a way to generate attorney fees) to sit back and

6  take in all the financial data that will be presented in the next four to eight weeks in connection with

7  the submission of KVW's lists, statements, schedules, and initial U.S. Trustee Guidelines. The Writ

8  Action is not an end unto itself; it yields and produces nothing for Creditor Ron, only fees for his

9  lawyers. When all is said and done, what Creditor Ron desires is money is his pocket, not his lawyer's

10 pockets, whether he can exact it by making demands for more money and applying undue pressure on

11 his mother or whether he can exact it by forcing the liquidation of the family business. As things

12 stand, it appears that Susanna Kelham is through being shaken down—Susanna Kelham is prepared to

13 liquidate the family business. To this end, the type of financial data originally sought in the Writ

14 Action may no longer be relevant as a practical matter, which is to say that the valuation of KVW as a

15 going concern is now off the table, Creditor Ron and his attorney need to start assessing Creditor Ron's

16 interest in KVW from a liquidation standpoint. Declaration of Hamilton Nicholsen, ¶¶ 3-46.

17         Finally, simply as a matter of completeness, it should be stressed that Creditor Ron's Motion is

18 replete with misrepresentations omissions, and mischaracterizations regarding the status of the Writ

19 Action. The motion opens with Creditor Ron telling this Court that, "*The only questions to be resolved*

20 *in that trial are whether the parties complied with the Court's writ of mandate issued on November 4,*

21 *2022 and whether Ronald Nicholsen can recover his attorneys fees and costs in attempting to enforce*

22 *his statutory rights"* (Motion, Page 3, Lines 17-21), which may well speak to the only issue that is

23 important to Creditor Ron's attorneys; but, then the Motion goes on and on about various outstanding

24

1    issues and the need for supplemental depositions[7], all while attempting to preserve the fiction that

2    "*Hamilton Nicholsen is the last fact-witness Ronald Nicholsen anticipates deposing in anticipation*

3    *of the trial in the state action* " and that the matter is ready for trial.  Motion, Page 9, Line 1-2.

4    While these misrepresentations omissions, and mischaracterizations are not outcome determinative *per*

5    *se*, they collectively help paint the complete picture of the true procedural status of the Writ Action,

6    pending appeals and all.  Time permitting, these issues will be addressed in a Supplemental

7    Declaration of Attorney Andrew White, one of many attorneys in the Writ Action, to be submitted at a

8    later time in support of this Opposition.

9         **D.  Keeping the Stay in Place Serves the Interest of Protecting the Estate and Its**
         **Creditors Without Substantially Affecting or Causing 'Legal Prejudice' to Creditor**
10        **Ron.**

11        As illustrated by paragraphs A, B, and C above, keeping the stay in place serves the policies

12   underlying Title 11 by protecting the Estate's creditors and equity holders; with that said, there is no

13   evidence of any "legal" prejudice to Creditor Ron in keeping the stay in place.  While Creditor Ron's

14   motion makes a nominal allegation of prejudice, the motion fails to present anything by way of

15   compelling factual or legal analysis to substantiate the claim.  Motion, Page 13, Lines 13-19.  Creditor

16   Ron argues that he is prejudiced because he has "expended significant legal fees over the past two

17   years to enforce his statutory right to inspect Kelham Vineyards' books and records in the state

18   action."  Motion, Page 13, Lines 15-16.  While this may and/or may not be true (*there is speculation*

19   *that Creditor Ron's attorneys agreed to take the case on a contingency because they see Susanna*

20   *Kelham as a vulnerable widow with "deep pockets"*), the fact that a litigant has expended "significant

21   funds" on prepetition litigation that has not been reduced to a judgment does not standing alone

22

23   _____

24   [7]  See Motion, Page 23, Footnote 3 regarding the alleged need for supplemental depositions from
     Susanna Kelham and Melanie Drescher.

1  constitute "legal" prejudice for relief from stay analysis.  If this were true, relief would be granted in

2  every situation where a pending action was stayed by the filing of a bankruptcy.  Creditor Ron also

3  argues that if relief is not granted, he is prejudiced because he will effectively be "forced to start over".

4  Motion, Page 13, Lines 17.  This allegation is utter nonsense. The automatic stay is just that a "stay".

5  It does not terminate the action.  Summarily stated, Creditor Ron has failed to show that leaving the

6  stay in place results in any legal prejudice to his claim.

7      **E.  Keeping the Stay in Place Preserves the Estate's Defenses Against the Claims of**
        **Creditor Ron; Granting Relief Would Be Highly Prejudicial to KVW, Other**
8       **Creditors, and All Equity Holders.**

9          Stated in the simplest terms, KVW at this juncture lacks the funds and legal representation to

10  defend against Creditor Ron's litigious claim.  As previously noted, KVW has already incurred unpaid

11  attorney fees and costs in excess of $400,000 in connection with Creditor Ron's statutory right to

12  inspect KVW's books, a debt that will appear as a claim against this Bankruptcy Estate.  In the past,

13  Susanna Kelham has been willing to foot the bill and advance enough funds to keep KVW afloat; but

14  Ms. Kelham has had enough—she is 72 years old and has grown weary and tired of her prodigal son's

15  shenanigans.  KVW's relationship with Corporate Counsel in the Writ Action has soured, with counsel

16  understandably doing as little as possible because they are not being paid.  At this juncture, until KVW

17  is able to demonstrate to an attorney that assets exist in this Estate to pay for their post-petition legal

18  services, nobody is interested in taking on this case.  Declaration of Hamilton Nicholsen, ¶¶ 11-13.  As

19  such, granting relief from stay at this juncture would be highly prejudicial to KVW, other creditors,

20  and all equity holders.  The situation is such that this case may require the appointment of a trustee, a

21  turn of events that would not serve anyone's interest given the complexity of the relationship between

22  KVW and its landlords and suppliers; however, as a matter of judicious case administration, the stay

23

24

1  should be allowed to remain in place to preserve the Estate's defenses against Creditor Ron so that the

2  situation can be evaluated by a trustee in the event one is appointed.

3      **F.  Keeping the Stay in Place Prohibits the Solicitation and/or Entry of Any State Court
        Order Which Requires Susanna Kelham to Speak on Behalf of KVW or Take Any
4       Action on Behalf of KVW.**

5          Summarily stated, the pending Writ Action is against KVW pursuant to California Corporate

6  Code §17704.10, which (a) grants members of a limited liability company clearly delineated rights to

7  inspect certain books and records and (b) contains provisions for an award of attorney fees against the

8  limited liability company if it fails to reasonably comply with California Corporate Code §17704.10

9  (g).  With that said, while Susanna Kelham is a named Defendant-Respondent in the Writ Action,

10  neither the statutory basis for the action nor the prayer for relief in that action seeks relief as to

11  Susanna Kelham individually, which is to say that Susanna Kelham has been named and/or functions

12  in the Writ Action simply as a proxy for or representative of KVW, which is to say that any demand or

13  order entered against Susanna Kelham would be a demand or order against KVW.  See, *Petition for*

14  *Writ*, attached as Exhibit 1 to the Declaration of H. Davis in Support of Motion.  As such, given the

15  unique parameters of the Writ Action, any demand or order entered against Susanna Kelham is *de*

16  *facto* a demand or order against KVW in violation of the automatic stay[8].

17  _____

18  [8] This point is illustrated by Creditor Ron's mischaracterization of the attorney fee order entered on
    his behalf against KVW, an order which is currently on appeal, a fact which Creditor Ron neglects to
19  point out.  Specifically, while Creditor Ron represents that the State Court entered  a "*sanctions*
    *awards against Susanna Kelham (personally) totaling over more than $140,000*" (Motion, Page 13,
20  Lines 17), the exact language of the Order is that *"Respondent Susanna Kelham (on behalf of*
    *Respondents) is ordered to personally pay…"*  Order, Page 2, Line 14.  While the distinction is subtle,
21  the distinction is important, which is to say that there is no stand-alone attorney fee award against
    Susanna Kelham, the attorney fee award (not labelled as a sanction by the Order) was entered
22  against KVW with Susanna Kelham, as KVW's Managing Member, personally ordered to pay it on
    "behalf of KVW".  Again, California Corporate Code §17704.10, the statutory basis for the Writ
23  Action, does not create causes of action against limited liability company managers or members,
    California Corporate Code §17704.10 simply creates a cause of action (and remedies thereon) against

1    With that said, without going into the minutia, there is a substantial body of case law that finds

2    that a non-debtor and a debtor share an identity of interests when the identity between parties is so

3    great as to make a judgment against the third-party defendant in effect a judgment or finding against

4    the debtor and thus in violation of the automatic stay, commonly referred to as the "alter-ego" and/or

5    "internally related entity" doctrines. See generally, In re Panther Mountain Land Development, LLC.,

6    686 F. 3d 916 (8th Cir. 2012).  To be clear, while Susanna Kelham would undoubtedly qualify for

7    protection under this body of case law, Counsel for Respondent is neither looking to nor relying on this

8    body of case law when asserting that given the parameters of the Writ Action, any demand or order

9    entered against Susanna Kelham is *de facto* a demand or order against KVW in violation of the

10   automatic stay.  In the case at bar, the conversion of fact and law is so unique that for all intents and

11   purpose, *vis a vis* the Writ Action, Susanna Kelham is KVW.

12         Having said that, it should be stressed that, should Creditor Ron and his attorneys not find this

13   argument compelling, grounds clearly exist for Susanna Kelham to secure a co-debtor stay under

14   controlling 9th Circuit precedents.  See generally,  In re Excel Innovations, Inc., 502 F. 3d 1086 (9th

15   Cir. 2007).  Specifically, as nominally illustrated above, to the extent KVW simply seeks an orderly

16   liquidation, "the likelihood of a successful reorganization" is very high while the hardship to Creditor

17   Ron of allowing the stay to remain in place is small (i.e., Creditor Ron has shown no legal prejudice).

18   As such, a court balancing these interests, under binding 9th Circuit, should find that a co-debtor stay is

19   appropriate given these unique facts.

20

21   _____

22   the limited liability company itself.  As such, any order or judgment issued in connection the Writ
     Action is an order or judgment against KVW and thus barred by the automatic stay.  See, Attachment
     to Notice of Entry of Judgment or Order, included as Exhibit 7 to the Declaration of H. Davis in

23   Support of Motion, more specifically, page 52 of Docket No. 11-2.

24

1

2                                        V
                                   **CONCLUSION**
3

4          Based on the foregoing, Respondent would urge this Court to deny Creditor Ron's motion

5   without prejudice, pending the development of new facts or a change in circumstances that might

6   constitute grounds for Creditor Ron to renew his motion and/or for the Court to reconsider the issue.

7          August 10, 2023

8

9

10  _____
    Rebekah Parker,
    Attorney for Main Street Cottage, LLC.,
11  Petitioning Creditor

12

13

14

15

16

17

18

19

20

21

22

23

24

**Declaration of Rebekah L. Parker**

I, Rebekah L. Parker, declare:

1.  I am an attorney at law, duly qualified and licensed to practice before the U.S. District Court for the Northern District of California, as well as the U.S. Bankruptcy Court for the Northern District of California. I have personal knowledge of the following facts.

2.  I drafted, reviewed, and revised, the above captioned **OPPOSITION TO RONALD NICHOLSEN II's MOTION FOR RELIEF FROM THE AUTOMATIC STAY: MEMORANDUM OF POINTS AND AUTHORITIES.**

3.  To the best of my knowledge, information, and belief, the facts set forth therein are true and correct.

4.  To the best of my knowledge and belief, all the documents attached hereto, in any, are true and correct copies of their originals.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on August 10, 2023, in the County of San Diego, State of California.

