Mark S. Bostick (Bar No. 111241)
Lisa Lenherr (Bar No. 258091)
**FENNEMORE LLP**
1111 Broadway, 24th Floor
Oakland, California 94607-4036
Telephone:  (510) 834-6600
Fax:  (510) 834-1928
Email:  mbostick@fennemorelaw.com
Email:  llenherr@fennemorelaw.com

Attorneys for Michael G. Kasolas, Trustee

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTA ROSA DIVISION

| | |
|---|---|
| In re | Case No. 23-10384-WJL |
| KELHAM VINEYARD & WINERY, LLC, | Chapter 11 |
| Debtor. | **MOTION FOR ORDER: (A) APPROVING OVERBID AND AUCTION PROCEDURES; (B) APPROVING SALE; (C) FINDING PURCHASER IS A GOOD FAITH PURCHASER WITHIN THE MEANING OF 11 U.S.C. § 363(m); (D) AUTHORIZING AND APPROVING PAYMENTS FROM SALE PROCEEDS; (E) WAIVING ANY STAYS OF ORDER; (F) APPROVING COMPROMISE WITH KELHAM PARTIES; AND (G) OTHER RELATED RELIEF** |

Date:      June 3, 2025
Time:      1:00 p.m. PT
Place:     1300 Clay Street
              Courtroom 220
              Oakland, CA 94612
Judge:     Honorable William J. Lafferty, III

**TABLE OF CONTENTS**

I.    JURISDICTION AND VENUE.................................................................................. 4

II.   STATEMENT OF FACTS...................................................................................... 4

III.  SALE ............................................................................................................... 6

   A.   Sale Assets ................................................................................................... 6

   B.   Marketing of Sale Assets ............................................................................ 7

   C.   Terms of Proposed Sale ............................................................................... 8

   D.   Sale is in the Best Interests of the Estate, Creditors, and Debtor ........................................ 9

   E.   Good Faith Purchaser ................................................................................ 10

IV.  COMPROMISE ................................................................................................ 10

   A.   Claims Being Resolved and Merits of Compromise ........................................................ 10

      1.   Lease Dispute. .................................................................................... 10

      2.   Admin. Damage Claim (De-Certification of Organic Status).......................................... 11

      3.   Admin. Damage Claim (nonspecific)..................................................................... 12

      4.   Growers' Secured Claim (Claim 11).................................................................... 13

      5.   Personal Property AP. ........................................................................... 13

      6.   Hamilton Wrongful Termination Admin. Claim.......................................................... 14

      7.   Hamilton Wage Admin. Claim........................................................................... 14

      8.   Pre-Petition General Unsecured Claims................................................................ 15

      9.   Estate's  Release of the Kelham Parties. ............................................................ 15

   B.   It is in the Paramount Interest of Creditors that the Agreement be Approved ................... 16

V.   OVERBID AND AUCTION PROCEDURES ....................................................... 17

VI.  DISBURSEMENTS TO BE PAID OUT OF SALE PROCEEDS ....................................... 19

VII. WAIVER OF STAY ........................................................................................ 19

VIII. CONCLUSION ................................................................................................ 20

51695560.1/513816.0119

**TABLE OF AUTHORITIES**

**Cases**

*Frazier Nuts, Inc. v. Am. Ag. Credit*, (2006) 141 Cal. App. 4th 1263 ........................................... 13

*Goodwin v. Mickey Thompson Entm't Group, Inc. (In re Mickey Thompson Entm't Group, Inc.)*, 292 B.R. 415 (9th Cir. B.A.P. 2003) ................................................................................... 10

*In re Alpine Group, Inc.*, 151 B.R. 931 (B.A.P. 9th Cir. 1993) ...................................................... 13

*Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377 (9th Cir. 1986) ....................................... 10

*Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282 (9th Cir. BAP 2005) ............. 9

**Statutes**

11 U.S.C. § 363 .................................................................................................... 1, 4, 10, 20

11 U.S.C. § 363(b) ........................................................................................................... 4

11 U.S.C. § 363(m) .............................................................................................. 1, 10, 20

11 U.S.C. § 503 ............................................................................................................. 11

11 U.S.C. §§ 101 *et seq.* .................................................................................................. 4

28 U.S.C. § 1334 ............................................................................................................. 4

28 U.S.C. § 1408 ............................................................................................................. 4

28 U.S.C. § 1409 ............................................................................................................. 4

28 U.S.C. § 157 ............................................................................................................... 4

Cal. Civ. Code § 1542 ...................................................................................................... 9

Cal. Food & Agr. Code § 55631(a) ................................................................................... 13

**Rules**

Fed. R. Bankr. P. 6004 ........................................................................................... 4, 19, 20

Fed. R. Bankr. P. 9019 .............................................................................................. 4, 7, 10

Michael G. Kasolas, Chapter 11 Trustee ("**Trustee**" or "**Seller**") of the above-captioned estate, hereby moves pursuant to section 363(b) of the Bankruptcy Code[1] and Rule 6004 and 9019 of the Federal Rules of Bankruptcy Procedure ("**FRBP**") for an order (A) approving overbid and auction; (B) approving sale to <u>insiders</u> the Kelham Parties[2] or successful overbidder; (C) finding purchaser is a good faith purchaser; (D) authorizing and approving payments from sale proceeds; (E) waiving any stay of order; (F) approving compromise with the Kelham Parties; and (G) other related relief, (the "**Motion**"), as follows:

## I. JURISDICTION AND VENUE

The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. The Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. STATEMENT OF FACTS

1. <u>Bankruptcy Case</u>. On July 20, 2023, an involuntary petition for relief under Chapter 11 of the Bankruptcy Code was filed against the Kelham Vineyard & Winery, LLC ("**Debtor**") as Case No. 23-10384 (the "**Bankruptcy Case**"). On August 16, 2023, an Order for Relief in an Involuntary Case was entered. On September 13, 2023, Michael G. Kasolas was appointed as Chapter 11 trustee of the debtor's estate.

2. <u>Personal Property AP.</u> On April 29, 2024, Hamilton and Kelham commenced AP Case No. 24-1006 against Trustee, seeking declaratory and injunctive relief regarding the ownership of certain personal property located on the Zinfandel Lane Property (the "**Personal Property AP**"). On March 25, 2025, the Personal Property AP was dismissed by stipulation of the parties. (AP Case No. 24-1006, Docket No. 26.)

3. <u>Lease Dispute.</u> Debtor allegedly leased certain real property commonly known as

---

[1] 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**").
[2] Susanna Kelham, individually, ("**Kelham**"); Susanna Kelham as Manager of the 360 Zinfandel Lane Tenants In Common Agreement ("**Landlord**"); Main Street Properties, LLC ("**Main Street**"); Kelham Growers, LLC ("**Growers**"); Hamilton Nicholsen, individually ("**Hamilton**"); and Kelham and Hamilton as members of Kelham Vineyard & Winery, LLC (the "**Members**") (collectively the "**Kelham Parties**" or "**Buyer**").

360 Zinfandel Lane, St. Helena, CA ("**Zinfandel Lane Property**"). On November 21, 2023, Hamilton filed and commenced AP Case No. 23-1016 against Trustee seeking declaratory relief determining the extent of the Bankruptcy Estate's interest in the Zinfandel Lane Property, among other claims for relief (the "**Lease AP**"). On December 18, 2023, Trustee filed a cross-complaint against Kelham, the Landlord, Ron Nicholsen, and Hamilton, seeking declaratory relief on status and interpretation of the alleged Lease, recovery of alleged lease overpayments, among other claims for relief (the "**Cross-Complaint**"). On August 8, 2024, the Bankruptcy Court entered an order determining that the alleged lease entered into by and between Debtor and Kelham on December 26, 2005 (the "**Lease**"), was valid and enforceable (the "**Lease Order**"). On August 27, 2024, Hamilton appealed the Lease Order to the Ninth Circuit Bankruptcy Appellate Panel, and that appeal is currently pending as Ninth Circuit B.A.P. Case No. 24-1135 (the "**Lease Appeal**").