Rebekah Parker, Declarant

## CERTIFICATE OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 4225-H Oceanside Boulevard #369, Oceanside CA, 92056-3472

On August 10, 2023, a true and correct copy of the foregoing document described as **OPPOSITION TO RONALD NICHOLSEN II 'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY: MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF REBEKAH PARKER IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR; and **(b)** in the manner indicated below:

William Lafferty
U.S. Bankruptcy Court,
1300 Clay St. Room 220,
Oakland, CA 94612
Served by Priority Mail

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 10, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

U.S. Trustee            USTPRegion17.SF.ECF@usdoj.gov
Rebekah Parker       attorneyrparker@gmail.com
Harold Davis          Hal.Davis@gtlaw.com

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL:** On August 10, 2023, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Susanna R. Kelham
Manager Member
Kelham Vineyard & Winery, LLC.
360 Zinfandel Lane
St. Helena, CA 94574
Served by U.S. Mail

<div style="margin-left: 2em;">

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on August 10, 2023, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

</div>

| | |
|---|---|
| Susanna R. Kelham | Alexis White, Attorney for |
| Manager Member | Susanna R. Kelham |
| Kelham Vineyard & Winery, LLC. | Day, Pace, York & York |
| 360 Zinfandel Lane | 587 Jefferson Street |
| St. Helena, CA 94574 | Napa, CA 94559 |
| Served by Email: | Served by Email |
| info@kelhamvineyards.com. | awhite@yorkyorklaw.com |

Service information continued on attached page: None

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

August 10, 2023

_Rebekah Parker_

# Exhibit 4 - REPLY re MFRS

Case: 23-10384   Doc# 72-5   Filed: 09/10/23   Entered: 09/10/23 16:21:38   Page 1 of
17

Case: 23-10384   Doc# 73-2   Filed: 09/12/23   Entered: 09/12/23 20:01:21   Page 70
of 120

Harold H. Davis (SBN CA 235552)
Marc R. Baluda (SBN CA 192516)
GREENBERG TRAURIG, LLP
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone: 415.655.1300
Facsimile: 415.707.2010
Hal.Davis@gtlaw.com
Marc.Baluda@gtlaw.com

Michael Thomson *pro hac vice pending*
GREENBERG TRAURIG, LLP
222 South Main Street, Suite 1730
Salt Lake City, Utah 84101
Telephone: 801.478.6817
thomsonm@gtlaw.com

Attorneys for Party in Interest
RONALD NICHOLSEN II

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SANTA ROSA DIVISION

In re

Kelham Vineyards & Winery, LLC

Bankruptcy Case No. 23-10384
Chapter 11
[Assigned to: Judge William Lafferty]

**REPLY MEMORANDUM IN FURTHER SUPPORT OF RONALD NICHOLSEN'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

Hearing:
DATE:     August 16, 2023
TIME:      9:30 a.m.
DEPT:     220, Oakland, CA

1                           [Assigned to: Judge William Lafferty]
REPLY MEMORANDUM IN FURTHER SUPPORT OF RONALD

Case: 23-10384    Doc# 73-2    Filed: 08/09/23    Entered: 08/09/23 20:38:38    Page 2 of 16
ACTIVE 689476864v4

# **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................................ 4

II.  THE PARTIES ......................................................................................................... 4

    A.   Ronald Nicholsen ...................................................................................... 4

    B.   The Creation of Debtor Kelham Vineyards ............................................... 5

    C.   The Discovery of the "Original" Operating Agreement is Curious ............ 6

    D.   Debtor Kelham Vineyards is Not the Victim of Bad Accounting ............... 7

    E.   Debtor Kelham Vineyards and Susanna Kelham have Rejected Every Opportunity for the Parties to Get a "Fresh" Start ....................................................................... 7

    F.   The Writ Action is Necessary to Compel Debtor Kelham Vineyards and Susanna Kelham's Compliance With California Law. ........................................................ 7

III. THE *CURTIS* FACTORS HEAVILY WEIGH IN FAVOR OF GRANTING RONALD NICHOLSEN RELIEF FROM THE AUTOMATIC STAY ........................................ 8

    A.   Lifting the Stay to Permit the Writ Action to Proceed to Trial will Conserve Judicial Resources ............................................................................................. 9

    B.   The Trial in the Writ Action is Not to Enforce a Monetary Judgment ................. 9

    C.   The Writ Action is Unrelated to and Will Not Interfere With the Bankruptcy Case .......... 10

    D.   Ronald Nicholsen will be Prejudiced if the Automatic Stay is Not Lifted ........................ 10

        1.   Kelham Vineyards' Disclosure Requirements in this Bankruptcy Proceeding is Not a Substitute of Ronald's Statutory Rights Of Inspection ........................................ 11

        2.   Ronald Nicholsen Will Be Highly Prejudiced If The Stay Is Imposed Before He Obtains Its Books And Records ........................................................................ 12

IV.  THE AUTOMATIC STAY DOES NOT – AND SHOULD NOT – APPLY TO SUSANNA KELHAM ................................................................................................................ 13

V.   CONCLUSION ...................................................................................................... 15

[Assigned to: Judge William Lafferty]

REPLY MEMORANDUM IN FURTHER SUPPORT OF RONALD

ACTIVE 689476864v4

# <u>TABLE OF AUTHORITIES</u>

## Cases

<u>Advanced Ribbons and Office Products, Inc. v. U.S. Interstate Distributing, Inc.</u>
  125 B.R. 259 (9th Cir. BAP 1991) ........................................................................................13

<u>Chugach Timber Corp. v. Northern Stevedoring & Handling Corp.</u>
  23 F.3d 241 (9th Cir.1994) ...................................................................................................13

<u>In re Curtis</u> 40 B.R. 795 (Bankr. D. Utah 1984) ..................................................4, 9, 10, 11

<u>In re Excel Innovations, Inc.</u>
  502 F.3d 1086 (9th Cir. 2007) .............................................................................................14

<u>In re Kronemyer</u> 405 B.R. 915 (9th Cir. 2009) .......................................................................9

<u>In re Miller</u>
  262 B.R. 499 (Bankr. App. Panel of 9th Cir. 2001) ............................................................13

<u>In re Panther Mountain Land Development, LLC</u>
  686 F. 3d 916 (8th Cir. 2012) ..............................................................................................15

<u>In re Plumberex Specialty Products, Inc.</u> 311 B.R. 551 (Bankr. C.D. Cal. 2004) .................4

<u>Marcus, Stowell & Beye Government Securities, Inc. v. Jefferson Investment Corp.</u>
  797 F.2d 227 (5th Cir.1986) ................................................................................................14

<u>Seiko Epson Corp. v. Nu–Kote International, Inc.</u>
  190 F.3d 1360 (Fed.Cir.1999) .............................................................................................14

<u>Smith v. Lenches</u>
  263 F.3d 972 (9th Cir. 2001) ...............................................................................................11

<u>Teachers Ins. & Annuity Ass'n v. Butler</u>
  803 F.2d 61 (2d Cir.1986) ...................................................................................................14

## Statutes

11 U.S.C. § 105 ........................................................................................................................14

11 U.S.C. § 362 ...................................................................................................................4, 14

Cal. Corp. Code 17701.13 .......................................................................................................13

Cal. Corp. Code 17704.10 ........................................................................................8, 9, 10, 13

Case: 23-10384    Doc# 73-2    Filed: 09/12/23    Entered: 09/12/23 20:01:21    Page 73
of 120

# I.     **INTRODUCTION**

As demonstrated in Ronald Nicholsen's motion to lift the automatic stay (the "Motion"), cause exists to lift the automatic stay pursuant to 11 U.S.C. § 362(d)(1).

Debtor Kelham Vineyards & Winery LLC ("Kelham Vineyards") did not oppose the Motion. Instead, creditor Main Street Cottage LLC ("Main Street LLC") did. Creditor Main Street LLC's opposition generates many questions, including why is creditor Main Street LLC filing oppositions on behalf of debtor Kelham Vineyards and how, without collusion, can a creditor have so much inside knowledge regarding debtor Kelham Vineyards' business operations. But for all the questions arising from creditor Main Street LLC's opposition, it fails to satisfy its burden of demonstrating that relief from the stay is unwarranted. In re Plumberex Specialty Products, Inc., 311 B.R. 551, 557 (Bankr. C.D. Cal. 2004) (footnote omitted). "Once a prima facie case has been established, the burden shifts to the debtor to show that relief from the stay is unwarranted." Id.

Ronald Nicholsen respectfully requests this Court lift the automatic stay to allow the writ of mandate action captioned Ronald Nicholsen II v. Kelham Vineyards & Winery LLC, et al., Case No. 21CV001403, pending in Superior Court of the State of California, for the County of Napa, to proceed to trial as scheduled on October 2, 2023. As detailed in the Motion and this further reply, the 12 factors articulated In re Curtis, 40 B.R. 795, 799–800 (Bankr. D. Utah 1984) weigh in favor of lifting the stay. Finally, Ronald Nicholsen will be prejudiced in the absence of the stay being lifted and creditor Main Street LLC's belief that debtor Kelham Vineyards will fully comply with its disclosure obligations under bankruptcy laws—when it has failed to comply with its statutory obligations under California law—is highly dubious.

# II.     **THE PARTIES**

In light of the factual inaccuracies and misrepresentations about Ronald Nicholsen that run rampant throughout purported creditor Main Street Cottage LLC's *Opposition to Party in Interest Ronald Nicholsen's Motion to Lift the Automatic Stay* [Dkt. 21] Ronald Nicholsen is compelled to provide the following counterstatement of facts.

## A.     **Ronald Nicholsen**

1   Ronald Nicholsen is not, and does not fancy himself, "a playboy, a slick operator, or a wheel-

2   dealer." Dkt. 21: Main Street LLC's Opposition to Motion to Lift Stay ("Opp."), p. 6:4.

3   Ronald Nicholsen is a devoted husband to his wife Lauren, whom he married at Kelham

4   Vineyards & Winery LLC ("Kelham Vineyards") on September 24, 2011, with his brother Hamilton at

5   his side. Declaration of Ronald Nicholsen ("Decl. Nicholsen"), ¶ 2. Ronald and Lauren have four young

6   children (ages 7 to 12), three of whom were named after his brother Hamilton, their stepfather Rawson,

7   and their maternal grandmother. Decl. Nicholsen, ¶ 3.

8   After Susanna forced Ronald Nicholsen from Kelham Vineyards in May 2021, he obtained his

9   contractor's license (no. 1079572) in August 2021 and has been working as a contractor to support his

10  family. Decl. R. Nicholsen, ¶ 4, Ex. 20. He is currently working 5 to 6 days a week on various

11  construction projects, including remodeling a bakery in St. Helena, California. Decl. Nicholsen, ¶ 5.

12  Hamilton Nicholsen's belief that Ronald Nicholsen is a bon vivant is not only inadmissible lay opinion,

13  but it is at odds with reality.

14  Ron supports his family, even in adversity, and wants the family business to succeed. For

15  example, in March 2023, upon learning that Hamilton Nicholsen allegedly had a medical condition,

16  Ronald Nicholsen reached out to his family to offer his support, and he offered to return to the winery to

17  help with operations, writing to Susanna Kelham, "What can I do to help Ham,  you [*sic*], or the winery?

18  I completely understand how you must feel, but in all sincerity, regardless of our differences, I want you

19  to know I am here to help the family in any capacity, personally or professionally, that makes you

20  comfortable." Decl. Nicholsen, ¶ 6, Ex. 21. He also texted Hamilton Nicholsen asking, "Let me know

21  what I can do to help you or winery." Decl. Nicholsen, ¶ 7, Ex. 22. Neither Hamilton Nicholsen nor

22  Susanna Kelham bothered responding to him. Decl. Nicholsen, ¶¶ 6 – 7.

23  Hamilton Nicholsen and Susanna Kelham want debtor Kelham Vineyards to fail so they can take

24  its significant assets at a fire sale value without Ronald Nicholsen's consent and to further divest Ronald

25  Nicholsen's equity in the company. They are conspiring and colluding – as shown by creditor Main

26  Street LLC advocating debtor Kelham Vineyards' positions in its opposition to the motion to lift the stay.

27  **B.    The Creation of Debtor Kelham Vineyards**

28

ACTIVE 689476864v4

1    Like many family businesses, the origin story of the creation of the business is disputed and

2    depends on the storyteller. As a preliminary matter, it is interesting that creditor Main Street LLC tells the

3    origin story of debtor Kelham Vineyards; this is one of many examples in creditor Main Street LLC's

4    moving papers where the purported creditor advocates on behalf of the purported debtor. Creditor Main

5    Street LLC's origin story is also interesting given that Susanna Kelham testified she could not recall who

6    founded the winery.[1] Declaration of Harold Davis ("Decl. Davis"), ¶ 2, Ex. 23, S. Kelham Depo. Tr.

7    33:3-13.

8        In contrast, the admissible evidence demonstrates that Ronald Nicholsen founded the winery. In

9    May 1998, Rawson and Susanna Kelham purchased the real property at 360 Zinfandel Lane in St.

10   Helena, California. Decl. Davis, ¶ 4, Ex. 24. Thereafter, they leased the premises to Bench Partners,

11   which produced wine under the label Kelham MacLean. Decl. Davis, ¶ 2, Ex. 23, S. Kelham Depo. Tr.

12   30:12-18. Ronald Nicholsen was a partner in Bench Partners until Susanna Kelham bought out all four of

13   his partners in 2000 for $917,000. Decl. Davis, ¶ 2, Ex. 23, S. Kelham Depo. Tr. 31:8-25. Thereafter, she

14   brought Hamilton Nicholsen into the business by gifting him ownership of the company.[2] In December

15   2000, Ronald Nicholsen, as organizer, formed debtor Kelham Vineyards & Winery LLC. Decl. Davis,

16   ¶ 5, Ex. 26.

17   **C.    The Discovery of the "Original" Operating Agreement is Curious**

18       Susanna Kelham banned Ronald Nicholsen from the winery in May 2021. As part of the Writ

19   action, the California state court compelled debtor Kelham Vineyards to provide Ronald Nicholsen with

20   all his personal effects at the winery. Accordingly, on January 10 and March 18, 2023, based on the

21   parties' agreement, Ronald Nicholsen went to the Winery to retrieve his personal items only to discover

22   that Hamilton Nicholsen put them outside without covering the bin so that all the items were destroyed

23   by water. Decl. Nicholsen, ¶ 9.

24       According to Susanna Kelham, Hamilton Nicholsen was responsible for gathering Ronald

25

---

26   [1] On its website, it states that she – not Rawson Kelham – "established Kelham Vineyards along with her two sons, Ron
     Nicholsen and Hamilton Nicholsen in October 1997." Decl. Davis, ¶ 3, Ex. 24 (Website). There is no mention of Rawson

27   Kelham's origin story on its website. *Id.*
     [2] Hamilton Nicholsen's umbrage with Ronald Nicholsen purportedly being an owner without buying into the business is

28   accordingly rather rich.