4.    <u>Pre-Petition Claims filed by the Kelham Parties.</u> The Kelham Parties filed eight (8) claims in the Bankruptcy Case (collectively the "**Kelham Parties' Filed Claims**"), as follows: **(a)** <u>Claim 7 (Main Street)</u> On December 14, 2023, Main Street filed a claim in the amount of $107,500.00 (Claim No. 7); **(b)** <u>Claim 8 (Susanna)</u> On December 14, 2023, Susanna filed a claim in the amount of $305,000.00 (Claim No. 8) and on January 23, 2024, Trustee objected to Claim No. 8 (Docket No. 181); **(c)** <u>Claim 9 (Susanna)</u> On December 14, 2023, Susanna filed a claim in the amount of $931,500.00 (Claim No. 9) and on January 23, 2024, Trustee objected to Claim No. 9 (Docket No. 182); **(d)** <u>Claim 10 (Susanna)</u> On December 14, 2023, Susanna filed a claim in the amount of $269,095.53 (Claim No. 10) and on January 23, 2024, Trustee objected to Claim No. 9 (Docket No. 183); **(e)** <u>Claim 11 (Growers)</u> On December 14, 2023, Growers filed a claim in the amount of $533,929.45 (Claim No. 11)  and on September 6, 2024, Trustee objected to Claim No. 11 (Docket No. 279); **(f)** <u>Claim 12 (Landlord)</u> On December 14, 2023, Landlord filed a claim in the amount of $328,800.00 (Claim No. 12) and on January 23, 2024, Trustee objected to Claim No. 9 (Docket No. 184); **(g)** <u>Claim 13 (Hamilton)</u> On December 14, 2023, Hamilton filed a claim in the amount of $7,835.00 (Claim No. 13); and **(h)** <u>Claim 14 (Growers)</u> On December 14, 2023, Growers filed a claim in the amount of $291,969.25 (Claim No. 14).

5.    <u>Administrative Claims filed by the Kelham Parties.</u> On February 26, 2025, Kelham,

Case: 23-10384    Doc# 425    Filed: 04/24/25    Entered: 04/24/25 10:49:25    Page 5 of 27
51695560.1/513816.0119

Growers, Landlord, and Hamilton filed two (2) Request for Payment of Administrative Expense Claim Under 11 U.S.C. § 503(a), as Docket No. 412 and Docket No. 413, (collectively the "**Kelham Parties' Administrative Claims**"). The Kelham Parties' Administrative Claims seek: a) reimbursement for property taxes in the amount of $91,860.76 ("**Admin. Prop. Tax Claim**") (Docket No. 412, filed Feb. 26, 2025); b) past-due administrative rent in an amount TBD ("**Admin. Rent Claim**") (Docket No. 412, filed Feb. 26, 2025); c) claim for damages in an amount TBD arising from "damages due to the action and/or inactions by the Trustee and his agents relating to the property"[3] ("**Admin. Damage Claim**") (Docket No. 412, filed Feb. 26, 2025); d) damages, including attorneys' fees, arising out of the Lease litigation in an amount TBD ("**Lease Damage Claim**") (Docket No. 412, filed Feb. 26, 2025); e) wrongful termination of Hamilton in an amount TBD, including damages for backpay, lost wages and benefits, compensation for emotional distress, intentional infliction of emotional distress, defamation, loss of professional reputation, attorneys' fees and costs ("**Hamilton Wrongful Termination Admin. Claim**") (Docket No. 413, filed Feb. 26, 2025); and f) damages arising out of a purported failure to pay wages to Hamilton in an amount TBD ("**Hamilton Wage Admin. Claim**"). (Docket No. 413, filed Feb. 26, 2025.)

## III.    SALE

### A.    Sale Assets

The assets to be sold are described as: all right, title and interest of Trustee in and to all remaining property of the bankruptcy estate including but not limited to: (i) personal property; (ii) books and records; (iii) permits and licenses to the extent transferrable; (iv) all rights and obligations under the Lease; (v) any claims against the Kelham Parties; (vi) all right, title, and interest in the following litigation claims: the Cross-Complaint, the Lease Order, the Lease Appeal, and the Personal Property AP; (vii) the real property located at 540 Mund Road, St. Helena, CA; and (viii) any claims against third parties (with certain exclusions, see ¶ 1(c));

---

[3] The Claim states: "The damages include but are not limited to damages from the loss of the organic status of the vineyard due to negligence by the agents of the Debtor, the loss and damage to personal property located on the site which includes property both owned by the Debtor and owned by members of the Debtor." (Docket No. 412, p. 2, filed Feb. 26, 2025.)

(collectively, the "**Sale Assets**"); provided, however, the Sale Assets <u>do not</u> include: Chapter 5 claims; claims against Terra Valentine; that certain trademark (the "**Trademark**") identified as US Serial Number 78510891, and U.S. Registration Number 3032163 (together with the Trademark, collectively the "**Trademark Rights**"), registered on December 20, 2005 (and related litigation)[4]; and any property already sold or abandoned. The Sale Assets are being sold in an "AS IS" condition, on a "WHERE IS" basis and "WITH ALL FAULTS," and without any representation or warranties of any kind.

As part of the Agreement, certain claims will be released. These releases are described and evaluated pursuant to FRBP 9019 in § IV below.

**B.      Marketing of Sale Assets**

On March 1, 2024, Trustee filed an Application to Employ Onyx Asset Advisors, LLC ("**Onyx**" or "**Sales Agent**") as the Estate's Sales Agent to seek overbids in coordination with this sale process. (Docket No. 203, filed March 1, 2024.) The order approving Onyx's employment was entered April 1, 2024, as Docket No. 219. In April 2024, Trustee filed a sale motion proposing to sell all assets for $4.25 million, subject to overbid. (Docket No. 220.) However, the purchase offer was withdrawn when the Court did not approve the breakup fee. In October 2024, Trustee sold the wine assets for $2,035,914.00. (*See* Docket No. 343, entered Oct. 21, 2024). The remaining assets (the Sale Assets), with the exception of the Mund Road property,[5] were marketed in the ordinary course of business, as described in the declaration of Kevin Otus. (Otus Decl. ¶¶ 4-10.)[6]

---

[4] *See* Docket No. 420, filed Apr. 3, 2025 (Order extending deadlines); Docket No. 406, filed Feb. 7, 2025 (Kelham Supplemental Declaration); Docket No. 397, filed Jan. 22, 2025 (Trustee Response to Kelham Memorandum); Docket No. 395, fled Jan. 15, 2025 (Kelham Memorandum); Docket 372, entered Nov. 13, 2024 (Order setting Briefing Schedule re Trademark Objection); Docket No. 313, filed Sept. 25, 2024 (Trademark Objection).

[5] The Sales Agent did not market the real property located at 540 Mund Road, St. Helena, CA, because he is not a licensed broker. All structure(s) on the Mund Road property were destroyed in a wildland fire pre-Petition and the property is a vacant lot. All inquiries regarding the Mund Road property are directed to Trustee who can provide information on the property in his capacity as the <u>seller</u> (<u>not</u> as a real estate broker).

[6] All references to the Declaration of Kevin Otus shall be referred to as (Otus Decl. ¶ ___).