Nicholsen's personal effects. Decl. Davis, ¶ 2, Ex. 23, S. Kelham Depo. Tr. 347:7-14. Thus, it is curious that Hamilton Nicholsen subsequently discovered an outdated and irrelevant operating agreement allegedly within Ronald Nicholsen's possessions that should have been, but was not, provided to him.[3]

**D.    Debtor Kelham Vineyards is Not the Victim of Bad Accounting**

Debtor Kelham Vineyards and creditor Main Street LLC share the same bookkeepers and CPAs. *See* Dkt. 11-2: Decl. Davis, ¶¶ 12 – 13, Ex. 8 and Ex. 9. Creditor Main Street LLC dangerously undermines the existence of its purported debt by claiming debtor Kelham Vineyards employs bad and sloppy accounting practices, which includes mislabeling disbursements. Passing over that their shared bookkeeper testified that debtor Kelham Vineyards owed no debt to creditor Main Street LLC, there is no evidence substantiating this claim of bad accounting. Dkt. 11-1: Motion, p. 7-8. For example, debtor Kelham Vineyards has not filed any claims against its former bookkeepers or CPAs nor demanded indemnification for their "bad accounting."

**E.    Debtor Kelham Vineyards and Susanna Kelham have Rejected Every Opportunity for the Parties to Get a "Fresh" Start**

Hamilton Nicholsen's decision to file an involuntary bankruptcy on behalf of creditor Main Street LLC against debtor Kelham Vineyards as an act of "mercy" to allow its owners a fresh state is unavailing.

Since May 2021, Hamilton Nicholsen and Susanna Kelham have repeatedly represented to Ronald Nicholsen that they were obtaining a valuation of the company to buy him out. Decl. Nicholsen, ¶ 10, Ex. 27. Inexplicably, however, they have not made a single offer to buy out his interest. Id. This is true despite a settlement conference in the Writ action.

**F.    The Writ Action is Necessary to Compel Debtor Kelham Vineyards and Susanna Kelham's Compliance With California Law.**

Creditor Main Street LLC's efforts to characterize debtor Kelham Vineyards as the unwitting victim of the Writ action is bizarre especially in the context of this involuntary bankruptcy proceeding.

Susanna Kelham seized total and exclusive control over debtor Kelham Vineyards' business operations, she denied Ronald Nicholsen access to its records, and banned him from the winery. Decl.

---

[3] In an obvious demonstration of the necessity of the Writ action, Hamilton Nicholsen has not produced the alleged "original" operating agreement to Ronald Nicholsen.

1    Nicholsen, ¶ 8. As detailed in Ronald Nicholsen's Motion to Lift the Stay, he took a reasonable and

2    measured approach in the Writ action trying for nearly two years to secure Kelham Vineyards' and

3    Susanna's Kelham's compliance with California law. Dkt. 11-1: Motion at pg. 4-7. As a result of the Writ

4    action, Ronald Nicholsen has received thousands of pages of hard copy records, bank statements, credit

5    card statements, and other records. Dkt. 11-2: Decl. Davis, ¶ 5. Ronald Nicholsen would have never

6    obtained those records absent the Writ action. Decl. Nicholsen, ¶ 8. Nevertheless, debtor Kelham

7    Vineyards and Susanna Kelham have steadfastly refused to produce numerous other critical categories of

8    records, such as the company's emails, monthly reports of its inventory (which creditor Main Street LLC

9    contends is debtor Kelham Vineyards most significant asset), and records regarding real property. Dkt.

10   11-2: Decl. Davis, ¶ 10. Thus, creditor Main Street LLC's suggestion that the Writ action "produces

11   nothing" for Ronald Nicholsen is completely unfounded.

12   **III.    THE *CURTIS* FACTORS HEAVILY WEIGH IN FAVOR OF GRANTING RONALD**

13   **NICHOLSEN RELIEF FROM THE AUTOMATIC STAY.**

14        The principal purpose of the Writ action is to obtain records Ronald Nicholsen is entitled to

15   receive pursuant to California Corporations Code section 17704.10. *See* Dkt. 11-2: Decl. Davis, ¶ 2, Ex.

16   1 (Verified Petition for Writ of Mandate); ¶ 4, Ex. 4 (Writ). Thus, the gravamen of the Writ action is not

17   to obtain monetary relief, as claimed by creditor Main Street LLC, it is to mandate debtor Kelham

18   Vineyards' and Susanna Kelham's compliance with the law.[4] The ***only*** reason monetary awards have

19   been issued by the California state court is because of debtor Kelham Vineyards' and Susanna Kelham's

20   ongoing refusal to comply with the Writ, California law, and the California state court's orders. *See* Dkt.

21   11-2: Decl. Davis, ¶¶ 7, 9, and 11, Ex. 5 and 7.[5] It should also be noted that, as a debtor in possession,

22   Kelham Vineyards will have a continued duty to comply with "the requirements of the valid laws of the

23   State," which duty it is actively flouting by not providing an accounting to Ronald Nicholsen. *See* 28

24

---

25   [4] While Ronald Nicholsen may be awarded damages from the Debtor as part of the Writ action, he will not take any action to collect on any awarded damages outside of the context of this bankruptcy case unless further approval is given by the Court.

26   [5] The California state court has found in Ronald Nicholsen's favor on nearly every single issue before it – it issued a Writ

27   compelling their compliance, it found respondents Susanna Kelham and debtor Kelham Vineyards did not comply with the law or its Writ, it found their non-compliance was without justification, and it recently granted Ronald Nicholsen's motion to compel given debtor Kelham Vineyards' discovery gamesmanship. *Id*. The Writ action is valid and meritorious, contrary to

28   creditor Main Street LLC's baseless opinions about Ronald Nicholsen and his attorney's motives.

8                                  [Assigned to: Judge William Lafferty]
REPLY MEMORANDUM IN FURTHER SUPPORT OF RONALD

Case: 23-10384    Doc# 73-2    Filed: 09/12/23    Entered: 09/12/23 20:01:21    Page 78
of 120

*ACTIVE 689476864v4*

Case: 23-10384    Doc# 73-2    Filed: 09/12/23    Entered: 09/12/23 20:01:21    Page 78
of 120

U.S.C. § 959(b); Cal. Corp. Code § 17704.10.

**A.      Lifting the Stay to Permit the Writ Action to Proceed to Trial will Conserve Judicial Resources**

The trial in the Writ action consists of two questions that the California state court must decide: (1) did debtor Kelham Vineyards and Susanna Kelham comply with the California state court's Writ; and (2), if not, was their failure to comply justified. Cal. Corp. Code § 17704.10. There are 12 non-exclusive factors articulated In re Curtis, 40 B.R. 795, 799–800 (Bankr. D. Utah 1984), known as the *Curtis* factors, that courts weigh to determine whether "cause" exists to grant relief to allow an entity to continue pending litigation against a debtor in a non-bankruptcy forum. In re Kronemyer, 405 B.R. 915, 919, 921 (9th Cir. 2009).

Creditor Main Street LLC also does not dispute that the upcoming trial will completely resolve issues arising from the Writ action, so the first *Curtis* factor (whether the relief will result in a partial or complete resolution of the issues) also supports lifting the stay. In re Curtis, 40 B.R. at 799–800.

The California state action has been pending since October 2021, the California state court is familiar with the facts and legal issues in the Writ action, and the trial is scheduled to begin on October 2, 2023 – in 49 days. As such, the fourth *Curtis* factor (whether a specialized tribunal has been established to hear the particular cause of action and whether that tribunal has the expertise to hear such cases), the tenth *Curtis* factor (the interests of judicial economy and the expeditious and economical determination of litigation for the parties), and the eleventh *Curtis* factor (whether the foreign proceedings have progressed to the point where the parties are prepared for trial) are all present and supports lifting the automatic stay. In re Curtis, 40 B.R. at 799–800.

**B.      The Trial in the Writ Action is Not to Enforce a Monetary Judgment**

Staying the Writ action does not promote the policy of equality of distribution nor will it give one creditor an advantage over another, because Ronald Nicholsen is not seeking to enforce a monetary judgment. Conversely, if the Writ action were not allowed to continue, there would be an unlevel playing field as the petitioning creditor, Main Street LLC, by virtue of its officers Susanna Kelham and Hamilton Kelham, would have access to all of debtor Kelham Vineyards information and Ronald Nicholsen would

1  be playing in the dark as he still has not received the full accounting he is entitled to under state laws.

2      In the Writ action, debtor Kelham Vineyards and Susanna Kelham contend they both fully

3  complied with the Writ or their non-compliance is with justification. If the California state court finds in

4  their favor, then Ronald Nicholsen will not be reimbursed any amount. Only if the California state court

5  finds that debtor Kelham Vineyards and/or Susanna Kelham failed to comply with the Writ and that their

6  compliance was without justification may the California state court reimburse Ronald Nicholsen for his

7  costs in obtaining their compliance. Cal. Corp. Code § 17704.10.

8      **C.      The Writ Action is Unrelated to and Will Not Interfere With the Bankruptcy Case**

9      The conclusion of the Writ action has no connection with and will not interfere with the

10  bankruptcy case, so the second *Curtis* factor (the lack of any connection with or interference with the

11  bankruptcy case) weighs in favor of granting the Motion. In re Curtis, 40 B.R. at 799–800.

12      It is unclear why creditor Main Street LLC believes the trial in the Writ Action would interfere

13  with or hinder the orderly administration of the liquidation of debtor Kelham Vineyards' assets because it

14  proffers no evidence in support of this statement. Creditor Main Street also fails to identify debtor

15  Kelham Vineyards' purported lack of resources necessary to market its assets, particularly where such

16  marketing is commonly done by an investment banker without up-front (or minimal) costs expended by

17  the seller. Equally perplexing is why creditor Main Street LLC believes debtor Kelham Vineyards lacks

18  the funds and legal representation in the Writ action or how it knows debtor Kelham Vineyards'

19  relationship with its corporate counsel in the Writ action has "soured"; statements that again beg the

20  question – who is creditor Main Street advocating for in this involuntary bankruptcy action? Dkt. 21:

21  Opp., p. 12.

22      Creditor Main Street LLC cannot satisfy its burden of demonstrating that relief from the stay is

23  unwarranted based on these unsubstantiated statements by creditor Main Street LLC about debtor

24  Kelham Vineyards and non-party Susanna Kelham.

25      **D.      Ronald Nicholsen will be Prejudiced if the Automatic Stay is Not Lifted**

26      The balance of hardships favors lifting the automatic stay because Ronald Nicholsen will be

27  prejudiced if the stay is imposed. In addition to the fees already incurred preparing for trial in the Writ

28

10                                    [Assigned to: Judge William Lafferty]
REPLY MEMORANDUM IN FURTHER SUPPORT OF RONALD

Case: 23-10384    Doc# 73-2    Filed: 09/12/23    Entered: 09/12/23 20:01:21    Page 80
of 120

Case: 23-10384    Doc# 73-2    Filed: 09/12/23    Entered: 09/12/23 20:01:21    Page 80
of 120

action[6], the stay will prejudice Ronald Nicholsen's undisputed right to inspect the company's books and records, so the twelfth *Curtis* factor (the impact of the stay on the parties and the "balance of hurt") tips in favor of granting relief from stay. In re Curtis, 40 B.R. at 799–800.

The crux of creditor Main Street LLC's opposition to lifting the automatic stay is that debtor Kelham Vineyards "will" provide certain financial records in this bankruptcy action, and that, in its view, those records will satisfy Ronald Nicholsen's statutory right to inspect the company's books and records. Dkt. 21: Opp., at p. 10:6. This argument illustrates the legal prejudice Ronald Nicholsen will sustain if the automatic stay is not lifted to permit the Writ action to conclude. See Smith v. Lenches, 263 F.3d 972, 976 (9th Cir. 2001) ("We have previously held that "legal prejudice" means "prejudice to some legal interest, some legal claim, some legal argument.").

1. Kelham Vineyards' Disclosure Requirements in this Bankruptcy Proceeding is Not a Substitute of Ronald's Statutory Rights Of Inspection

Ronald Nicholsen will be prejudiced if his inspection rights under the California Corporations code are cauterized and limited by creditor Main Street LLC's filing of this involuntary bankruptcy.

The California Corporations Code and the Writ compels production of the company's "books and records" for "the current and past four fiscal years" including, but not limited to, 19 sub-categories of records. *See* Dkt. 11-2: Decl. Davis, ¶ 4, Ex. 4. Thus, the records subject to production in the Writ action are not limited to Kelham Vineyards' financial records. *See* Dkt 11-2: Decl. Davis, ¶ 21, Ex. 14, page 122 of 156 (denying, in part, Ronald Nicholsen's motion to compel access to Kelham Vineyards' corporate email account, but stating, "[t]he court takes no position on the method by which Kelham Vineyards complies with the November 4, 2022 Writ and Order. While the Court is disappointed at the rancor and delays surrounding Kelham Vineyards' compliance…"); *cf.* Dkt. 21: Opp., p. 10 (suggesting Ronald Nicholsen should "sit back" and take in all the "financial data" that Kelham Vineyards is apparently going to produce).