### C. Terms of Proposed Sale

Trustee proposes to sell the Sale Assets to the Kelham Parties; the purchase price includes cash in the sum of Four Hundred Thousand Dollars ($400,000.00) and the Kelham Parties' general releases of all claims, including administrative claims, prepetition and post-petition claims, asserted and unasserted claims, and unknown claims against the Estate and its agents (the "**Purchase Price**"). Trustee has determined that the value of the Kelham Parties' bid is $1,200,000.00. (*See* § V below.) A copy of the settlement and release agreement (the "**Agreement**") is attached as **Exhibit 1** to the Kasolas Declaration. (Kasolas Decl. ¶ 3, Ex. 1.)[7]

A cash deposit of One Hundred Thousand Dollars ($100,000.00) has been received by Trustee (the "**Deposit**"). The balance of the cash component of the Purchase Price ($300,000.00) will be paid within five (5) days of entry of the Order approving the Agreement. The Deposit will be refunded in the event that the Agreement is not approved by the Bankruptcy Court or the Kelham Parties are not the successful bidders in the event there are any qualified overbids. Upon receipt of the total Purchase Price ("**Closing**"), the Parties will cooperate in good faith regarding delivery of the Sale Assets except that Trustee shall have no delivery obligation with respect to any permit or license that requires an independent escrow, including, but not limited to, any California Department of Alcoholic Beverage Control (ABC) or Alcohol and Tobacco Tax and Trade Bureau (TTB) license or permit. Upon Closing, the Buyer shall have the sole and exclusive authority to transfer, dissolve, and/or dispose of any and all licenses and permits subject to this Agreement.

The Agreement includes the following waiver of claims and mutual releases:

a) Upon approval of the Agreement, the Kelham Parties will waive and release all known or unknown claims against the Estate, the Trustee, his agents and professionals, including all pre-petition and post-petition claims filed or unfiled by the Kelham Parties, not including their bare membership interests in the Debtor. Kelham Parties will withdraw all claims against the Estate with prejudice.

b) Upon approval of the Agreement, the Kelham Parties absolutely and unconditionally release and forever discharge the Trustee, his associates, agents (but see exception in ¶ 2(d)), as well as his and their successors, assigns, and present

---

[7] All references to the Declaration of Michael G. Kasolas shall be referred to as (Kasolas Decl. ¶ ___, Ex. ___).

Case: 23-10384   Doc# 425   Filed: 04/24/25   Entered: 04/24/25 10:49:25   Page 8 of 27
51695560.1/513816.0119

and former, agents, professionals, officers, directors, and employees, of any and all known and unknown claims, demands, costs, expenses, damages, debts and causes of action of any kind, nature or description, whether arising in law or equity, contract or tort or under any state or federal law; provided however, that the releases shall not affect the litigation related to the Trademark and Trademark Rights or any claims or obligations of the Trustee under this Agreement.

**c)** Upon payment of the Purchase Price in full, the Trustee on behalf of the Estate absolutely and unconditionally releases and forever discharges the Kelham Parties, their associates, affiliates, as well as their successors, assigns, and present and former, agents, professionals, officers, directors, and employees, of any and all known and unknown claims, demands, costs, expenses, damages, debts and causes of action of any kind, nature or description, whether arising in law or equity, contract or tort or under any state or federal law; provided however, that this release shall not apply to Rebekah Parker, Esq. and Holland & Knight LLP and shall not affect the litigation related to the Trademark and Trademark Rights or any of the claims or obligations of the Kelham Parties under this Agreement.

**d)** Notwithstanding any other provision in this Agreement to the contrary, the release of agents of the Trustee in ¶ 2(b) does not apply to Ronald Nicholsen and his related entities (collectively "**R. Nicholsen**"), to the extent that R. Nicholsen was not acting within the scope of his agency with trustee and: i) unlawfully converted property of the estate; ii) committed an intentional tort; iii) embezzled funds of the Estate; or iv) committed any other criminal acts.

With regard to the waiver of claims and mutual release, the Parties expressly waive any and all rights and claims under 1542 of the California Civil Code.

Within thirty (30) days of entry of an order approving the Agreement, the Parties shall dismiss all pending adversary proceedings, contested matters, and appeals (other than the litigation related to the Trademark and Trademark Rights) with prejudice with each side bearing their fees and costs.

**D.      Sale is in the Best Interests of the Estate, Creditors, and Debtor**

When approving a sale outside of ordinary course of business, the bankruptcy court's obligation "is to assure that optimal value is realized by the estate under the circumstances." *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288 (9th Cir. BAP 2005). Trustee has been marketing the assets of the Estate since at least March 2024. (Kasolas Decl. ¶ 4.) Trustee believes that all potentially interested purchasers have been reached or will be reached by the overbid opportunity marketing efforts. (Kasolas Decl. ¶ 4.) Trustee, with the assistance of his professionals, negotiated the Agreement, and developed the Overbid and

1 Auction Procedures (defined below § V) with the goal of obtaining the highest and best offer for
2 the purchase of the Sale Assets. (Kasolas Decl. ¶ 5.) Other than the Mund Road property, the Sale
3 Assets with the most potential value are of an uncertain nature, subject to litigation and its
4 associated risks; these include: the rights related to the Lease, claims against third-parties, and
5 claims against the Kelham Parties. Due to the uncertain value of these claims, Trustee is relying on
6 the overbid and auction procedures to facilitate the sale process and maximum value.

7 **E. Good Faith Purchaser**

8 If Buyer or any potential overbidder seeks to be found a "good faith" purchaser within the
9 meaning of 11 U.S.C. § 363(m), Buyer or the overbidder shall provide Trustee with a competent
10 declaration confirming facts that support a finding that Buyer or overbidder is a good faith
11 purchaser entitled to the protections of 11 U.S.C. § 363(m). That declaration shall be filed prior to
12 the Sale Hearing.

13 **IV. COMPROMISE**

14 The proposed Agreement is both a sale and a compromise arising in the context of a
15 dispute between family members, which implicates both a sale pursuant to 11 U.S.C. § 363 and
16 compromise pursuant to FRBP 9019. *Goodwin v. Mickey Thompson Entm't Group, Inc. (In re*
17 *Mickey Thompson Entm't Group, Inc.)*, 292 B.R. 415, 421-22 (9th Cir. B.A.P. 2003). A
18 compromise must be fair and equitable; the traditional factors bankruptcy courts in the Ninth
19 Circuit apply on a motion to approve a compromise are: (a) the probability of success in the
20 litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the
21 complexity of the litigation involved, and the expense, inconvenience and delay necessarily
22 attending it; and (d) the paramount interest of the creditors and a proper deference to their
23 reasonable views. *Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377 at 1381 (9th Cir. 1986).

24 **A. Claims Being Resolved and Merits of Compromise**

25 The following claims are resolved by the proposed Agreement:

26 1. **Lease Dispute**.

27 The Agreement resolves the Lease AP, the Cross-Complaint, the Lease Appeal, the Rent

28

Claim Objection,[8] the Admin Rent Claim, Admin. Prop. Tax Claim (obligation arising from the Lease), the Lease Damage Claim, and all related Lease issues. Trustee asserts that the Lease is valid and enforceable, the Debtor overpaid rent (resulting in an undetermined amount owed to the Estate), and upon termination of the Lease, either the Landlord must purchase the improvements from the Estate (estimated value $12 million),[9] or the Estate may purchase from Landlord the Zinfandel Lane Property at fair market value (less the value of the Improvements). Landlord disputes the validity of the Lease and claims $328,800.00 is owed in pre-Petition rent (Claim No. 12), and asserts post-Petition rent accrued between July 20, 2023, and December 31, 2024 (approx. 17 months), in the amount of $76,371.00 per month (approx.. $1,298,307.00). (Docket No. 263, filed Sept. 3, 2024; see also Docket No. 412, filed Feb. 26, 2025 (Admin Rent Claim in an amount TBD).) This Court determined the Lease was valid and enforceable, and that decision is on appeal (the Lease Appeal). Although Trustee believes that the probability of success in the Lease related litigation is high and that there should not be any difficulty with collection if successful, the complexity of the litigation, the expense, delay, and potential liability for attorneys' fees if the Estate is unsuccessful, present a level of risk for the Estate that Trustee does not believe is justified under the circumstances. Moreover, the Lease litigation is already the subject of one appeal, and further appeals are anticipated. Trustee believes that it is in the paramount interest of creditors that the Lease related claims be resolved. To the extent that an interested party believes that the Lease related claims/litigation have more value than is being received by the Estate, the Trustee urges those parties to participate in the overbid and auction process.