Creditor Main Street LLC's suggestion that Ronald Nicholsen or his attorneys lack an understanding of the amount of disclosure and examination of debtor Kelham Vineyards in this

---

[6] Creditor Main Street LLC's speculation about the financial agreement between Ronald Nicholsen and his counsel is irrelevant, and it is incorrect.

1  bankruptcy proceeding is baseless. While debtor Kelham Vineyards must prepare schedules, statements,

2  and provide information to the United States Trustee, debtor Kelham Vineyards' **creation** of bankruptcy

3  lists, statements, and schedules is not equivalent to the production of the company's books and records

4  from the current and past four fiscal years or documents required by the Writ. *See* Dkt. 21: Opp., p. 7.

5  Moreover, creditor Main Street LLC contends that debtor Kelham Vineyards is plagued by sloppy

6  accounting and mislabeled or mischaracterized disbursements so it is unclear how the production of

7  summaries of such deficient financial records will satisfy Ronald Nicholsen's statutory rights to inspect

8  the books and records themselves. Dkt. 21: Opp., p. 4, fn. 2.

9       Finally, and critically important, creditor Main Street LLC has no grounds to claim that debtor

10  Kelham Vineyards will comply with its disclosure obligations or discovery in this bankruptcy

11  proceeding. Debtor Kelham Vineyards did not oppose Ronald Nicholsen's Motion, and there are no

12  declarations or evidence on behalf of debtor Kelham Vineyards substantiating this belief. Ronald

13  Nicholsen and his attorneys lack trust that debtor Kelham Vineyards or Susanna Kelham will suddenly

14  start complying with statutory duties of full disclosure and candor when they have failed to do so for

15  more than two years in the Writ action.

16          2.   <u>Ronald Nicholsen Will Be Highly Prejudiced If The Stay Is Imposed Before He

17             Obtains Its Books And Records</u>

18       As demonstrated in Ronald Nicholsen's Motion to Appoint a Trustee there is ample evidence of

19  self-dealing by Susanna Kelham to the detriment of debtor Kelham Vineyards. Dkt. 16. Ronald

20  Nicholsen is entitled under the law to obtain the company's books and records to determine whether

21  Susanna Kelham breached her fiduciary duties owed to the company, whether any other members have

22  committed fraud, or other misdeeds to his detriment. Creditor Main Street LLC's argument that Ronald

23  Nicholsen should simply sit back on his legal rights of inspection and potential legal claims is not well-

24  received.

25       For example, somehow creditor Main Street LLC knows that debtor Kelham Vineyards has

26  allegedly incurred more than $400,000 in unpaid legal fees to date defending itself in the Writ action.

27  Dkt. 21: Opp., pg. 12. If, however, those fees include amounts Susanna Kelham incurred as manager of

28  Kelham Vineyards (as Ronald Nicholsen suspects) she would be prohibited from obtaining

1   indemnification from the company if she breached her fiduciary duties and, thus, those fees may not be a

2   debt of the company. Cal. Corp. Code, § 17704.08.

3   **IV.     THE AUTOMATIC STAY DOES NOT – AND SHOULD NOT – APPLY TO SUSANNA**

4   **KELHAM**

5        California Corporations Code section 17704.10 imposes a duty on Susanna Kelham, as the

6   manager of Kelham Vineyards, to provide Ronald Nicholsen records pursuant to his demand. ("***Upon the***

7   ***request of a member*** [Ronald Nicholsen] or transferee, for purposes reasonably related to the interest of

8   that person as a member or a transferee, ***a manager*** [Susanna Kelham] or, if the limited liability company

9   is member-managed, a member in possession of the requested information, ***shall promptly deliver***, in

10  writing, to the member or transferee, at the expense of the limited liability company, a copy of the

11  information required to be maintained by paragraphs (1), (2), and (4) of subdivision (d) of Section

12  17701.13, and any written operating agreement of the limited liability company.").

13       Accordingly, Ronald Nicholsen named Susanna Kelham as a respondent in his verified petition

14  for writ of mandate because she has an independent severable obligation to provide him records. *See* Dkt.

15  11-2: Decl. Davis, ¶ 2, Ex. 1, pg. 14 (see prayer for relief, "That the Court issue a writ of mandate

16  compelling Respondents to forthwith deliver to Petitioner copies of the KELHAM CORPORATE

17  RECORDS."). Susanna Kelham testified that she did nothing to comply with Ronald Nicholsen's

18  demands.

19       Thus, creditor Main Street LLC's claim that she is only named in the Writ action as a "proxy" of

20  the Company is disingenuous – as the California state court held respondent Susanna Kelham *personally*

21  liable for *Respondents'* (Kelham Vineyards and Susanna Kelham) failure to satisfy the California

22  Corporations Code. Dkt. 11-2: Decl. Davis, ¶ 11, Ex. 7.

23       Because Susanna Kelham is not a debtor in this action, there is no automatic stay of the Writ

24  action against her. "Section 362(a)(1) applies only to actions against a debtor." In re Miller, 262 B.R.

25  499, 503 (Bankr. App. Panel of 9th Cir. 2001) (citing Chugach Timber Corp. v. Northern Stevedoring &

26  Handling Corp., 23 F.3d 241, 246 (9th Cir.1994), quoting Advanced Ribbons and Office Products, Inc. v.

27  U.S. Interstate Distributing, Inc., 125 B.R. 259, 263 (9th Cir. BAP 1991) ("[The automatic stay] does not

28

---

13                                    [Assigned to: Judge William Lafferty]

REPLY MEMORANDUM IN FURTHER SUPPORT OF RONALD

protect non-debtor parties or their property. [Citations omitted]. Thus, section 362(a) does not stay actions against guarantors, sureties, corporate affiliates, or other non-debtor parties liable on the debts of the debtor."); see also <u>Seiko Epson Corp. v. Nu–Kote International, Inc.</u>, 190 F.3d 1360, 1364 (Fed.Cir.1999) ("It is clearly established that the automatic stay does not apply to non-bankrupt co-defendants of a debtor 'even if they are in a similar legal or factual nexus with the debtor.'-"); <u>Teachers Ins. & Annuity Ass'n v. Butler</u>, 803 F.2d 61, 65 (2d Cir.1986) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants."); <u>Marcus, Stowell & Beye Government Securities, Inc. v. Jefferson Investment Corp.</u>, 797 F.2d 227, 230 n. 4 (5th Cir.1986) ("The well established rule is that an automatic stay of judicial proceedings against one defendant does not apply to proceedings against co-defendants.")

In support of extending the automatic stay to include Susanna Kelham, creditor Main Street LLC (an entity she owns and controls), argues that any demand or judgment against her in the Writ action is akin to being against debtor Kelham Vineyards. Susanna Kelham should not be permitted to use this bankruptcy proceeding filed by her company, as creditor, against her other company, as debtor, to shield herself from complying with California law and the personal liability that may arise because of her non-compliance.

Finally, the legal authorities cited by creditor Main Street LLC in support of extending the automatic stay to Susanna Kelham as a co-debtor do not stand for the proposition for which they are offered. <u>In re Excel Innovations, Inc.</u>, 502 F.3d 1086 (9th Cir. 2007), the Ninth Circuit Court of Appeal reversed and remanded a preliminary injunction issued pursuant to 11 U.S.C. § 105(a) staying an arbitration proceeding between two non-bankrupt parties because the bankruptcy court "misapprehended the operative legal standard" in ruling on the motion. <u>Id</u>. at 1089. "Moreover, we have consistently held that the automatic stay does not apply to suits against non-debtors." <u>Id</u>. at 1095. Notably, Susanna Kelham did not file a Section 105(a) preliminary injunction motion, and because Main Street failed to provide a pin cite provided Ronald Nicholsen can only guess as to how that case stands for the proposition that the stay extends to Susanna Kelham or that she should be a co-debtor.

Creditor Main Street LLC's reliance on <u>In re Panther Mountain Land Development, LLC</u>, 686 F.

3d 916 (8th Cir. 2012) is equally unavailing. Once again, the Eighth Circuit Court of Appeals reversed and remanded the court's decision that the automatic stay extended to a proposed state action. Id. at 924 (stating in dicta, "Further, even if it were somehow possible to characterize the Improvement Districts as subsidiary corporations wholly owned by the Debtor (or owned by an asset of the Debtor), the automatic stay does not, in general, apply to actions against parties who enjoy factual or legal relationships with a debtor, such as a debtor's wholly owned subsidiaries.").

Finally, Susanna Kelham (and debtor Kelham Vineyards) failed to appear in these proceedings and have not requested the stay be extended to her. For all these reasons, the automatic stay does not and should be extended to Susanna Kelham.

## V.    CONCLUSION

For the foregoing reasons, and the reasons set forth in the Motion, the Court should lift the automatic stay as it pertains to the California Writ action so that it may proceed to trial as scheduled. If, however, the Court denies the Motion, it should confirm that the automatic stay does not apply to Susanna Kelham in the Writ action.

Dated: August 14, 2023                         GREENBERG TRAURIG, LLP

                                          By:    /s/ Harold H. Davis
                                                  Harold H. Davis
                                                  Marc R. Baluda

                                                  Attorneys for Petitioner
                                                  RONALD NICHOLSEN II

ACTIVE 689476864v4

## CERTIFICATE OF SERVICE OF DOCUMENT

I, the undersigned, declare that I am employed in the County of Salt Lake, Utah. I am over the age of 18 years and not a party to the within entitled action. My business address is 222 South Main Street, Suite 1730, Salt Lake City, Utah 84101.

A true and correct copy of the foregoing document described as **REPLY MEMORANDUM IN FURTHER SUPPORT OF RONALD NICHOLSEN'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 1002-2(c); and (b) in the manner indicated below:

Hon. William Lafferty, U.S. Bankruptcy Court, 1300 Clay St. Room 220, Oakland, CA 94612
*Served by Overnight Mail*

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 14, 2023, I checked the CM/ECF docket for this bankruptcy case and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

U.S. Trustee USTPRegion17.SF.ECF@usdoj.gov
Rebekah Parker attorneyrparker@gmail.com
Harold Davis hal.davis@gtlaw.com

**SERVED BY U.S. MAIL OR OVERNIGHT MAIL**: On August 14, 2023, I served or will cause to be served within 24 hours the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Susanna R. Kelham
Kelham Vineyard & Winery, LLC
360 Zinfandel Lane St. Helena, CA 94574
*Served by U.S. Mail*

I declare, under penalty of perjury, that the foregoing is true and correct.

August 14, 2023

# Exhibit  5 re May 10th Order

Case: 23-10384     Doc# 72-6     Filed: 09/10/23     Entered: 09/10/23 16:21:38     Page 1 of
4



21CV001403
Napa - Civil

1    Harold H. Davis (SBN 235552)
2    Marc R. Baluda (SBN 192516)
    **GREENBERG TRAURIG, LLP**
3    101 Second Street, Suite 2200
    San Francisco, CA 94105
4    Telephone: (415) 655-1300
5    Facsimile: (415) 707-2010
    E-mail: davish@gtlaw.com
6
    *Attorneys for Petitioner RONALD NICHOLSEN II*
7

**FILED**

MAY 10 2023

Clerk of the Napa Superior Court
By: Perez
         Deputy

8

9          SUPERIOR COURT OF THE STATE OF CALIFORNIA

10               FOR THE COUNTY OF NAPA

11    RONALD NICHOLSEN II,           Case No. 21CV001403

12         Petitioner,

13    v.

                       **[PROPOSED] ORDER FOLLOWING**
                       **CONTINUED SECOND ORDER TO SHOW**
14    KELHAM VINEYARDS & WINERY LLC,    **CAUSE HELD ON APRIL 17, 2023**
     AND SUSANNA ROGERS KELHAM,
15

        Respondents.            Hearing Date: April 17, 2023
16                              Time:        8:30 a.m.
                             Dept.:        B

17

18

19

20

21

22

23

24

25

26

27

28

                              1
                      [PROPOSED] ORDER

*ACTIVE 686992263v3*

Case: 23-10384   Doc# 72-6   Filed: 09/10/23   Entered: 09/10/23 16:21:38   Page 2 of 4

On the Court's own motion, a continued second Order to Show Cause hearing was held on April 17, 2023, mandating that Respondents Kelham Vineyards & Winery LLC ("Kelham Vineyards" or the "Company") and Susanna Kelham (collectively, "Respondents") show cause why they should not be sanctioned for failing to comply with the Court's Writ of Mandate and Order Granting Petitioner Ronald Nicholsen II's Writ of Mandate to Enforce His Rights to Obtain, Inspect, and Copy Certain Records of a Limited Liability Company Per California Corporations Code dated November 4, 2022 (the "November Order"). The November Order provided, inter alia, that "Respondents must comply with California Corporations Code section 17704.10 by providing Petitioner Ronald Nicholsen II ("Petitioner" or "Nicholsen") with the Company's books and records", as specifically set forth therein. Respondents were required to file and serve an initial return of the writ not later than December 15, 2022.