2.    **Admin. Damage Claim (De-Certification of Organic Status)**

The Agreement resolves all claims that Landlord asserts regarding alleged economic damages arising out of the de-certification of Debtor's organic status; Landlord alleges losses in

---

[8] On December 14, 2023, Landlord filed a claim in the amount of $328,800.00, for "Rent Due Under Oral Month to Month Lease Agreement." (Claim No. 12) On January 23, 2024, Trustee objected to Claim No. 9 (the "**Rent Claim Objection**"). (Docket No. 184.)

[9] *See* Declaration of Hal Forcey in Support of Motion for Allowance of Claim for Administrative Rent Under 11 U.S.C. § 503 (Docket No. 264, filed Sept. 3, 2024) (estimating improvements to have a value of $12,333,875.00).)

the amount of $1,043,811.15. (*See* Docket No. 268, p. 7, filed Sept. 3, 2024; see also Docket No. 412, filed Fe. 26, 2025 (Admin Damage Claim in the amount TBD).) Trustee asserts that any organic status was property of the Estate, and Landlord has no legal economic interest in Debtor's organic status and that even if Landlord does have a cognizable interest, it was Landlord's agent Mark Neal that caused the loss of the organic status certification. Trustee believes that the probability of success of Landlord's claim is remote. The collectability factor is not at issue because it is a claim against the Estate that is being asserted/released. Nonetheless, if this matter were to be litigated, substantial discovery, including depositions, and a trial to determine the legal and factual questions, would be necessary. Although not complex, the expense, inconvenience and delay weigh in favor of resolution. Trustee believes that it is the paramount interest of creditors that the these claims be resolved as part of the compromise. The release of these claims is not considered a major contributor of value to the Agreement.[10]

### 3. Admin. Damage Claim (nonspecific)

The Agreement resolves all claims by Landlord and Kelham related to other purported post-Petition unliquidated "damages due to the action and/or inactions by the Trustee and his agents relating to the property," including "the loss and damage to personal property located on the site which includes property both owned by the Debtor and owned by members of the Debtor." (*See* Docket No. 412, filed Fe. 26, 2025 (Admin Damage Claim).) Trustee is not aware of any loss or damage and does not believe any such claims are valid and, to the extent that they are, they should be articulated with specificity. Because Trustee does not believe these are valid claims, he values the probability of his success as near certain. The collectability factor is not at issue because it is a claim against the Estate that is being asserted/released. Without evidence of any actual loss or damage, Trustee is unable to assess the complexity of the litigation and whether discovery efforts would be required; however, the expense of unnecessary litigation,

---

[10] Note: Landlord may assert that Ronald Nicholsen and his related entities (collectively "**R. Nicholsen**") are to blame for the de-certification. However, claims against R. Nicholsen as Trustee's agent are being released <u>except</u> to the extent that R. Nicholsen was not acting within the scope of his agency with trustee and: i) unlawfully converted property of the estate; ii) committed an intentional tort; iii) embezzled funds of the Estate; or iv) committed any other criminal acts.

1  inconvenience and delay, weigh in favor of resolution. The release of these claims is not

2  considered a major contributor of value to the Agreement.[11]

3          **4.**    **Growers' Secured Claim (Claim 11)**.

4        The Agreement also resolves the Growers' Claim. (Claim 11.) On December 14, 2023,

5  Growers filed a claim in the amount of $533,929.45, asserting a producer's lien on the 2022

6  harvest of Cabernet Sauvignon, Merlot, Malbec and Cabernet Franc grapes (the "**Growers'**

7  **Grapes**"). (Claim No. 11.) The Growers' Grapes were limited to 5,079 gallons of bulk wine which

8  were sold pursuant to Court order, with the lien attaching to the sale proceeds pending further

9  determination of value. (Docket No. 343, entered Oct. 21, 2024.) Growers asserts that the breadth

10 of their lien is not limited to the to the product delivered but extends to all raw and processed

11 products in the Estate's possession—and, therefore, their lien is fully secured in the amount of

12 $533,929.45. Trustee disputes this and asserts that a producers lien only attaches to the Growers'

13 Grapes and proceeds from the Growers' Grapes. Cal. Food & Agr. Code § 55631(a) (lien attaches

14 to product); *see, also, Frazier Nuts, Inc. v. Am. Ag. Credit*, (2006) 141 Cal. App. 4th 1263 (lien

15 attaches to proceeds of the product). Trustee asserts the proceeds received from the Growers'

16 Grapes is $50,790.00, so any secured claim is limited to this amount, with the balance of the

17 Growers' claim treated as an unsecured claim. *In re Alpine Group, Inc.*, 151 B.R. 931, 935 (B.A.P.

18 9th Cir. 1993) (actual sale is "conclusive evidence of the property's value"). Based on the facts

19 and established case law, Trustee values the probability of his success high. The collectability

20 factor is not at issue because it is a claim against the Estate that is being asserted/released. The

21 litigation involved is not complex, but there would be an associated expense, inconvenience and

22 delay, including potential appeals. Trustee has determined that it is of paramount interest of the

23 creditors to have the matter resolved.

24         **5.**    **Personal Property AP.**

25       On March 25, 2025, the Personal Property AP was dismissed by stipulation of the parties.

26 (AP Case No. 24-1006, Docket No. 26.) Although the Personal Property AP has been dismissed,

27

28 [11] See note 10.

the Agreement was negotiated prior to its dismissal and provides to resolve any issues raised in the Personal Property AP. The resolution of the Personal Property AP is not considered a major contributor of value to the Agreement.[12]

### 6. <u>Hamilton Wrongful Termination Admin. Claim</u>

The Agreement resolves Hamilton's administrative claim for purported wrongful termination in an amount TBD, including damages for backpay, lost wages and benefits, compensation for emotional distress, intentional infliction of emotional distress, defamation, loss of professional reputation, attorneys' fees and costs. (Docket No. 413, filed Feb. 26, 2025.) Trustee is not aware of any valid wrongful termination claims and, to the extent that there are any such valid claims, they should be articulated with specificity. Because Trustee does not believe these are valid claims, he values the probability of his success as near certain. The collectability factor is not at issue because it is a claim against the Estate that is being asserted/released. Without evidence of any valid claim, Trustee is unable to assess the complexity of the litigation and whether discovery efforts would be required; however, the expense of unnecessary litigation, inconvenience and delay, weigh in favor of resolution. The release of these claims is not considered a major contributor of value to the Agreement.

### 7. <u>Hamilton Wage Admin. Claim</u>

The Agreement resolves Hamilton's administrative claim for purported damages arising out of a purported failure to pay wages to Hamilton in an amount TBD. (Docket No. 413, filed Feb. 26, 2025.) Trustee is not aware of any valid administrative wage claims and, to the extent that there are any such valid claims, they should be articulated with specificity. Because Trustee does

---

[12] Prior to the dismissal: Trustee asserted, and the Kelham Parties disputed, that the Personal Property AP had already been fully resolved by the Estate's abandonment of property (Docket No. 303, filed Sept. 20, 2024) and the Estate's admission that the balance of the personal property listed in the complaint is not property of the estate. (See Docket No. 386, pp. 5-6, filed Dec. 17, 2024.) Trustee valued the probability of his success as near certain because of his position that it has already been resolved. The collectability factor was not at issue because it was a claim against the Estate that was being asserted/released. Without evidence of any valid claims still at issue, Trustee was unable to assess the complexity of the litigation and whether discovery efforts would be required; however, the expense of unnecessary litigation, inconvenience and delay, weighed in favor of resolution.

not believe these are valid claims, he values the probability of his success as near certain. The collectability factor is not at issue because it is a claim against the Estate that is being asserted/released. Without evidence of any valid claim, Trustee is unable to assess the complexity of the litigation and whether discovery efforts would be required; however, the expense of unnecessary litigation, inconvenience and delay, weigh in favor of resolution. The release of these claims is not considered a major contributor of value to the Agreement.