Subsequently, the Court held a Case Management Conference on January 23, 2023. At that time, Respondents had not filed a case management conference statement and had not returned the writ as required by the November Order. Consequently, the Court set an Order to Show Cause ("First OSC") hearing for February 15, 2023. Respondents did not timely file a response to the OSC per California Rule of Court 3.110(i). At the time of the First OSC hearing, Respondents had still not returned the writ as required by the November Order. As a result, the Court entered an order on March 2, 2023, which, among other things, (i) imposed a sanction of $1,500 on Susanna Kelham, personally, (ii) found that Respondents failure to return the writ was without justification pursuant to California Corporations Code section 17704.10, (iii) set a second Order to Show Cause hearing for March 13, 2023 ("Second OSC"), and (iv) ordered the parties to brief the issue of remedies available to Petitioner for Respondents' failure to comply with California Corporations Code section 17704.10.

In compliance with the March 2, 2023 Order, the parties submitted their briefs and additional filings including, Kelham Vineyards' Initial Return to Writ, filed on March 9, 2023; Petitioner's Petition for Recovery of Fees and Expenses and Response to OSC, filed on March 9, 2023 (the "Petition for Fees"); Kelham Vineyards' Brief Regarding Remedies and Request for Evidentiary

2

**[PROPOSED] ORDER**

*ACTIVE 686992263v3*

Hearing, filed on March 10, 2023; and Petitioner's Notice of Respondents' Noncompliance with the Court's November 4, 2022 Writ and First Order to Show Cause, and accompanying documents, filed on March 10, 2023.

The Second OSC was held on March 13, 2023, and the Court then continued the Second OSC and set a hearing on Petitioner's Petition for Fees for April 17, 2023. The Court also set a briefing schedule with opening briefs due March 30, 2023 and responses due April 11, 2023, and the parties accordingly filed their briefs and responses. On April 17, 2023, the Court heard argument on the pleadings set forth above, and issued an Amended Minute order on April 21, 2023.

<u>**ORDER**</u>

Having fully considered the pleadings, evidence, and arguments of all parties, both written and oral, and finding good cause therefor, the Court HEREBY ADOPTS ITS AMENDED MINUTE ORDER, attached hereto as Exhibit A, with the following modification:

1. Respondent Susanna Kelham (on behalf of Respondents) is ordered to personally pay, within 15 days of the notice of entry of this order, $134,679.40 (consisting of $107,820 in attorneys' fees, $2,449.61 in costs and $24,409.79 in expenses) payable to Petitioner's counsel.

**IT IS SO ORDERED**

Dated: 5-9 , 2023          By: _Scotty_____

2

[PROPOSED] ORDER

*ACTIVE 686992263v3*

# Exhibit  6 - Operating Agreement

Case: 23-01009    Doc# 2    Filed: 09/10/23    Entered: 09/10/23 17:17:41    Page 1 of 30

# OPERATING AGREEMENT FOR THE KELHAM VINEYARDS & WINERY, LLC


*change?*

A. THIS OPERATING AGREEMENT is entered into as _____ 2010, by SUSANNA R. KELHAM, RONALD C. NICHOLSEN and HAMILTON NICHOLSEN (referred to individually as a Member and collectively as the Members).

B. The Members desire to amend a limited liability company (Company) formed under the Beverly-Killea Limited Liability Company Act.

C. The Members enter into this Agreement to form and provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, the Members agree as follows:

## ARTICLE I: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement and when not so defined shall have the meanings set forth in California Corporations Code section 1700

1.1. "Act" means the Beverly-Killea Limited Liability Company Act California Corporations Code 17000-17705), including amendments from time to time.

1.2. "Adjusted Capital Contribution" is defined in Article IV, Section 4.6(a).

1.3. "Adjusted Capital Account Deficit" is defined in Article IV, Section 4.3(a).

1.4. "Affiliate" of a Member means (1) any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

1.5. "Agreement" means this operating agreement, as originally executed and as amended from time to time.

1.6. "Articles of Organization" is defined in Corporations Code section 17001(b), as applied to this Company.

1.7. "Assignee" means a person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement, but who has not become a Member.

1.8. "Assigning Member" means a Member who by means of a Transfer has transferred an Economic Interest in the Company to an Assignee.

1.9. "Available Cash" means all net revenues from the Company's operations, including net proceeds from all sales, refinancing, and other dispositions of Company property that the Manager, in the Manager's sole discretion, deems in excess of the amount reasonably necessary for the operating requirements of the Company, including debt reduction and Reserves.

1.10. "Book Depreciation" is defined in Article IV, Section 4.3(b).

1.11. "Capital Account" means, with respect to any Member, the account reflecting the capital interest of the Member in the Company, consisting of the Member's initial Capital Contribution maintained and adjusted in accordance with Article III, Section 3.[6].

1.12. "Capital Contribution" means with respect to any Member, the amount of the money and the Fair Market Value of any property (other than money) contributed to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take "subject to" under IRC section 752) in consideration of a Percentage Interest held by such Member. A Capital Contributions shall not be deemed a loan.

1.13. "Capital Event" means a sale or disposition of any of the Company's capital assets the receipt of insurance and other proceeds derived from the involuntary conversion of Company property, the receipt of proceeds from a refinancing of Company property, or a similar event with respect to company property or assets.

1.14. "Code or "IRS" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.15. "Company" means the company named in Article II, Section2.2 of this Agreement.

1.16. "Company Minimum Gain" is defined in Article IV, Section 4.3(c).

1.17. "Confidential Information" is defined in Article X, Section 10.2.

1.18. "Corporations Code" ("Corp C") means the California Corporations Code.

1.19. "Economic Interest" means a Person's right to share in the income, gains, losses, Deductions, credit or similar items of, and to receive distributions from, the Company, but does not include any other rights of a Member, including the right to vote or to participate in management.

1.20. "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

l.21. "Encumbrance" means, with respect to any Membership Interest, or any element thereof, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.22. "Gross Asset Value" means, with respect to any item of property of the Company the item's adjusted basis for federal income tax purposes, except as follows:

(a) The initial Gross Asset Value of any item of property contributed by a Member to the Company shall be the fair market value of such property, as mutually agreed by the contributing Member and the Company;

(b) The Gross Asset Value of any item of Company property distributed to any Member shall be the fair market value of such item of property on the date of distribution; and

(c) The Gross Asset Value of any item of Company property shall be subject to the Adjustments specified in Article IV, Section 4.11.

1.23. "Initial Members" means those Persons whose names are set forth in the first sentence of this Agreement. A reference to an "Initial Member" means any of the Initial Members.

1.24. "Involuntary Transfer" means with respect to any Membership Interest, or any element thereof, any Transfer or Encumbrance, whether by operation of law, pursuant to court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.25. "Issue" or "Child" or "Children" shall refer to lineal issue of all degrees of the designated ancestor. Said term shall exclude stepchildren, foster children and children naturally born but not raised for a substantial time by the designated ancestor but shall include children adopted into the class.

1.26. "Losses". See Article IV, Section 4.2.

1.27. "Majority of Members" means a Member or Members whose Percentage Interests represent more than 50 percent of the Percentage Interests of all the Members.

1.28. "Manager" or "Managers" means the Person(s) named as such in Article II or the Persons who from time to time succeed any Person as a Manager and who, in either case, are serving at the relevant time as a Manager. The term "Manager" and the reference to the Manager in the singular shall be deemed to refer to the Manager or Managers serving under this document from time to time.

1.29. "Member" means an initial Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, and who remains a Member.

1.30." Member Nonrecourse Debt" is defined in Article IV, Section 4.3(d).

1.31. "Member Nonrecourse Debt Minimum Gain" is defined in Article IV, Section 4.3(e).

1.32." Member Nonrecourse Deductions" is defined in Article IV, Section 4.3(f).

1.33. "Membership Interest" means a Member's rights in the Company, collectively, Including the Member's Economic Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

1.34." Nonrecourse Deductions" is defined in Article IV, Section 4.3(g).

1.35." Nonrecourse Liability" is defined in Article IV, Section 4.3(h).

1.36. "Notice" means a written notice required or permitted under this Agreement. A notice shall be deemed given or sent when deposited as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, DHL, WorldWide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic means, and such transmission is electronically confirmed as having been successfully transmitted; or when delivered to the home or office of a recipient in the care of a person whom the sender has reason to believe will ultimately communicate the notice to the recipient.

1.37. "Percent of the Members" means the specified total of Percentage Interests of all the members.

1.38. "Percentage Interest" means a fraction, expressed as a percentage, the numerator of which is the total of a Member's Capital Account and the denominator of which is the total of all Capital Accounts of all Members.

1.39. "Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.40. "Profits" and "Losses" are defined in Article IV, Section 4.2.

1.41. "Proxy" has the meaning set forth in the first paragraph of Corp C 17001(ai) A Proxy may not be transmitted orally.

1.42. "Regulations" ("Reg") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Code, as such Regulations maybe

amended from time to time, including corresponding provisions of applicable successor regulations.

1.43. "Reserves" means the aggregate of reserve accounts that the Manager, in the Manager's sole discretion, deems reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses and working capital requirements.

1.44. "Successor in Interest" means an Assignee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.45. "Tax Item" means each item of income, gain, loss, deduction, or credit of the Company.

1.46. "Tax Matters Partner" means such Person as may be designated under Article VI, Section 6.6.

1.47. "Transfer" means, with respect to a Membership Interest or any element of a Membership Interest, any sale, assignment, gift, Involuntary Transfer, Encumbrance, or other disposition of such a Membership Interest or any element of such Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.48. Triggering Event" is defined in Article VIII, Section 8.4.

1.49. "Vote" means a written consent or approval, a ballot cast at a meeting, or, a voice vote.

1.50. "Voting Interest" means with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Percentage Interest.

## ARTICLE II: ARTICLES OF ORGANIZATION

2.1. Promptly following execution of this Agreement, the Manager shall cause Restated Articles of Organization, in the form attached to this Agreement as Exhibit 1, to be filed with the California Secretary of State.

2.2. The name of the Company shall be the KELHAM VINEYARDS & WINERY, LLC

2.3. The principal executive office of the Company shall be at 360 Zinfandel Lane, St. Helena, California, or such other place or places as may be determined by the Manager from time to time.

2.4. The initial agent for service of process on the Company shall be SUSANNA R. KELHAM, whose address is: 360 Zinfandel Lane, St. Helena, California 94574. The Manager may from time to time change the company's agent for service of process.

2.5. The Company will be formed for the purposes of engaging in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea Limited Liability Company Act.

2.6. The Members intend the Company to be a limited liability company under the Act, classified as a partnership for federal and, to the maximum extent possible, state income taxes. Neither the Manager nor any Member shall take any action in consistent with the express intent of the parties to this Agreement

2.7. The term of existence of the Company shall comment on the effective date of filing of Articles of Organization with the California Secretary of State, and shall continue until the date specified in the article of organization, unless sooner terminated by the provisions of this Agreement or as provided by law.

2.8. The names and addresses of the Initial Members are as set forth in Exhibit 2.

2.9. The name and business address of the Manager is as set forth in Exhibit 3.

## ARTICLE III: CAPITAL AND CAPITAL CONTRIBUTIONS

3.1. Each Member shall contribute to the capital of the Company as the Member's initial Capital Contribution the money and property specified in Exhibit 4. The initial Fair Market Value of each item of contributed property (net of liabilities secured by such property) that the Company is considered to assume or to take "subject to" under IRC section 752, is also set forth in Exhibit 4, together with the description and amount of these liabilities. If a Member fails to make the initial Capital Contributions specified in this Section within 30 days after the effective date of this Agreement, that Member's entire Membership Interest shall terminate, and that Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to make the initial Capital Contribution.

3.2. No Member shall be required to make any additional Capital Contributions. No Member may voluntarily make any additional Capital Contribution.

3.3. An individual Capital Account for each Member shall be maintained in accordance with the requirements of Reg. 1.704-1(b)(2)(iv) and adjusted in accordance with the following provisions:

(a) A Member's Capital Account shall be increased by that Member's Capital Contributions, that Member's share of Profits, and any items in the nature of income or gain that are specially allocated to that Member pursuant to Article IV.

(b) A Member's Capital Account shall be increased by the amount of any Company liabilities assumed by that Member subject to and in accordance with the provisions of Reg 1.704-1(b)(2)(iv)(c).

(c) A Member's Capital Account shall be decreased by (a) the amount of cash distributed to that Member; (b) the Fair Market Value of any property of the Company so distributed, net of liabilities secured by such distributed property that the distributee Member is considered to assume or to be subject to under IRC section 752; and (c) the amount of any items in the nature of expenses or losses that are specially allocated to that Member pursuant to Article IV.

(d) A Member's Capital Account shall be reduced by the Member's share of any expenditure of the Company described in IRC section 705(a)(2)(B) or which are treated as IRC section 705(a)(2)(B) expenditures pursuant to Reg section 1.704- 1(b)(2)(iv)(i) (including syndication expenses and losses nondeductible under IRC sections 267(a)(l) or 707(b)).

(e) If any Economic Interest (or portion thereof) is transferred, the transferee of such Economic Interest or portions shall succeed to the transferor's Capital Account attributable to such interest or portion.

(f) The principal amount of a promissory note that is not readily traded on an established securities market and that is contributed to the Company by the maker of the note shall not be included in the Capital Account of any Person until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Reg section1.70 4-1(b)(2)(iv)(d)(2).