## 8. **Pre-Petition General Unsecured Claims**

Several other general unsecured claims[13] filed by the Kelham Parties are being released under the Agreement. Although release of these claims does save the Estate from incurring litigation costs in connection with claim objections, the release of the claims is not considered a major contributor of value to the Agreement because even if the claims are allowed, the distribution to general unsecured claims is anticipated to be minimal.

## 9. **Estate's Release of the Kelham Parties.**

As part of the Agreement the Estate is releasing the Kelham Parties from all claims, including potential claims for breach of fiduciary duty and performance of the Lease obligations

---

[13] Claim 7 (Main Street) On December 14, 2023, Main Street filed a claim in the amount of $107,500.00 claiming rent owed on a oral month-to-month agreement. (Claim No. 7.) Claim No. 7 provides no back-up documentation and Trustee disputes its validity.

Claim 8 (Susanna) On December 14, 2023, Susanna filed a claim in the amount of $305,000.00, for "Reimbursement for Mund Street Property Loan Payoff." (Claim No. 8.) Claim No. 8 provides no evidence supporting the claim. On January 23, 2024, Trustee objected to Claim No. 8. (Docket No. 181.)

Claim 9 (Susanna) On December 14, 2023, Susanna filed a claim in the amount of $931,500.00, for "Services Rendered as general Manager Per Operating Agreement." (Claim No. 9.) On January 23, 2024, Trustee objected to Claim No. 9. (Docket No. 182.)

Claim 10 (Susanna) On December 14, 2023, Susanna filed a claim in the amount of $269,095.53, for "Claim for Reimbursement of Misc. Advances." (Claim No. 10.) Claim No. 10 provides no backup documentation supporting the claim. On January 23, 2024, Trustee objected to Claim No. 9. (Docket No. 183.)

Claim 13 (Hamilton) On December 14, 2023, Hamilton filed a claim in the amount of $7,835.00, for "Services Rendered and Expense Reimbursement." (Claim No. 13.) Claim No. 13 includes no backup documentation and Trustee disputes its validity.

Claim 14 (Growers) On December 14, 2023, Growers filed a claim in the amount of $291,969.25, for "Loan/Property Tax Advances on behalf of KVW." (Claim No. 14.) Claim No. 14 includes no backup documentation and Trustee disputes its validity.

Case: 23-10384   Doc# 425   Filed: 04/24/25   Entered: 04/24/25 10:49:25   Page 15 of 27
51695560.1/513816.0119

(i.e., the buyout). With regard to the potential breach of fiduciary duty claims[14] against the Kelham Parties, Trustee is uncertain whether he would be successful in this litigation, and recognizes that any potential success would come with a lot of risk, would be difficult, complex, and cause extensive delays. Although collection would not be an issue due to the value of real property assets believed to be owned by the Kelham Parties, it is difficult to value the numerous potential offsets and counterclaims that may arise as part of any breach of fiduciary duty litigation. Moreover, although Trustee has successfully liquidated the wine assets, Trustee does not believe that there are sufficient funds in the estate to justify further litigation without a more assured outcome and quantifiable benefit to the estate. Therefore, Trustee believes that it is in the best interests of creditors that these claims be resolved as expeditiously and as efficiently as possible.

Respecting the Estate's Lease rights, while they have great potential value (possibly in excess of Ten Million Dollars), their realization would require significant litigation, likely including multiple appeals, such that from the Estate's perspective the continued expense and delay of the litigation as well as the risks and costs that may be incurred if unsuccessful, render settlement of all Lease-related claims as being in the best interest of creditors.

**B.      It is in the Paramount Interest of Creditors that the Agreement be Approved**

The claims being resolved by the Agreement are numerous, interwoven, and built upon a contentious family dispute. Trustee has weighed the potential benefit of pursuing the above-described litigation and of reorganization against the risk and cost of doing the same and determined that a resolution of claims is appropriate under the circumstances. Trustee's proposed resolution is subject to overbid.

---

[14] Potential breach of fiduciary duty claims include, among other claims: mismanagement of Debtor by Susanna Kelham by causing Debtor to become a signatory of the Bank of Marin real property loan for no consideration (see Claim No. 3, filed Dept. 18, 2023); putting Debtor improvidently into bankruptcy to avoid the obligations under the State Court writ (see Sup. Court of California, County of Napa, Case No. 21-CV-001403); conspiracy to deny validity of Lease in bad faith which gave rise to unnecessary litigation at great financial cost; causing an agent post-Petition to terminate the organic status of the Debtor; and falsifying trademark information to the determinant of Debtor.

Case: 23-10384   Doc# 425   Filed: 04/24/25   Entered: 04/24/25 10:49:25   Page 16 of 27
51695560.1/513816.0119

## V. OVERBID AND AUCTION PROCEDURES

Trustee's proposed overbid and auction procedures (the "**Overbid and Auction Procedures**") are attached hereto as **Exhibit A** the "**Overbid Notice of Opportunity to Overbid and Auction Sale**"). Overbids must be all-cash, and without contingencies.

**Value of Kelham Parties Bid.** To facilitate the overbid process, the value of the Kelham Parties' bid is determined to be $1,200,000.00. This is comprised of $400,000.00 cash plus non-cash consideration which Trustee has valued at $800,000.00. The non-cash consideration includes the release of an undisputed administrative claim in the amount of $91,816.00[15] for real property taxes paid by Landlord; release of the Kelham Growers' lien[16]; release of all post-Petition damage claims[17]; and saved attorneys' fees and costs related to these claims.[18]

**Minimum Overbid.** The minimum overbid shall be **$1,300,000.00**[19] **plus indemnification (the "Indemnification"), for which an amount up to $500,000.00 must be secured by a letter of credit or other acceptable accommodation.** This is intended to cover <u>all</u> related risk and liability arising from the Lease and related litigation, including, but not limited to, any administrative rent determined to be owed and any potential attorneys' fees awards reaching back to the Petition Date (or otherwise for which the Estate is found to be liable). Qualified Overbidder is purchasing litigation and shall step into Trustee's shoes to continue prosecution of all litigation.

**Bidding.** If there is an overbid at $1,300,000.00 cash plus Indemnification, and the minimum overbid increment is $25,000.00 (subject to change, *see* Overbid and Auction Procedures), the Kelham Parties' next bid would be $1,325,000.00 ($425,000 cash plus other consideration in the amount of $800,000.00). In turn, the next bid from the Qualified Overbidder would be $1,350,000.00 cash plus Indemnification. This example assumes that no other non-cash consideration is provided by the Qualified Overbidder. To the extent that a Qualified Overbidder includes non-cash consideration in its bid, Trustee may in his sole discretion value the non-cash

---

[15] (Docket No. 412, filed Feb. 26, 2025.)
[16] See § IV(A)(4).
[17] See § IV(A)(2-3).
[18] As described in § IV, the release of pre-Petition unsecured claims and post-Petition unsupported claims are ascribed a nominal value.
[19] This is calculated as 10% rounded down to the nearest $100,000.00.

Case: 23-10384    Doc# 425    Filed: 04/24/25    Entered: 04/24/25 10:49:25    Page 17 of 27
51695560.1/513816.0119

consideration for purposes of the Auction bidding.

**Qualification Requirements**. Qualification requirements are described in detail in the Overbid and Auction Procedures and require, *inter alia*, an irrevocable offer, commitment deposit, numerous financial disclosures, evidence of ability to perform, and use of a form of overbid. Trustee may, in his sole discretion, determine and designate the potential bidder as a qualified bidder ("**Qualified Bidder**") and the overbid as a qualified overbid ("**Qualified Overbid**"). Trustee in his sole discretion, may qualify bidders at any time before the end of the Auction.