(g) Each Member's Capital Account shall be increased or decreased as necessary to reflect a revaluation of the Company's property assets in accordance with the requirements of Reg sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g), including the special rules under Reg section 1.701-l(b)(4), as applicable. The provisions of this Agreement respecting the maintenance of Capital Accounts are intended to comply with Reg section1.704-1(b) and shall be interpreted and applied in a manner consistent with those Regulations.

3.4. A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

3.5. No interest shall be paid on funds or property contributed to the capital of the Company or on the balance of a Member's Capital Account.

3.6. A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement.

3.7. No Member shall have priority over any other Member with respect to the return of a Capital Contribution or distributions or allocations of income, gain, losses, deductions, credits or items thereof.

## ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

4.1. The Profits and Losses of the Company and all items of the Company income, gain, loss, deduction, or credit shall be allocates, for Company book purposes and for tax purposes, to a Member in accordance with the Member's Percentage Interest.

4.2. As used in this Agreement, "Profits and Losses" means, for each fiscal year or other period specified in this Agreement, an among equal to the Company's taxable income or loss for such period, determined in accordance with the IRC section 703(a), including al Tax Items required to be stated separately pursuant to IRC section 703(a)(1), with the following adjustments:

   (a) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

   (b) Any expenditures of the Company described in IRC section705(a)(2)(B) or treated as IRC section 705(a)(2)(B) expenditures pursuant to Reg section 1.704-1(b)(z)(iv)(i) and not otherwise taken into account in computing Profits or Losses shall be subtracted fom such taxable income or shall increase such loss; and

   (c) Notwithstanding the foregoing provisions of this Section 4.2, any items of income, gain, loss, or deduction that are specially allocated shall not be taken into account in computing Profits or Losses under Section 4.1.

4.3. The following definitions shall apply with respect to this Article IV.

   (a) "Adjusted Capital Account Deficit" means with respect to any Member the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year of the Company, after such Member's Capital Account has been adjusted as follows: (1) the Member's Capital Account shall be increased by the amount of such Member's share of Company Minimum Gain and Member N onrecourse Debt Minimum Gain; and(2) the Member's Capital Account shall be decreased by the amount of the items described in Reg sections 1.704-l(b)(2)(ii)(d)(4),(5), and (6).

This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Reg section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently with that Regulation.

   (b) "Book Depreciation" means, with respect to any item of Company property for a given fiscal year, a percentage of depreciation or other cost recovery deduction allowable for federal income tax purposes for such item during that fiscal year equal to the result (expressed as a percentage) obtained by dividing (1) the Fair Market Value of that item at the beginning of the fiscal year (or the acquisition date during

the fiscal year), by (2) the federal adjusted tax basis of the item at the beginning of the fiscal year (or the acquisition date during the fiscal year). If the adjusted tax basis of an item is zero, the Manager may determine Book Depreciation, provided that he does so in a reasonable and consistent manner.

(c) "Company Minimum Gain" has the meaning set forth in Reg section 1.704-2(d)(1).

(d) "Member Nonrecourse Debt" is defined in Reg section 1.704-2(b)(4).

(e) "Member Nonrecourse Debt Minimum Gain" for a fiscal year of the Company means the net increase in Minimum Gain attributable to Member Nonrecourse Debt, determined as set forth in Reg section 1.704-2(i)(2).

(f) "Member Nonrecourse Deductions" has the meaning set forth in Reg section 1.704-2(1)(2). For any fiscal year of the Company the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt equals the net increase during that fiscal year in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt during that fiscal year, reduced (but not below zero) by the amount of any distributions during such year to the Member bearing the economic risk of loss for such Member Nonrecourse Debt if such distributions are both from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, all as determined according to the provisions of Reg section 1.704-2(i)(2). In determining Member Nonrecourse Deductions the ordering rules of Reg section 1.704-2(j) shall be followed.

(g) "Nonrecourse Deductions" has the meaning set forth in Reg section 1.704-2(c). The amount of Nonrecourse Deductions for a Company fiscal year equals the net increase in the amount of Company Minimum Gain during that fiscal year, reduced (but not below zero) by the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain.

(h) "Nonrecourse Liability" is defined in Reg section 1.752-1(a)(2).

4.4. The following special allocations shall be made in the following order:

(a) Company Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain during a fiscal year, each Member shall be allocated before any other allocation under this Section, items of Company income and gain for such fiscal year equal to such Member's share of the net decrease in Company Minimum Gain as determined in accordance with Reg section1.704-2(g) (2).

(b) Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease in Member Nonrecourse Debt Minimum Gain during a fiscal year, any Member with a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member

Nonrecourse Debt as of the beginning of such fiscal year shall be allocated items of Company income and gain for such year (and, if necessary, subsequent years) equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. A Member's share of net decrease in Member Nonrecourse Debt Minimum Gain shall be determined pursuant to Reg section 1.704-2 (g)(2). A Member shall not be subject to the foregoing chargeback to the extent permitted under Reg section 1.704-2(i)(4).

(c) Qualified Income Offset. If any Member unexpectedly receives an adjustment, allocation, or distribution described in Reg section 1.704-1(b)(2)(ii)(d)(4)(5), or (6), such Member shall be allocated items of Company income and gain (consisting of a pro rata portion of each item of Company income including gross income and gain for such fiscal year) in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustment, allocation, or distribution.

4.5. Member Nonrecourse Deductions for any fiscal year of the Company shall be allocated to the Members in the same proportion as Profits are allocated under Section 4.1, provided that any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears (or is deemed to bear) the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Reg section 1.704-2(i)(2).

4.6. In any fiscal year of the Company, Profits in excess of Losses of the Company resulting from a Capital Event in that Fiscal Year shall be allocated to the Members in the following order:

(a) To Members, whose Adjusted Capital Contributions are in excess of their Capital Accounts, in proportion to those excesses, until all of those excesses have been eliminated. "Adjusted Capital Contributions" means, with respect to each Member the excess of such Member's contribution to the capital of the Company over all prior distributions to the Member that have resulted from Capital Events.

(b) Among the Members in the proportion that the Capital Contribution of each Member bears to the total Capital Contributions of all Members.

4.7. In any fiscal year of the Company, Losses in excess of Profits of the Company, resulting from a Capital Event in that fiscal year, shall be allocated to the Members with positive Capital Accounts, in proportion to their positive Capital Account balances, until no Member has a positive Capital Account. For this purpose Capital Accounts shall be reduced by the adjustments set forth in Reg sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

4.8. Any unrealized appreciation or unrealized depreciation in the values of Company property distributed in kind to Members shall be deemed to be Profits or Losses realized by the Company immediately prior to the distribution of the property and such Profits or Losses shall be allocated to the Capital Accounts in the same proportions as Profits are allocated under Section 4.1. Any property so distributed shall be treated as a distribution

to the Members to the extent of the Fair Market Value of the property, less the amount of any liability secured by and related to the property. Nothing contained in this Agreement is intended to treat or cause such distributions to be treated as sales for value. For the purposes of this Section 4.8, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the Fair Market Value of such property and the Company's federal adjusted tax basis for such property.

4.9. Any item of income, gain, loss, or deduction with respect to any property (other than cash) that has been contributed by a Member to the capital of the Company, or that has been revalued pursuant to the provisions of Article III, Section 3. [6](g), and that is required or permitted to be allocated to such Member for income tax purposes under IRC section 704(c) in order to take into account the variation between the tax basis of such property and its Fair Market Value at the time of its contribution, shall be allocated solely for income tax purposes in the manner required or permitted under IRC section 704(c) using the "traditional" method described in Reg section 1.704-3(b), except that any other method allowable under applicable Regulations may be used for any contribution of property with respect to which there is agreement among the contributing Member and the Manager (and, if the Manager and the contributing Member are Affiliates, a Majority of Members who are not Affiliates of the Manager).

4.10. In the case of a Transfer of an Economic Interest during any fiscal year of the Company, the Assigning Member and Assignee shall each be allocated Profits or Losses based on the number of days each held the Economic Interest during that fiscal year. if the Assigning Member and Assignee agree to a different proration and advise the Manager of the agreed proration before the date of the Transfer, Profits or Losses from a Capital Event during that fiscal year shall be allocated to the holder of the Interest on the day such Capital Event occurred. If an Assignee makes a subsequent Assignment, said Assignee shall be considered an "Assigning Member" with respect to the subsequent Assignee for purposes of the aforesaid allocations.

4.11. (a) The Gross Asset Value of all Company property shall be adjusted as of the following times: (l) the acquisition of an interest or additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (2) the distribution of money or other property (other than a de minimis amount) by the Company to a Member as consideration for Economic Interest in the Company, and (3) the liquidation of the Company within the meaning of Reg section 1.704-l(b)(2)(ii)(g); provided, however, that adjustments under clauses (1) and (2) above shall be made only in the event of a revaluation of Company property under Article III, Section 3. [6](g) in accordance with Reg section 1.704-1(b)(2)(iv)(f);

(b) The Gross Asset Value of Company property shall be increased or decreased to reflect Adjustments to the adjusted tax basis of such property pursuant to IRC section 732, IRC section 733, or IRC section7 43, subject to the limitations imposed by IRC section 755 and Reg section 1.704-l(b)(2)(iv)(m); and

(c) If the Gross Asset Value of an item of property has been determined or adjusted pursuant to Article I, Section 22 or Paragraph (a) or (b) of this Section 4.11, such Gross Asset Value shall be adjusted by the Book Depreciation if, any, taken into account with respect to such property for purposes of computing Profits and Losses.

4.12. It is the intent of the Members that each Member's allocated share of Company Tax Items be determined in accordance with this Agreement to the fullest extent permitted by IRC sections 704 (b) and 704(c). Notwithstanding anything to the contrary contained in this Agreement, if the Company is advised that, as a result of the adoption of new or amended regulations pursuant to IRC sections 704(b) and 704(c), or the issuance of authorized interpretations, the allocations provided in this Agreement are unlikely to be respected for federal income tax purposes, the Manager is hereby granted the power to amend the allocation provisions of this Agreement, on advice of accountants and legal counsel, to the minimum extent necessary to cause such allocation provisions to be respected for federal income tax purposes,



4.13. All Available Cash, other than revenues or proceeds from a Capital Event or the dissolution of the Company, shall be distributed among the Members in the same manner as Profits. The parties intend that Available Cash shall be distributed as soon as practicable following the Manager's determination that such cash is available for distribution. The parties acknowledge that no assurances can be given with respect to when or whether said cash will be available for distributions to the Members.



4.14. All Available Cash resulting from a Capital Event (as distinguished from normal business operations or the dissolution of the Company) shall be distributed to the Members in accordance with their respective Percentage interests at such times as the Members may agree,

4.15. If the proceeds from a sale or other disposition of an item of Company property consistent of property other than cash, the value of that property shall be as determined by the Manager. Such on cash proceed shall then be allocated among all the Members in proportion to their Percentage Interests. If such non-cash proceeds are subsequently reduced to cash, such cash shall be distributed to each Member in accordance with Section 4.14.

4.16. Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Company, or when any Member's interests liquidated, all items of income and loss first shall be allocated to the Members Capital Accounts under this Article IV, and other credits and deductions to the Members Capital Accounts shall be made before the final distribution is made. The final distribution to the Members shall be made as provided in Article IX, Section9 .2(d) of this Agreement. The provisions of this Section 4 .16 and Article IX, Section9 .2(d) shall be construed in accordance with the requirements of Reg section1 .704-1(b)(2)(ii)(b)(2).

## ARTICLE V: MANAGEMENT

5.1. The business of the Company shall be managed by the Person named as a Manager in Article II, Section 2 .9. or any successors, selected as provided in Section 5 .3. Except as otherwise provided in this Agreement, all decisions concerning the management of the Company's business shall be made by the Manager or if there is more than one Manager, then by a Vote of a majority, by member, of the Managers.

5.2. Each Manager shall serve until the earlier of (l) the Manager's resignation, retirement, death, or disability; (2) the Manager's removal by the Members; and (3) the expiration of the Manager's term as Manager, if a term has been designated by a Majority of Members, A new Manager shall be appointed by a majority of Members on the occurrence of any of the foregoing events.

5.3. Each Manager has been appointed by a Majority of Members for (a) a term expiring with the appointment of a successor. A Manager who is not also a Member may be removed with or without cause at any time by action of a Majority of Members. A Manager who is a Member may be removed only on the Vote of all other Members and the execution and filing of a Certificate of Amendment of the Articles of Organization of the Company in conformity with Corporations Code section 17054, if necessary, to provide that the Company is to be managed by Members.

5.4, The Manager shall have the powers and duties described in Section 5.8 hereof and such other powers and duties as may be prescribed in this Agreement or by the Members. Notwithstanding the foregoing, the Manager shall not take any of the following actions on behalf of the Company unless all of the Members consent to the taking of such action.