**Auction Procedures.** The proposed auction procedures are described in detail in the Overbid and Auction Procedures, and that document should be closely reviewed. By way of general summary of the auction procedures:

    a. <u>Opening Bid and other Auction Procedures.</u> After review of all Qualified Bidder submissions, Trustee, in his sole discretion, may determine the opening bid (or bids, if Trustee elects to sell lots separately), may set minimum bid increments for any subsequent bid(s) (anticipated $25,000.00 increments), and may establish any other procedures (including adjusting minimum bid increments) he deems necessary to facilitate the Auction. At least twenty-four hours prior to the start of the Sale Auction, Trustee shall provide a copy of the opening bid (or bids, if Trustee elects to sell lots separately) to all participating Qualified Bidders attending the Auction. Either the Trustee or his representatives, or the Bankruptcy Court, shall direct and preside over the Auction.

    b. <u>Authority to Bid</u>. All representatives of Qualified Bidders who submit any bid at the Auction represent that he/she has authority to bid and that the bid he/she submits is/are binding on the Qualified Bidder.

    c. <u>Overbids</u>. Each subsequent round of bidding (following the opening bid) must comply with the Qualification Requirements and minimum bid increments set by Trustee until the Trustee or the Court elects to close bidding once the highest and best bid(s) for the Sale Assets has been reached.

    d. <u>Determination of Winning Bid(s).</u> Trustee or the Court shall determine the highest and best bid(s) at Auction (the "**Winning Bid(s)**"). Sale Assets may be sold in separate lots. All bidding will be concluded at the Auction (which may be continued from time to time) and there will be no further bidding subsequent to the closure of the Auction.

    e. <u>Back-Up Bid.</u> At the conclusion of the Auction, Trustee may designate a back-up bid(s) from those bids at Auction that Qualified Bidders have designated as available for back-up bid(s) selection (the "**Back-Up Bid(s)**"). At the conclusion of the Auction, if a bidder is designated as a backup bidder ("**Backup Bidder**"), his/her/its Commitment Deposit shall not be refunded unless or until the sale closes with the Winning Bid.

    f. <u>Discretion to Determine Opening and Winning Bid.</u> The Seller will take into account any factors he deems relevant to the value of the Qualified Bidder's bid to Seller when determining which bid constitutes the opening bid, and overbid or Winning Bid(s) including, among other things, the following: (A) the amount and nature of any consideration; (B) the proposed assumption of liabilities, if any;

Case: 23-10384    Doc# 425    Filed: 04/24/25    Entered: 04/24/25 10:49:25    Page 18 of
27
51695560.1/513816.0119

(C) the ability of the Qualified Bidder to consummate the proposed transaction; (D) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (E) any purchase price adjustments; (F) the impact of the contemplated transaction on any actual or potential litigation; (G) the net economic effect of the offer; (H) the net after-tax consideration to be received by Seller; (I) the net amounts to be paid to Seller; and (J) such other considerations as Seller deems relevant.

Trustee requests approval of the Overbid and Auction Procedures along with the form of Notice of Opportunity to Overbid and Auction Sale. Trustee, with the assistance of his professionals, developed the proposed Overbid and Auction Procedures with the goal of obtaining the highest and best offer for the purchase of the Sale Assets. (Kasolas Decl. ¶ 5.) Trustee is believes that the Overbid and Auction Procedures should facilitate and enhance a successful overbid auction and sale process. (Kasolas Decl. ¶ 5.)

## VI. DISBURSEMENTS TO BE PAID OUT OF SALE PROCEEDS

Trustee proposes to pay after Closing:

1) Sales Agent commission (the "**Commission**") as follows: (a) if there are no overbidders, a Commission in the amount of 11% on $400,000.00, with the balance of the sale price allocated to the release; (b) in the event of an overbid, a Commission will apply to any amount bid over $800,000.00 in value; provided, however, in the event that the only overbids are made by insiders and not facilitated by the Sales Agent, the commission will be limited to 11% of $400,000.00;

2) reimbursement to Sales Agent of any out-of-pocket expenses up to an aggregate[20] amount of $15,000.00, excluding shipping and transportation charges; and

3) reimbursement of actual cost for all documented accommodation related expenses for Agent employees and/or representatives working onsite. (*See* Docket No. 219, entered Apr. 1, 2024.)

## VII. WAIVER OF STAY

Trustee requests that the Court enter an order waiving the fourteen (14) day stay provisions of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure. It is in the best interests of the

---

[20] Aggregate expenses include amounts incurred and paid as part of the sale of wine assets. (*See* Docket No. 343, entered Oct. 21, 2024.)

19

estate that the auction sale be closed as quickly as possible without any stay of the order.

**VIII.   CONCLUSION**

WHEREFORE, Trustee respectfully requests that this Court make and enter an order:

1.    Approving the Motion;

2.    Approving the Compromise;

3.    Finding notice of the Motion and the hearing thereon, as well as the service of such notice were proper and adequate based on the circumstances of the case;

4.    Approving the sale procedures;

5.    Authorizing the Trustee to sell the Sale Assets;

6.    Finding the Buyer or successful overbidder is a good faith purchaser pursuant to 11 U.S.C. § 363(m);

7.    Authorizing the Trustee to pay from proceeds of sale the amounts indicated *supra* in § VI;

8.    Waiving any stay of the Sale Order pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure; and

9.    For such other and further relief as the Court deems necessary.


DATED:  April 24, 2025                    FENNEMORE LLP


                                By:   */s/ Lisa Lenherr*
                                      _____
                                      Mark S. Bostick
                                      Lisa Lenherr
                                      Attorneys for Michael G. Kasolas, Trustee

Case: 23-10384   Doc# 425   Filed: 04/24/25   Entered: 04/24/25 10:49:25   Page 20 of 27
51695560.1/513816.0119

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTA ROSA DIVISION

| | |
|---|---|
| In re | Case No. 23-10384-WJL |
| KELHAM VINEYARD & WINERY, LLC. | Chapter 11 |
| Debtor. | **NOTICE OF OPPORTUNITY TO OVERBID, AUCTION SALE, AND HEARING ON MOTION TO APPROVE SALE** |
| | Date: June 3, 2025<br>Time: 1:00 p.m. PT<br>Place: 1300 Clay Street<br>Courtroom 220<br>Oakland, CA 94612<br>Judge: Honorable William J. Lafferty, III |

**TO: DEBTOR, ALL CREDITORS OF THE ESTATE, POTENTIAL BUYERS OF ESTATE ASSETS, PARTIES WHO HAVE REQUESTED SPECIAL NOTICE, AND THE UNITED STATES TRUSTEE:**

**PLEASE TAKE NOTICE** that Michael G. Kasolas, trustee herein ("**Trustee**"), has entered into an agreement (the "**Agreement**")[1] to sell (the "**Sale**") pursuant to section 363 of the Bankruptcy Code,[2] and Rule 9019 of the Federal Rules of Bankruptcy Procedure, subject to overbid and Bankruptcy Court approval, all right, title and interest of Trustee in and to all remaining property of the bankruptcy estate including but not limited to: (i) personal property; (ii) books and records; (iii) permits and licenses to the extent transferrable; (iv) all rights and obligations under the Lease[3]; (v) any claims against the Kelham Parties; (vi) all right, title, and interest in the following litigation claims: the Cross-Complaint, the Lease Order, the Lease Appeal, and the Personal Property AP; (vii) the real property located at 540 Mund Road, St. Helena, CA; and (viii) any claims against third parties with certain exclusions (see Agreement ¶ 1(c)); (collectively, the "**Sale Assets**").

**PLEASE TAKE FURTHER NOTICE** that Sale Assets do not include: Chapter 5 claims; claims against Terra Valentine; that certain trademark (the "**Trademark**") identified as US Serial Number 78510891, and U.S. Registration Number 3032163 (together with the Trademark, collectively the "**Trademark Rights**"), registered on December 20, 2005 (and related litigation); and any property already sold or abandoned.