    (a) Any act that would make it impossible to carry on the ordinary business of the Company;
    (b) Any confession of a judgment against the Company
    (c) The dissolution of the Company;
    (d) The disposition of all or a substantial part of the Company's assets not in the ordinary course of business:
    (e) The incurring of any debt not in the ordinary course of business;
    (f) A change in the nature of the principal business of the Company;
    (g) The incurring of any contractual obligation or the making of any capital expenditure with a total cost of more than ten thousand dollars ($10,000);
    (h) The filing of a petition in bankruptcy or the entering into of an arrangement among creditors; and
    (i) The entering into, on behalf of the Company, of any transaction constituting a "reorganization" within the meaning of Corp C 17600.
    (j) The employing, hiring, or otherwise working in the Company of any spouse, girlfriend, and/or significant other of any of the Members without unanimous vote of all Members.

5.5. If there is more than one Manager, actions of the Managers shall be taken at meetings or as otherwise provided in this Section 5.5 by a majority. No regular meetings of the Managers need be held. The Managers may call a meeting of the Managers by giving Notice of the time and place of the meeting at least 48 hours prior to the time of the holding of the meeting. The Notice need not specify the purpose of the meeting, nor the location if the meeting is to be held at the principal executive office of the Company.

If there is more than one Manager, a majority of Managers shall constitute a quorum for the transaction of business at any meeting of the Managers.

If there is more than one Manager, the transactions of the Managers at any meeting, however called or noticed, or wherever held, shall be as valid as though transacted at a meeting duly held after call and notice if a quorum is present and if either before or after the meeting, each Manager not present signs a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes of such meeting.

If there is more than one Manager any action required or permitted to be taken by the Managers under this Agreement may individually or collectively consent in writing to such action.

Managers may participate in the meeting through the use of a conference telephone or similar communications equipment, provided that all Managers participating in the meeting can hear one another.

The Manager shall keep or cause to be kept with the books and records of the Company full and accurate minutes of all meetings, notices and waivers of notices of meetings, and all written consents of actions of the Managers, if there is more than one Manager.

5.6. It is acknowledged that the Manager has other business interests to which the Manager devotes part of the Manager's time. The Manager shall devote such time to the conduct of the business of the Company as tire Manager, in the Manager's own good faith and discretion, deems necessary.

5.7. The Manager shall be entitled to compensation for the Manager's services and to reimbursement for all expenses reasonably incurred by the Manager in the performance of the Manager's duties.

5.8. The Manager shall be the chief executive officer of the Company and shall have general supervision of the business and affairs of the Company, shall preside at all meetings of Members and of Managers, and shall have such other powers and duties usually vested in a chief executive officer. A Unanimous Vote of the Members is required to assign additional officers of the Company, and to alter the powers and duties of the Manager. The Manager can establish the powers and duties of all other officers and the compensation of all Company officers and amendment the articles of organization of this Agreement as required.

5.9. The Manager shall cause all assets of the Company whether real or personal, to be held in the name of the Company.

5.10. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by the Manager. Withdrawal from such accounts shall require only the signature of the Manager or such other person or persons as the Manager may designate.

## ARTICLE VI: ACCOUNTS AND ACCOUNTING

6.1. Complete books of account of the Company's business in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at such other locations as the Manager shall determine from time to time and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of such inspection and copying shall be borne by the Member.

6.2. Financial books and records of the company shall be kept on the cash method of accounting, which shall be the method of accounting followed by the company for federal income, tax purposes. The financial statements of the Company shall be appropriate and adequate for the company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company shall be January 1 through December 31.

6.3. At all times during the term of existence of the Company, and beyond that term if the Manager deems it necessary; the Manager shall keep or cause to be kept the books of account referred to in Section 6.2, together with:

    (a) A current list of the full name and last known business or residence address of each Member, together with the capital contribution and the share in Profits and Losses of each Member;

    (b) A current list of the full name and business or residence address of each Manager;

    (c) A copy of the Articles of Organization, as amended;

    (d) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

    (e) An original executed copy or counterparts of this Agreement, as amended;

    (f) Any powers of attorney under which the Articles of Organization or any amendments to said articles were executed;

(g) Financial statements of the Company for the six most recent fiscal years, and

(h) The books and Records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

If the Manager deems that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of said items shall be as designated by the Manager.

6.4. Within 75 days after the end of each taxable year of the Company the Manager shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year.

## ARTICLE VII: MEMBERSHIP-MEETINGS,

## VOTING, INDEMNITY

7.1. There shall be only one class of membership and no Member shall have any rights or preferences in addition to or different from those possessed by any other Member except as specifically provided for in Article IV. Members shall have the right and power to appoint, remove, and replace Managers and officers of the Company and the right to Vote on all other matters with respect to which this Agreement or the Act requires or permits such Member action. Each Member shall Vote in proportion to the Member's Percentage Interest as of the governing record date, determined in accordance with Section 7 .2, If a Member has assigned all or part of the Member's Economic Interest to a person who has not been admitted as a Member, the Assigning Member shall Vote in proportion to the Percentage Interest that the Assigning Member would have had, if the assignment had not been made.

Without limiting the foregoing, all of the following acts shall require a sixty-six and two-thirds percent (66 2/3%) Vote of the Members:

(a) The Transfer of a Membership Interest and the admission of the Assignee as a Member of the Company;

(b) A compromise of the obligation of a Member to make a Capital Contribution under Article III.

7.2. The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager or by a Majority of Members; provided that such record date shall not be more than 60, or less than ten calendar days prior to the date of the meeting and not more than 60 calendar days prior to any other

action. In the absence of any action setting a record date, the record date shall be determined in accordance with Corp C section 17104(k).

7.3. At all meetings of Members, a Member may Vote in person or by Proxy. Such Proxy shall be filed with the Manager before or at the time of the meeting, and may be filed by facsimile transmission to the Manager at the principal executive office of the Company or such other address as may be given by the Manager to the Members for such purposes.

## ARTICLE VIII: TRANSFERS OF MEMBERSHIP INTERESTS

8.1. A Member may not withdraw from the Company without the written consents of all remaining Members. Withdrawal shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred prior to the effective date of withdrawal. A withdrawing Member shall have only the rights of a holder of an Economic Interest in the Company in respect of the Member's Membership Interest in the Company. Unless all remaining Members consent to such withdrawal, the withdrawing Member shall not be entitled to a distribution of its Economic Interest until the dissolution and liquidation of the Company. For purposes of this Section 8.1, the term "Economic Interest" shall not mean or include any right to share in the income, gains, losses, deductions, credits, or similar items of the Company attributable to any period following withdrawal, or any right to information concerning the business and affairs of the Company, except as provided in Corporations Code section 17106.

8.2. Except as expressly provided in this Agreement, a Member shall not transfer any part of the Member's Membership Interest in the Company, whether now owned or later acquired, unless (a) the other Members unanimously approve the transferee's admission to the Company as a Member upon such Transfer and (b) the Membership Interest to be transferred, when added to the total of all other Membership Interests transferred in the preceding 12 months, will not cause the termination of the Company under the Code. No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Membership Interest in the Company unless such Encumbrance has been approved in writing by the Manager. Such approval may be granted or withheld in the Manager's sole discretion. Any Transfer or Encumbrance of a Membership Interest without such approval shall be void. Notwithstanding any other provision of this Agreement to the contrary, a Member who is a natural person may transfer all or any portion of his or her Membership Interest to any revocable trust created fol the benefit of the Member, or any combination between or among the Member and the Member's issue; provided that the Member retains a beneficial interest in the trust and ail of the Voting Interest included in such Membership Interest. A Transfer of a Member's beneficial interest in such trust, or failure to retain such Voting Interest, shall be deemed a Transfer of a Membership interest.

8.3. If a Member wishes to transfer any or all of the Member's Membership Interest in the Company pursuant to a Bona Fide Offer (as defined below), the Member shall give Notice to the Managers at least 30 days in advance of the proposed sale or Transfer, indicating the terms of the Bona Fide Offer and the identity of the offeror. The Company

and the other Members shall have the option to purchase the Membership Interest proposed to be transferred at the price and on the terms provided in this Agreement. If the price for the Membership Interest is other than cash, the fair value in dollars of the price shall be as established in good faith by the Company. For purposes of this Agreement, "Bona Fide Offer" means an offer in writing setting forth all relevant terms and conditions of purchase from an offeror who is ready, willing, and able to consummate the purchase and who is not an Affiliate of the selling Member. For 30 days after the Notice is given, the Company shall have the right to purchase the Membership Interest offered, on the terms stated in the Notice, for the lesser of (a) the price stated in the Notice (or the price plus the dollar value of noncash consideration, as the case may be) and (b) the price determined under the appraisal procedures set forth in Section 8.8.

If the Company does not exercise the right to purchase all of the Membership Interest, then, with respect to the portion of the Membership Interest that the Company does not elect to purchase, that right shall be given to the other Members for an additional 30-day period, beginning on the day that the Company's right to purchase expires. Each of the other Members shall have the right to purchase, on the same terms, a part of the interest of the offering Member in the proportion that the Member's Percentage Interest bears to the total Percentage Interests of all of the Members who choose to participate in the purchase; provided, however, that the Company and the participating Members may not, in the aggregate, purchase less than the entire interest to be sold by the offering Member.

If the Company and the other Members do not exercise their rights to purchase all of the Membership Interest, the offering Member may, within 90 days from the date the Notice is given and on the terms and conditions stated in the Notice, sell or exchange that Membership Interest to the offeror named in the Notice. Unless the requirements of Section 8.2 are met, the offeror under this section shall become an Assignee, and shall be entitled to receive only the share of Profits or other compensation by way of income and the return of Capital Contribution to which the assigning Member would have been entitled.

8.4. On the happening of any of the following events (Triggering Events) with respect to a Member or an Assignee of an economic interest, the Company and the other Members shall have the option to purchase the economic interest or Membership Interest in the Company of such Assignee of an economic interest or Member (Selling Member) at the price and on the terms provided in Section 8.8 of this Agreement:

(a) The death, bankruptcy, or withdrawal of a Member or an Assignee of an economic interest, or the winding up and dissolution of a corporate Member, or merger or other corporate reorganization of a corporate Member as a result of which the corporate Member does not survive as an entity; provided that the remaining Members have elected to continue the business of the Company as provided in Article IX, Section 9.l(a)

(b) The failure of a Member or an Assignee of an economic interest to make the Member's Capital Contribution pursuant to the provisions of Article III of this Agreement.

(c) The occurrence of any other event that is, or that would cause, a Transfer in contravention of this Agreement.

Each Member or Assignee of an economic interest agrees to promptly give Notice of a Triggering Event to the Managers.

8.5. Notwithstanding any other provisions of this Agreement:

(a) If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion thereof to that Member's spouse (an "Award"), then, notwithstanding that such transfer would constitute an unpermitted Transfer under this Agreement, that Member shall have the right to purchase from his or her former spouse the Membership Interest, or portion thereof that was so transferred, and such former spouse shall sell the Membership Interest or portion thereof to that Member at the price set forth below in Section 8.8 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the court award (the Expiration Date), the Company and the other Members shall have the option to purchase from the former spouse the Membership Interest or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the Award.

(b) Upon the death of a Member or an Assignee of an economic interest, the interest of such deceased person may only be left to another Member, the issue of another Member or the issue of such deceased person. If, by reason of the death of a spouse of a Member, any portion of a Membership Interest is transferred to a Transferee other than (1) that Member or (2) a trust created for the benefit of that Member (3) or for the benefit of that Member and any combination between or among the Member and the Member's issue, in which the Member is the sole Trustee and the Member, as Trustee or individually possesses all of the Voting Interest included in that Membership Interest, then the Member shall have the right to purchase the Membership Interest or portion thereof from the estate or other successor of his or her deceased spouse or Transferee of such deceased spouse, and the estate, successor, or Transferee shall set the Membership Interest or portion thereof at the price set forth in Section 8.8 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the date of death (the Expiration Date), the Company and the other Members shall have the first right to purchase from the estate or other successor of the deceased spouse the Membership Interest shall or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the death.

8.6. On the receipt of Notice by the Manager and the other Members as contemplated by Sections 8.1, 8.3, and 8.5, and on receipt of actual notice of any Triggering Events as determined in good faith by the Manager (the date of such receipt is hereinafter referred to as the "Option Date") the Manager shall promptly cause a Notice of the occurrence of such a Triggering Event to be sent to all Members, and the Company shall have the option, for a period ending 30 calendar days following the determination of the purchase price as provided in Section 8.8, to purchase the Membership Interest in the Company to which the option relates, at the price and on the terms set forth in Section 8.8 of this Agreement, and the other Members, pro rata in accordance with their prior Membership Interests in the Company, shall then have the option, for a period of 30 days thereafter, to purchase the Membership Interest in the Company not purchased by the Company, on the same terms and conditions as apply to the Company. If all other Members do not elect to purchase the entire remaining Membership Interest in the Company, then the Members electing to purchase shall have the right, pro rata in accordance with their prior Membership Interest in the Company, to purchase the additional Membership Interest in the Company available for purchase The transferee of the Membership Interest in the Company that is not purchased shall hold such Membership Interest in the Company subject to all of the provisions of this Agreement.

8.7. Neither the Member whose interest is subject to purchase under this Article, nor such Member's Affiliate, shall participate in any Vote or discussion of any matter pertaining to the disposition of the Member's Membership Interest in the Company under this Agreement.