**PLEASE TAKE FURTHER NOTICE** that the sale of all rights and obligations under the Lease and related litigation includes all related risk and liability, including, but not limited to, any administrative rent determined to be owed and any potential attorneys' fees awards reaching back to the Petition Date (or otherwise for which the Estate is found to be liable). (*See, also*,

---

[1] A copy of the Agreement is available upon request sent to: kotus@thinkonyx.com

[2] 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**").

[3] Undefined capitalized terms shall have the meaning ascribed to them in the Agreement.

1

footnote 4.)

   **PLEASE TAKE FURTHER NOTICE** that the sale is conditioned upon bankruptcy court (the "**Bankruptcy Court**") approval (the "**Order**").

   **PLEASE TAKE FURTHER NOTICE** that the sale is subject to overbid. Overbids must be all-cash or cash-equivalents, and without contingencies. If any prospective overbidder desires to inspect the Sale Assets prior to submission of an overbid, such overbidder should contact: kotus@thinkonyx.com; provided, however, if any prospective overbidder desires to inspect the 540 Mund Road property, such overbidder should contact Seller directly at trustee@kasolas.net with a copy to mbostick@fennemorelaw.com.

   **PLEASE TAKE FURTHER NOTICE** that anyone interested in purchasing some or all of the Sale Assets must satisfy the following bidder qualification requirements ("**Qualification Requirements**"):

   a. Offer. The potential bidder shall submit a written offer.

      i. Such written offer shall be in the form of **Exhibit 1** (the "**Bidder APA**"). The Bidder APA must include a blackline showing any changes.

      ii. Such written offer shall be irrevocable until conclusion of the Auction and, if determined to be the winning bid, shall be final and irrevocable.

      iii. Such written offer may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence.

      iv. If bidding on all of the Sale Assets, there will be a minimum overbid in the amount of **$1,300,000.00 plus Indemnification, for which an amount up to $500,000.00 must be secured by a letter of credit or other acceptable accommodation**.[4] Any potential bidder is encouraged to review the economics of the pending offer to ensure submission of a competitive bid.

      v. Qualified Bidders may not request, and the Bidder APA may not be conditioned on or otherwise entitle the Qualified Bidder to any break-up fee, expense reimbursement or similar type of payment.

      vi. Bidder APA must provide bidder expressly consents to bid procedures described herein and the jurisdiction of the Bankruptcy Court and waives any right to a jury trial in connection with any disputes relating to the Auction or the consummation of the Bidder APA.

   b. 363(m) Declaration. Bidder may request a finding that it is a "good faith" purchaser within the meaning of 11 U.S.C. § 363(m). If such a request is made, it must provide Trustee a competent declaration of such bidder's representative confirming facts supporting a finding by the Court that such bidder would be a good faith purchaser entitled to the protections of 11 USC § 363(m). The declaration will be filed by Seller prior to the hearing to approve the sale.

   c. Financial Information. The potential bidder shall provide Trustee verified financial information evidencing the potential bidder's ability to consummate the Bidder APA, including the source of funding for the purchase price. Financial information must identify the actual potential bidder and owners and ultimate parent company of the potential bidder.

---

[4] Any Qualified Overbid must include an indemnification (the "**Indemnification**") of the Estate which shall cover <u>all</u> related risk and liability arising from the Lease and related litigation. Qualified Overbidder is purchasing litigation and shall step into Trustee's shoes to continue prosecution of all litigation.

51568413.1
Case: 23-10384   Doc# 425   Filed: 04/24/25   Entered: 04/24/25 10:49:25   Page 23 of 27

d. <u>Request for Information.</u> Each Qualified Bidder shall comply with all reasonable requests for additional information by Seller regarding such Qualified Bidder and its contemplated transaction. Seller may determine that the Qualified Bidder is not or is no longer a Qualified Bidder if Qualified Bidder fails to comply with Seller's requests for additional information.

e. <u>Commitment Deposit.</u> The potential bidder shall submit to Trustee a commitment deposit in the amount of **10% (ten percent)** of the overbid purchase amount ("**Commitment Deposit**"). The Commitment Deposit shall be made by cashiers' check or wire transfer of immediately available funds (wire instructions available upon request). If the potential bidder is not qualified by Trustee as a Qualified Bidder (defined below) or is not the successful bidder or designated as a back-up bidder (if any), its Commitment Deposit will be returned.

f. <u>Delivery.</u> All of the foregoing items (including, without limitation, the Commitment Deposit) must be delivered no later than **May 29, 2025, at 5:00 p.m.**, to Onyx Asset Advisors, LLC, at 50 California Street, Suite 1500, San Francisco, CA 94111, or via email kotus@thinkonyx.com; with copies sent to mbostick@fennemorelaw.com.

**PLEASE TAKE FURTHER NOTICE** that upon submission of the Qualification Requirements, Trustee may, in his sole discretion, determine and designate the potential bidder as a qualified bidder ("**Qualified Bidder**") and the overbid as a qualified overbid ("**Qualified Overbid**"). Trustee in his sole discretion, may qualify bidders at any time before the end of the Auction.

**PLEASE TAKE FURTHER NOTICE** that if a timely Qualified Overbid is received, an auction (the "**Auction**") shall take place on **June 3, 2025, at 1:00 p.m. PT** at or during the hearing on approval of the Agreement, and may, in in the sole discretion of the Trustee or the Court, be continued from time to time until completed. Auction participants may appear via Zoom (instructions to be provided upon qualification). All Qualified Bidders shall be notified of any other Qualified Bidder, and shall be provided a copy of each Qualified Overbid as soon as practicable.

**PLEASE TAKE FURTHER NOTICE** that the following auction procedures shall apply:

g. <u>Valuation of Kelham Parties' Bid</u>: To facilitate the overbid process, Trustee has determined that the value of the Kelham Parties' bid is $1,200,000.00, comprised of $400,000.00 cash and $800,000.00 in non-cash consideration. Therefore, if there is an overbid at $1,300,000.00 cash plus Indemnification, and the minimum overbid increment is $25,000.00, the Kelham Parties' next bid would be $1,325,000.00 ($425,000 cash plus other consideration in the amount of $800,000.00). In turn, the next bid from the Qualified Overbidder would be $1,350,000.00 cash plus Indemnification. This example assumes that no other non-cash consideration is provided by the Qualified Overbidder. To the extent that a Qualified Overbidder includes non-cash consideration in its bid, Trustee may in his sole discretion value the non-cash consideration for purposes of the Auction bidding.

h. <u>Opening Bid and other Auction Procedures.</u> After review of all Qualified Bidder submissions, Trustee, in his sole discretion, may determine the opening bid (or bids, if Trustee elects to sell lots separately), may set minimum bid increments for any subsequent bid(s) (anticipated $25,000.00 increments), and may establish any other procedures (including adjusting minimum bid increments) he deems necessary to facilitate the Auction. At least twenty-four hours prior to the start of the Sale Auction, Trustee shall provide a copy of the opening bid (or bids, if Trustee elects to sell lots separately) to all participating Qualified Bidders attending the Auction. Either the Trustee or his representatives, or the Bankruptcy Court, shall direct and preside over the Auction.

i. <u>Authority to Bid.</u> All representatives of Qualified Bidders who submit any bid at the Auction represent that he/she has authority to bid and that the bid he/she submits is binding on the Qualified Bidder.