8.8. The purchase price of the Membership Interest that is the subject of an option under Section 8.6 shall be the, "Fair Option Price" of the interest and determined under this Section 8.8. "Fair Option Price", means f lie cash price that a willing buyer would pay to a willing seller when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts on the Option bate. Each of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree upon the Fair Option Price. If the parties are unable to so agree within 30 days of the Option Date, the selling party shall appoint, within 40 days of the Option Date, one appraiser, and the purchasing party shall appoint within 40 days of the Option Date, one appraiser. The two appraisers shall within a period of five additional days, agree upon and appoint an additional appraiser. The three appraisers shall, within 60 days after the appointment of the third appraiser, determine the Fair Option Price of the Membership Interest in writing and submit their report to all the parties.

The Fair Option Price shall be determined by disregarding the appraiser's valuation that diverges the greatest from each of the of the two appraisers' valuations, and the arithmetic mean of the remaining two appraisers' valuations shall be the Fair Option

Price, Each purchasing party shall pay for the services of the appraiser selected by it, plus one half of the fee charged by the third appraiser, and one half of all other costs relating to the determination of Fair Option Price. The Fair Option Price as so determined shall be payable in cash.

8.9. Except as expressly permitted under Section 8.2, a prospective transferee (other than an existing Member) of a Membership Interest may be admitted as a Member with respect to such Membership Interest (Substituted Member) only (a) on the unanimous Vote of the other Members in favor of the prospective transferee's admission as a Member, and (b) on such prospective transferee executing a counterpart of this Agreement as a party hereto. Any prospective transferee of a Membership Interest shall be deemed an Assignee's, and, therefore, the owner of only an Economic Interest until such prospective transferee has been admitted as a Substituted Member. Except as otherwise permitted in the Act, any such Assignee shall be entitled only to receive allocations and distributions under this Agreement with respect to such Membership Interest and shall have no right to Vote to exercise any rights of a Member until such Assignee has been admitted as a Substituted Member. Until the Assignee becomes a Substituted Member, the Assigning Member will continue to be a Member and to have the power to exercise any rights and powers of a Member under this Agreement, including the right to Vote in proportion to the Percentage Interest that the Assigning Member would have had in the event that the assignment had not been made.

8.10. Any person admitted to the Company as a Substituted Member shall be subject to all the provisions of this Agreement that apply to the Member from whom the Membership Interest was assigned, provided, however, that the assigning Member shall not be released from liabilities as a Member solely as a result of the assignment, both with respect to obligations to the Company and to third parties, incurred prior to the assignment.

8.11. The initial sale of Membership Interests in the Company to the Initial Members has not been qualified or registered under the securities laws of any state, including California, or registered under the Securities Act of 1933, in reliance upon exemptions from the registration provisions of those laws. Notwithstanding any other provision of this Agreement, Membership Interest may not be transferred unless registered or qualified under applicable state and federal securities law unless, in the opinion of legal counsel satisfactory to the Company, such qualification or registration is not required. The Member who desires to transfer a Membership Interest shall be responsible for all legal fees incurred in connection with said opinion.

## ARTICLE IX: DISSOLUTION AND WINDING UP

9.1. The Company shall be dissolved upon the first to occur of the following events:

    (a) The death, bankruptcy, retirement, resignation, expulsion, or dissolution of a Member, if the remaining Members, by the Vote of a Majority of Members within 180 days of the happening of that event Vote to dissolve the business of the

Company, in which case, the Company shall dissolve. For purposes of this Paragraph (a), in determining a Majority of Members, the Percentage Interest of the Member who has died, become bankrupt, retired, resigned, been expelled or dissolved shall not be taken into account.

(b) The expiration of the term of existence of the Company.

(c) The written agreement of all Members to dissolve the Company.

(d) The sale or other disposition of substantially all of the Company's assets.

(e) Entry of a decree of judicial dissolution under Corporations Code section 17351.

9.7. On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company. The Managers who have not wrongfully dissolved the Company or', if there is no such Manager, the Members, shall wind up the affairs of the Company. The Delegates winding up the affairs of the Company shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members), the remaining assets of the Company shall be distributed or applied in the following order:

(a) To pay the expenses of liquidation.

(b) To the establishment of reasonable reserves by the Delegate for contingent liabilities or obligations of the Company. Upon the Delegate's determination that such reserves are no longer necessary, said reserves shall be distributed as p provided in this Section 9.2.

(c) To repay outstanding loans to Members. If there are insufficient funds to pay such Loans in full, each Member shall be repaid in the ratio that the Member's loan, together with interest accrued and unpaid there on, bears to the total of all such loans from Members, including all interest accrued and unpaid thereon. Such repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest.

(d) Among the Members with Positive Capital Account Balances as provided in Article IV, Section. 4.16.

9.3. Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of each Member, such Member shall have no recourse against any other

Members for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement.

## ARTICLE X: ARBITRATION

10.1. Any action to enforce or interpret this Agreement, or to resolve disputes with respect to this Agreement as between the Company and a Member, or between or among the Members, shall be settled by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive dispute resolution process in the State of California, but arbitration shall be a nonexclusive process elsewhere. Any party may commence arbitration by sending a written demand for arbitration to the other parties. Such demand shall set forth the nature of the matter to be resolved by arbitration. The Manager shall select the place of arbitration. The substantive law of the State of California shall be applied by the arbitrator to the resolution of the dispute. The parties shall share equally all initial costs of arbitration. The prevailing party shall be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator shall be final, binding, and conclusive on all parties. Judgment may be entered upon any such decision in accordance with applicable law in any court having jurisdiction thereof. The arbitrator (if permitted under applicable law) or such court may issue a writ of execution to enforce the arbitrator's decision.

## ARTICLE XI: GENERAL PROVISIONS

11.1. This Agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all the parties. This Agreement replaces and supersedes all prior written and oral agreements by and among the Members and Managers or any of them.

11.2. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.3. This Agreement shall be construed and enforced in accordance with the internal laws of the State of California. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

11.4. This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

11.5. Whenever used in this Agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

11.6. The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

11.7. Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members in the carrying on of their own respective businesses or activities.

11.8. Except as provided in this Agreement, no provision of this Agreements shall be construed to constitute a Member, in the Member's capacity as such, the agent of any other Member.

11.9. Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

11.10. The article, section, and paragraph titles and headings contained in this Agreement are inserted as a matter of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

11.11. This Agreement may be altered, amended, or repealed only by a writing signed by all of the Members. .

11.12. Time is of the essence of every provision of this Agreement that specifies a time for performance.

11.13. This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first above written.

RONALD C. NICHOLSEN
Manager and Member

HAMILTON NICHOLSEN
Manager and Member

SUSANNA R. KELHAM
Manager and Member

KELHAM VINEYARDS & WINERY, LLC

EXHIBIT 2

<u>MEMBERS</u>

NAME:                                    ADDRESS:

SUSANNA R. KELHAM          P.O. Box 2707, Yountville, California 94599

RONALD C. NICHOLSEN       P.O, Box 2707, Yountville, California 94599

HAMILTON R. NICHOLSEN    P.O. Box 2707, Yountville, California 94599

KELHAM VINEYARDS & WINERY, LLC

EXHIBIT 3

## MANAGER

Name:                                    Address:

Susanna R. Kelham                        360 Zinfandel Lane, St. Helena, CA 94574

Successors:

Hamilton Nicholsen, Member               360 Zinfandel Lane, St. Helena, CA 94574

Ronald Nicholsen, Member                 360 Zinfandel Lane, St. Helena, CA 94574

As Equal Managing Members

Case: 23-01009    Doc# 2    Filed: 09/10/23    Entered: 09/10/23 17:17:41    Page 27 of 30

Case: 23-10384    Doc# 73-2    Filed: 09/12/23    Entered: 09/12/23 20:01:21    Page 117 of 120




# State of California
## Secretary of State

### LIMITED LIABILITY COMPANY
### CERTIFICATE OF AMENDMENT

**A $30.00 filing fee must accompany this form.**

**IMPORTANT** – Read instructions before completing this form.

This Space For Filing Use Only

| 1. | SECRETARY OF STATE FILE NUMBER | 2. | NAME OF LIMITED LIABILITY COMPANY |
|---|---|---|---|
| | **200035310017** | | Kelham Vineyards & Winery LLC |

3. COMPLETE ONLY THE SECTIONS WHERE INFORMATION IS BEING CHANGED. ADDITIONAL PAGES MAY BE ATTACHED IF NECESSARY.

    **A.**  LIMITED LIABILITY COMPANY NAME (END THE NAME WITH THE WORDS "LIMITED LIABILITY COMPANY," "LTD. LIABILITY CO." OR THE ABBREVIATIONS "LLC" OR "L.L.C.")

    **B.**  THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY (CHECK ONE):

        [✓] ONE MANAGER
        [ ] MORE THAN ONE MANAGER
        [ ] ALL LIMITED LIABILITY COMPANY MEMBER(S)

    **C.**  AMENDMENT TO TEXT OF THE ARTICLES OF ORGANIZATION:

    As attached

    **D.**  OTHER MATTERS TO BE INCLUDED IN THIS CERTIFICATE MAY BE SET FORTH ON SEPARATE ATTACHED PAGES AND ARE MADE A PART OF THIS CERTIFICATE. OTHER MATTERS MAY INCLUDE A CHANGE IN THE LATEST DATE ON WHICH THE LIMITED LIABILITY COMPANY IS TO DISSOLVE OR ANY CHANGE IN THE EVENTS THAT WILL CAUSE THE DISSOLUTION.

| 4. | FUTURE EFFECTIVE DATE, IF ANY: | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | **MONTH** | November | **DAY** | 1 | **YEAR** | 2010 |

5. NUMBER OF PAGES ATTACHED, IF ANY:

6. IT IS HEREBY DECLARED THAT I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

    SIGNATURE OF AUTHORIZED PERSON

    Susanna Kelham

    TYPE OR PRINT NAME AND TITLE OF AUTHORIZED PERSON

    November 1, 2010

    DATE

7. **RETURN TO:**

    **NAME**     Susanna Kelham
    **FIRM**     Kelham Vineyards & Winery LLC
    **ADDRESS**   360 Zinfandel Lane
    **CITY/STATE**  St. Helena, CA 94574
    **ZIP CODE**

SEC/STATE FORM LLC-2 (Rev. 03/2005) – FILING FEE $30.00

APPROVED BY SECRETARY OF STATE

Case: 23-01009   Doc# 2   Filed: 09/10/23   Entered: 09/10/23 17:17:41   Page 28 of 30



# State of California
## Secretary of State

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That the attached transcript of _____ page(s) is a full, true and correct copy of the original record in the custody of this office.



**IN WITNESS WHEREOF,** I execute this certificate and affix the Great Seal of the State of California this day of

FEB 2 2 2010

**DEBRA BOWEN**
Secretary of State

Sec/State Form CE-109 (REV 01/2009)

OSP 09 118849



# State of California
## Secretary of State

### STATEMENT OF INFORMATION
(Limited Liability Company)

Filing Fee $20.00. If amendment, see instructions.

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**ENDORSED - FILED**
In the office of the Secretary of State
of the State of California

JAN 0 8 2010

1. LIMITED LIABILITY COMPANY NAME (Please do not alter if name is preprinted.)

KELHAM VINEYARDS & WINERY, LLC
200035310017

This Space For Filing Use Only

**DUE DATE:**

**FILE NUMBER AND STATE OR PLACE OF ORGANIZATION**

| 2. SECRETARY OF STATE FILE NUMBER | 3. STATE OR PLACE OF ORGANIZATION |
|---|---|
| 200035310017 | CALIFORNIA |

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 4 and 6 cannot be P.O. Boxes.)

| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | CITY AND STATE | ZIP CODE |
|---|---|---|
| 360 ZINFANDEL LN | SAINT HELENA, CA | 94574 |

| 5. CALIFORNIA OFFICE WHERE RECORDS ARE MAINTAINED (DOMESTIC ONLY) | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 360 ZINFANDEL LN | SAINT HELENA | CA | 94574 |

**NAME AND COMPLETE ADDRESS OF THE CHIEF EXECUTIVE OFFICER, IF ANY**

| 6. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| | | | |

**NAME AND COMPLETE ADDRESS OF ANY MANAGER OR MANAGERS, OR IF NONE HAVE BEEN APPOINTED OR ELECTED, PROVIDE THE NAME AND ADDRESS OF EACH MEMBER** (Attach additional pages, if necessary.)

| 7. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| SUSANNA KELHAM | 1469 DWYERD RD/ PO BOX 2707 | YOUNTVILLE, CA | 94571 |
| 8. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| RON NICHOLSEN | 360 ZINFANDEL LN | SAINT HELENA, CA | 94574 |
| 9. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| HAMILTON NICHOLSEN | 360 ZINFANDEL LN | SAINT HELENA, CA | 94574 |

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and Item 11 must be completed with a California address. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 11 must be left blank.)

| 10. NAME OF AGENT FOR SERVICE OF PROCESS |
|---|
| SUSANNA KELHAM |

| 11. ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | ZIP CODE |
|---|---|---|
| 360 ZINFANDEL LN | ST HELENA | 94574 |

**TYPE OF BUSINESS**

12. DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

WINERY

13. THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

| ALAN MILLER | Alan Smith | AGENT | 1/7/2010 |
|---|---|---|---|
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |

LLC-12 (REV 03/2007)  APPROVED BY SECRETARY OF STATE