3

j. <u>Overbids</u>. Each subsequent round of bidding (following the opening bid) must comply with the Qualification Requirements and minimum bid increments set by Trustee until the Trustee or the Court elects to close bidding once the highest and best bid(s) for the Sale Assets has been reached.

k. <u>Determination of Winning Bid(s).</u> Trustee or the Court shall determine the highest and best bid(s) at Auction (the "**Winning Bid(s)**"). Sale Assets may be sold in separate lots. All bidding will be concluded at the Auction (which may be continued from time to time) and there will be no further bidding subsequent to the closure of the Auction. At the conclusion of the Auction, the Commitment Deposit of the Winning Bid shall be nonrefundable.

l. <u>Back-Up Bid.</u> At the conclusion of the Auction, Trustee may designate a back-up bid(s) from those bids at Auction that Qualified Bidders have designated as available for back-up bid(s) selection (the "**Back-Up Bid(s)**"). At the conclusion of the Auction, if a bidder is designated as a backup bidder ("**Backup Bidder**"), his/her/its Commitment Deposit shall not be refunded unless or until the sale closes with the Winning Bid.

m. <u>Discretion to Determine Opening and Winning Bid.</u> The Seller will take into account any factors he deems relevant to the value of the Qualified Bidder's bid to Seller when determining which bid constitutes the opening bid, and overbid or Winning Bid(s) including, among other things, the following: (A) the amount and nature of any consideration; (B) the proposed assumption of liabilities, if any; (C) the ability of the Qualified Bidder to consummate the proposed transaction; (D) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (E) any purchase price adjustments; (F) the impact of the contemplated transaction on any actual or potential litigation; (G) the net economic effect of the offer; (H) the net after-tax consideration to be received by Seller; (I) the net amounts to be paid to Seller; and (J) such other considerations as Seller deems relevant.

**PLEASE TAKE FURTHER NOTICE** that Trustee's acceptance of the Winning Bid(s) at Auction is subject to Bankruptcy Court approval. Seller and the winning bidder(s) shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an Order approving the sale. The hearing on the Trustee's motion to approve the Sale will occur on the same day as the Auction (i.e., **June 3, 2025, at 1:00 p.m.**).

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and supporting declarations, filed concurrently herewith may be obtained from the Clerk of the Bankruptcy Court, off Pacer, or upon request from the undersigned

DATED: April 24, 2025

*/s/ Lisa Lenherr*

Mark S. Bostick (Bar No. 111241)
Lisa Lenherr (Bar No. 258091)
**FENNEMORE LLP**
1111 Broadway, 24th Floor
Oakland, California 94607-4036
Telephone: (510) 834-6600
Email: mbostick@fennemorelaw.com
Email: llenherr@fennemorelaw.com
Attorneys for Michael G. Kasolas, Trustee

## EXHIBIT 1
## BIDDER APA

This Bidder APA is submitted pursuant to the overbid procedures described in the Notice of Opportunity to Overbid, Auction Sale, and Hearing on Motion to Approve Sale, filed on April 24, 2025 (the "**Notice**"), in the *Kelham Vineyard & Winery, LLC* bankruptcy case pending in the U.S. Bankruptcy Court, Northern District of California, as Case No. 23-10384. The undersigned hereby submits an overbid as follows:

1. **Purchaser Name:**_____

2. **Purchase Address**:_____

3. **Purchaser Phone**:_____

4. **Purchaser Email**:_____

5. **Purchaser attorney information (if any)**:_____

6. **Purchase Price**: $_____

7. **Non-Cash Consideration**[5]: [describe in detail]_____
   _____

8. **Indemnification of the Estate**: Purchaser agrees to indemnify and hold harmless the Estate for <u>all</u> risk and liability arising from the Lease[6] and related litigation, including, but not limited to, any administrative rent determined to be owed and any potential attorneys' fees awards reaching back to the Petition Date (or otherwise for which the Estate is found to be liable) (the "**Indemnification**"). Purchaser understands that it is purchasing litigation and shall step into Trustee's shoes to continue prosecution of all purchased litigation. **Such Indemnification must be supported by verified information showing that Purchaser is likely to perform on such Indemnification obligation to the satisfaction of Trustee and an amount up to $500,000.00 must be secured by a letter of credit or other acceptable accommodation. Describe verifiable information (and attach documentation) and proposed security for Indemnification**:_____
   _____

9. **Commitment Deposit**: $_____

10. **Assets to be purchased:** all Sale Assets[7] as described in the Notice. [If not purchasing all Sale Assets, please describe]_____

11. **Payment/Closing terms**. The balance of the Purchase Price shall be paid within five (5) days of entry of the Order approving the sale. Upon receipt of the total Purchase Price ("**Closing**"), the Parties will cooperate in good faith regarding delivery of the Sale Assets except that Trustee shall have no delivery obligation with respect to any transferrable

---

[5] Pursuant to the Notice describing the overbid procedures, Trustee has sole discretion to determine the value of non-cash consideration for purposes of the Auction.

[6] Undefined capitalized terms shall have the meaning ascribed to them in the Agreement filed as Exhibit 1 to the Declaration of Michael G. Kasolas (filed on April 24, 2025).

[7] I understand and agree that the assets listed for sale <u>do not</u> include: Chapter 5 claims; claims against Terra Valentine; that certain trademark (the "**Trademark**") identified as US Serial Number 78510891, and U.S. Registration Number 3032163 (together with the Trademark, collectively the "**Trademark Rights**"), registered on December 20, 2005; and any property already sold or abandoned.

permit or license that requires an independent escrow, including, but not limited to, any California Department of Alcoholic Beverage Control (ABC) or Alcohol and Tobacco Tax and Trade Bureau (TTB) license or permit.

12. This offer is all cash and without contingencies.

13. This offer is irrevocable until entry of an order approving the sale following conclusion of the Auction and, if determined to be the winning bid, shall be final and irrevocable

14. Bidder expressly consents to bid procedures described in the Notice and the jurisdiction of the Bankruptcy Court and waives any right to a jury trial in connection with any disputes relating to the Auction or the consummation of the Bidder APA.

15. [**OPTIONAL** Bidder requests a finding that it is a "good faith" purchaser within the meaning of 11 U.S.C. § 363(m) and will provide Trustee a competent declaration of such Bidder's representative confirming facts supporting a finding by the Court that such bidder would be a good faith purchaser entitled to the protections of 11 USC § 363(m).]

16. Other terms: _____

I UNDERSTAND THAT THE SALE ASSETS ARE BEING SOLD BY THE CHAPTER 11 TRUSTEE ("SELLER") FOR THE BANKRUPTCY CASE IN ITS AS-IS CONDITION, ON A "WHERE IS" BASIS AND "WITH ALL FAULTS," AND SUCH SALE IS WITHOUT RECOURSE, REPRESENTATION, OR WARRANTY OF ANY KIND BY SELLER, WHETHER EXPRESS, IMPLIED OR IMPOSED BY LAW, WHICH RECOURSE, REPRESENTATIONS, AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED BY BUYER. BUYER ACKNOWLEDGES THAT IT IS FULLY RELYING ON ITS OWN (OR IT REPRESENTATIVES') INSPECTIONS, EXAMINATIONS AND EVALUATIONS OF THE SALE ASSETS AND NOT UPON ANY STATEMENTS (ORAL OR WRITTEN) THAT MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) BY SELLER OR ANY OF THEIR RESPECTIVE REPRESENTATIVES, AGENTS OR ATTORNEYS. WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES AGREE THAT SELLER HAS NOT MADE ANY, AND EXPRESSLY AND SPECIFICALLY DISCLAIMS ANY AND ALL, REPRESENTATIONS, GUARANTIES OR WARRANTIES, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW OR RELATING TO THE SALE ASSETS, INCLUDING, WITHOUT LIMITATION, OF OR RELATING TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

I UNDERSTAND THAT APPROVAL OF THE SALE IS SUBJECT TO BANKRUPTCY COURT APPROVAL.

BY EXECUTING THIS BIDDER APA THE UNDERSIGNED AGREE TO BE BOUND BY THE OVERBID PROCEDURES DESCRIBED IN THE NOTICE.

Purchaser(s):

By:_____     By:_____

Name:_____     Name:_____

Date:_____     Date:_____